ACCEPTED
03-15-00007-CV
4825837
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/9/2015 12:57:03 PM
JEFFREY D. KYLE
CLERK

**NO. 03-15-00007-CV**
_____

*IN THE THIRD COURT OF APPEALS*
*AUSTIN, TEXAS*

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/9/2015 12:57:03 PM
JEFFREY D. KYLE
Clerk

**JOHN DOE**
*Appellant*

**V.**

**BOARD OF DIRECTORS OF THE STATE BAR OF TEXAS,
COMMISSION FOR LAWYER DISCIPLINE; AND LINDA ACEVEDO, IN
HER OFFICIAL CAPACITY AS THE CHIEF DISCIPLINARY COUNSEL
OF THE STATE BAR OF TEXAS**
*Appellees*

_____

On Appeal from the 126th Judicial District Court of Travis County, Texas
Cause No. D-1-GN-14-001635

_____

**APPELLANT'S BRIEF**

_____

**WEST, WEBB, ALLBRITTON & GENTRY,
P.C.**
1515 Emerald Plaza
College Station, Texas 77845
Telephone ~ (979) 694-7000
Facsimile ~ (979) 694-8000

GAINES WEST
State Bar No. 21197500
gaines.west@westwebblaw.com

JENNIFER D. JASPER
State Bar No. 24027026
jennifer.jasper@westwebblaw.com

ROB GEORGE
State Bar No. 24067623
rob.george@westwebblaw.com

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

1.    **Appellee (Plaintiff below):**

John Doe

**Counsel for Appellant:**

GAINES WEST
State Bar No. 21197500
gaines.west@westwebblaw.com

JENNIFER D. JASPER
State Bar No. 24027026
jennifer.jasper@westwebblaw.com

ROB GEORGE
State Bar No. 24067623
rob.george@westwebblaw.com

WEST, WEBB, ALLBRITTON, & GENTRY, P.C.
1515 Emerald Plaza
College Station, Texas 77845
(979)694-7000 – Telephone
(979)694-8000 – Facsimile
*Appellate and Trial Court Counsel*


2.    **Appellees (Defendant below):**

Board of Directors of the State Bar of Texas, Commission For Lawyer
Discipline; and Linda Acevedo, in her official capacity as the Chief
Disciplinary Counsel of the State Bar of Texas

**Counsel for Appellant:**

PAUL HOMBURG, III
Disciplinary Counsel
State Bar No. 09934050
phomburg@texasbar.com
Office of the Chief Disciplinary Counsel
State Bar of Texas

711 Navarro, Suite 750
San Antonio, Texas 78205
(210) 208-6600 – Telephone
(210) 208-6625 – Facsimile
*Trial Court Counsel*


Rebecca Stevens
Disciplinary Counsel
State Bar No. 24065381
bstevens@texasbar.com

Office of the Chief Disciplinary Counsel
State Bar of Texas
P. O. Box 12487
Austin, Texas 78711-2487
(512) 427-1350 – Telephone
(512) 2427-4167 – Facsimile
*Trial Court Counsel*

# TABLE OF CONTENTS

Identities of Parties and Counsel................................................................. ii

Index of Authorities ...............................................................................v

Issues Presented .................................................................................vi

Statement of Facts..............................................................................2

Summary of Argument .........................................................................4

Arguments and Authorities ....................................................................5

    A. Standard of Review..................................................................5

    B. The State Bar Defendants do not enjoy sovereign immunity
       from the lawsuit .....................................................................5

    C. Doe has standing to bring this suit, which is not moot ............................8

       1. Injury ..........................................................................8

       2. Mootness......................................................................9

    D. This case does not seek to enjoin a grievance proceeding .....................11

Conclusion .....................................................................................13

Prayer ..........................................................................................13

Certificate of Compliance ....................................................................14

Certificate of Service ..........................................................................14

# INDEX OF AUTHORITIES

## <u>CASES</u>

*Estate of Terrell v. Sisk*,
  111 S.W.3d 274 (Tex. App.—Texarkana 2003, no pet.)......................................6

*Favaloro v. Commission for Lawyer Discipline*,
  13 S.W.3d 831 (Tex. App.—Dallas 2000, no pet.). .............................................12

*In re Doe*,
  19 S.W.3d 249, 253 (Tex. 2000) .........................................................................5

*Save Our Springs Alliance, Inc. v. City of Dripping Springs*,
  304 S.W.3d 871 (Tex. App.—Austin 2010, pet. denied). .....................................8

*State v. Holland,*
  221 S.W.3d  639 (Tex. 2007). .............................................................................5

*Sheth v. Dearen,*
  225 S.W.3d 828 (Tex. App.—Houston [14th Dist.] 2007, no pet.) ......................5

*State Bar of Texas v. Gomez,*
  891 S.W2d 243 (Tex. 1994). ...................................................................... 11, 12

*Tex. Dep't of Pub. Safety v. Salazar*,
  304 S.W.3d 896 (Tex. App.—Austin 2009, no pet.)........................................8, 9

*Tex. Dep't of Transp. v. Sefzik*,
  355 S.W.3d 618 (Tex. 2011). ..................................................................... 4, 7, 8

*Univ. Scholastic League v. Buchanan*,
  848 S.W.2d 298 (Tex. App.—Austin 1993, no writ). ..........................................10

*Valley Baptist Med. Ctr. v. Stradley*,
   210 S.W.3d 770 (Tex. App.—Corpus Christi 2006, no pet.). ................................5

## RULES AND CODES

TEX. R. DISC. P. 2.10 ....................................................................................9

TEX. R. DISC. P. 2.16 ...................................................................... 2, 3, 7, 10, 12

TEX. R. DISC. P. 15.09. .............................................................. 4, 5, 6, 7

TEX. DISCIPLINARY R. PROFF'L CONDUCT Preamble ...................................................1

## OTHER

MERRIAM-WEBSTER ONLINE DICTIONARY .................................................................6

# ISSUES PRESENTED

This appeal presents the following issues:

- **Whether the trial court erred in dismissing Plaintiff's claims for lack of jurisdiction, based on sovereign immunity.**

- **Whether the trial court erred in dismissing Plaintiff's claims for lack of jurisdiction, based on a lack of standing or mootness.**

- **Whether the trial court erred in dismissing Plaintiff's claims for lack of jurisdiction over Plaintiff's request related to the Texas Rules of Disciplinary Procedure**

TO THE HONORABLE THIRD COURT OF APPEALS:

The Preamble to the Texas Disciplinary Rules of Professional Conduct states:

> The Legal profession has taken a responsibility to assure that its regulation is undertaken in the public interest rather than in furtherance of parochial or self-interested concerns of the bar, and to insist that every lawyer both comply with its minimum disciplinary standards and aid in securing their observance by other lawyers. Neglect of these responsibilities compromises the independence of the profession and the public interest which it serves.

TEX. DISCIPLINARY R. PROFF'L CONDUCT Preamble, *reprinted in* TEX. GOV'T CODE ANN., title 2, subtit. G, app. A. (Vernon 2013).

To support this goal of assuring that self-regulation is undertaken "in the public interest" (rather than in self-interest), the system must always strive to be *transparent*. Yet, that is exactly the opposite of what the State Bar Defendants seek in this case. They have insisted that the very rules put into place to implement self-regulation "in the public interest" actually prohibit a complaining member of the public from learning why his grievance against a Texas attorney was summarily dismissed with no explanation. There are no rules or laws, however, which prohibit the complaining party himself, from learning about his own grievance and why it was dismissed.

# STATEMENT OF FACTS

The procedural facts of this case are not in dispute. John Doe filed a sixteen-page grievance against a Texas-licensed attorney. The Chief Disciplinary Counsel ("CDC") sent its recommendation regarding the grievance *ex parte* to the Summary Disposition Panel ("SDP"). The CDC then informed Complainant that his grievance had been dismissed.

When Doe requested the CDC's recommendation to the SDP (to understand why the CDC believed the allegations in his complaint did not surpass the low-threshold of "just cause"), the CDC claimed that such a disclosure would violate Texas Rules of Disciplinary Procedure 2.16, which generally makes the grievance process confidential. Thus, the CDC has interpreted 2.16 as making the grievance process confidential, *from the complainant himself*.

This misinterpretation of 2.16 provided the basis for Doe's declaratory judgment action, filed on May 30, 2014, against the State Bar of Texas, Commission for Lawyer Discipline, the State Bar of Texas, and Linda Acevedo in her Official Capacity as the Chief Disciplinary Counsel of the State Bar of Texas (collectively, "The State Bar Defendants"). C.R. 4-20.[1] In his declaratory judgment action below, Doe sought to have the trial court declare that Texas Rules

---

[1] Appellant will cite to the Clerk's Record as "CR [Page No.]" and to the Reporter's Record as "RR [Page No.]/[Line No.]."

of Disciplinary Procedure 2.16 does <u>not</u> apply to complainants, and the CDC cannot hide its recommendation to the SDP from the Complainant (Appellant).[2] C.R. 8 at ¶ 22. Doe also requested a declaration that Defendant Linda Acevedo, in her official capacity as the Chief Disciplinary Counsel of the CFLD, by and through her employee agents, acted without legal authority in denying Doe a copy of the CDC's recommendation to the SDP on Doe's grievance, and that as a result, he is entitled to receive a copy of the recommendation. C.R. 9 at ¶ 23.

To avoid such a declaration, the State Bar Defendants filed a Motion to Dismiss, which raised 5 separate arguments, and requested dismissal of the suit. C.R. 21-29. On July 23, 2014, a hearing on the Motion to Dismiss was held before the Honorable Scott Jenkins. R.R. 1-40.

On October 8, 2014, an Order granting dismissal was signed. C.R. 88. However, the parties were not notified that the Order was granted, and did not discover the Order until December 5, 2014. Doe then filed an Unopposed Motion to Establish Notice of Judgment under Texas Rules of Civil Procedure 306a (C.R. 89-106), which the trial court signed on January 6, 2015 (C.R. 107), thus

---

[2] Along with his original declaratory judgment petition, Appellant filed below a Motion to Seal Records, out of an abundance of caution, to maintain the confidentiality of the entire grievance proceeding. Oddly, the State Bar Defendants <u>opposed</u> the Motion to Seal, a position contrary to their underlying confidentiality arguments. Despite this opposition, the Trial Court granted the Motion to Seal (CR 31-32) ordering eleven separate documents sealed, including the original 16-page grievance. Thus, while not included in the Clerk's Record, those sealed records are available to this appellate court.

establishing that Doe first had notice of the October 8, 2014 Order on December 5, 2014, and appellate deadlines would run from December 5, 2014. While the Motion to Establish Notice of Judgment was pending, out of an abundance of caution, Doe filed his Notice of Appeal on December 31, 2014. Pursuant to the signed Order granting the Motion to Establish Notice, Doe's notice of appeal was timely filed.

## SUMMARY OF ARGUMENT

The trial court had jurisdiction over Does's claims because the State Bar Defendants were not immune from suit under Texas Rules of Disciplinary Procedure 15.09 or under *Sefzik*. Furthermore, the trial court had jurisdiction because Does's claims are justiciable, and because Does's lawsuit does not seek to enjoin the grievance process.

## ARGUMENTS AND AUTHORITIES

A.  **Standard of Review**

The Motion to Dismiss is properly characterized as a motion to dismiss for want of jurisdiction. RR 6 at 9-10. Under Texas caselaw, the proper standard of review is dictated by the substance of the issue to be reviewed as opposed to the procedural vehicle through which that issue is developed. *See Sheth v. Dearen*, 225 S.W.3d 828, 831 n. 2 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000); *Valley Baptist Med. Ctr. v. Stradley*, 210 S.W.3d 770, 773 (Tex. App.—Corpus Christi 2006, no pet.)). Each argument Appellees raised below as a basis for dismissal implicates jurisdiction. Thus, the standard of review is de novo. *See State v. Holland,* 221 S.W.3d 639, 642 (Tex. 2007).

B.  **The State Bar Defendants do not enjoy sovereign immunity from this lawsuit.**

The Motion to Dismiss argues that the trial court lacked jurisdiction because Texas Rules of Disciplinary Procedure 15.09 provides the State Bar Defendants with complete immunity. C.R. 24 ¶6. But 15.09 applies to *individuals*, not entities, and thus the trial court should have rejected this argument. TEX. R. DISC. P. 15.09, *reprinted in* TEX. GOV'T CODE ANN., title 2, subtit. G, app. A-1 (Vernon 2013).

Texas Rules of Disciplinary Procedure 15.09 states, in relevant part, that all "*members* of the Commission, the Chief Disciplinary Counsel . . . all *members* of Committees, all *members* of the Board of Disciplinary Appeals . . . are immune from suit for any conduct in the course of *their* official duties. *Id.* (emphases added). "Member" means "one of the individuals composing a group." MERRIAM-WEBSTER ONLINE DICTIONARY, Definition 2, *available at* www.merriam-webster.com/dictionary/member (last visited July 17, 2014). The use of the term "their" also confirms that 15.09 applies to individuals, not entities. Thus, by its own terms, Rule 15.09 applies only to suits against individuals.

In the case at bar, Doe named as Defendants the Board of Directors of the State Bar and the Commission for Lawyer Discipline, neither of which is an individual (or "member"), as contemplated by Rule 15.09. *See* C.R. 79; TEX. R. DISC. P. 15.09. Doe also named the Chief Disciplinary Counsel in her official capacity, but a suit against her in her official capacity is not a suit against her as an individual. *See, e.g.*, *Estate of Terrell v. Sisk*, 111 S.W.3d 274, 282 (Tex. App.—Texarkana 2003, no pet.) (noting that an official-capacity suit against a governmental employee is not a suit against the employee but against his employer). Accordingly, none of the named Defendants are "members," or

*individuals*, as Rule 15.09 contemplates; therefore, Rule 15.09 does not apply, and the trial court should have rejected this argument.[3]

At the hearing on the Motion to Dismiss (for the first time), the State Bar Defendants asserted that they were entitled to sovereign immunity as state agencies, citing *Sefzik*. *See* RR 15/20 (citing *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618 (Tex. 2011). According to the State Bar Defendants, *Sefzik* confirmed that the declaratory judgment act does not waive immunity, *i.e.* there must be a legislatively-provided waiver for the claims at issue. *See id.* This general statement of *Sefzik's* holding is correct. However, *Sefzik* also made clear that declaratory judgment actions may be brought against the state or its officers in two instances: (1) in actions against the state, and its agencies, which challenge the validity of a statute; and (2) in *ultra vires* claims against a state officer. *Id.* at 621–22.

Doe's pleadings comply with *Sefzik's* directives. In the present case, Doe prayed for (1) an interpretation that Rule 2.16 does not bar Doe from receiving a copy of the CDC's recommendation to the SDP, and (2) a declaration that Defendant Acevedo, in her official capacity as the Chief Disciplinary Counsel, acted *ultra vires* in denying Doe's request for a copy of the CDC's

---

[3] Even if the Chief Disciplinary Counsel, who was sued in her official capacity, is considered an *individual* to whom TRDP may apply, Complainant alleged that she acted *ultra vires*—without authority—which means she could not have been acting "in the course of [her] official duties" as required for Rule 15.09 to apply. *See* TEX. R. DISCIPLINARY. P 15.09; *see, e.g.*, C.R. 82 ¶18.

recommendation to the SDP.  CR 83.  Because both requests are allowed by *Sefzik*, the trial court should have disregarded the State Bar Defendants' argument.  *See id.*

## C. <u>Doe has standing to bring this suit, which is not moot.</u>

In their Motion to Dismiss, the State Bar Defendants asserted that (1) Doe failed to plead an injury-in-fact; and (2) the issues are moot.  Both points are incorrect.  Because Doe properly alleged his specific and legally cognizable interest affected by the State Bar Defendants' actions, and because those actions will be repeated time and again without being reviewed, the issues are justiciable, and the trial court has jurisdiction to decide them.

### 1. Injury

The State Bar Defendants argue that Doe alleged "no actual harm from any act of any of the Defendants."  C.R. 25 ¶8.  In a declaratory judgment action, to establish standing, a plaintiff must show actual or imminent harm to his own particular interests.  *See Tex. Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 906 (Tex. App.—Austin 2009, no pet.) (citing *Save Our Springs Alliance, Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 882 (Tex. App.—Austin 2010, pet. denied)).

In his Second Amended Petition, Doe states that the State Bar Defendants' unauthorized action—denying his request for a copy of the CDC's *ex parte*

recommendation to the SDP—prevents him from reviewing the CDC's finding of "no just cause." C.R. 82 ¶18. Thus, Doe cannot evaluate how his grievance failed, in Defendants' estimation, to satisfy the very low "just cause" standard. *Id.* Further, the "TRDP authorizes Plaintiff to file another grievance in this matter, but the CDC's unauthorized decision to hide its *ex parte* recommendation to the SDP renders futile any effort to correct Plaintiff's grievance in a new filing."[4] *Id.*; *see* TEX. R. DISC. P. 2.10. Thus, Doe's interest in filing a new grievance is actually harmed by the State Bar Defendants' unauthorized actions relating to their *ex parte* recommendation. *See Salazar*, 304 S.W.3d at 906 (citation omitted).

### 2. Mootness

The Motion to Dismiss asserts that there is no live controversy because once the SDP dismissed Doe's grievance, the process ended and cannot be revisited. C.R. 25-26 ¶9. But because this case meets the "public interest" exception to the mootness doctrine—the questions involved in this case are of considerable public importance, are capable of arising again between the same parties or other

---

[4] To the extent the State Bar Defendants argue that Doe cannot assert a new grievance against this attorney, and thus there is no need for Doe to review the *ex parte* recommendation, this argument fails under the language of TRDP 2.10. TRDP 2.10 does not limit the number of grievances a complainant may file, so long as the grievance is classified as a "complaint." TRDP 2.10. The limitations of TRDP 2.10 apply only when the CDC classifies grievances as "inquiries," and then circumscribe the number of attempts a complainant may make to have his grievance classified as a complaint and not an inquiry. *Id.* TRDP 2.10's restrictions simply do not apply once the CDC classifies a grievance as a "complaint." *Id.*

members of the public, and will continue to evade judicial review—this case is not moot. *See Univ. Scholastic League v. Buchanan*, 848 S.W.2d 298, 304 (Tex. App.—Austin 1993, no writ).

Specifically, under the State Bar Defendants' interpretation of Texas Rules of Disciplinary Procedure 2.16, a person complaining of attorney conduct— normally a member of the public—will *never* have access to the CDC's *ex parte* recommendation to the SDP. Thus, the question in this case will arise again and again, each time a grieving complaint's grievance is summarily dismissed with no explanation. Each time Defendants determine that the "just cause" standard has not been met (in any grievance proceeding against any attorney), Defendants will again refuse to provide a copy of their *ex parte* recommendation *to the complaining party* (who began the whole complaint process).

Moreover, following this pattern ensures that Defendants' "no just cause" determination is never scrutinized, and the complaining member of the public never knows why his grievance against the attorney did not meet that low standard.

In addition, whether the State Bar Defendants are permitted to hide their *ex parte* recommendation to the decision-maker from the complaining member of the public—the very person who initiated the grievance process—is a question of considerable public importance. The State Bar Defendants will continue unjustifiably using Rule 2.16 to keep their *ex parte* recommendation from the

parties to a grievance proceeding and again, more importantly, keep their reasons to recommend dismissal from the very person making the complaint. Furthermore, as in this case, the SDP will continue to rule on the recommendations from the CDC before a court can intervene, thereby prohibiting review of the CDC's *ex parte* recommendation and "no just cause" finding. For those reasons, this case satisfies the "public interest exception" to the mootness doctrine, and the trial court had jurisdiction to hear the pending declaratory judgment action.

**D.** **This case does not seek to enjoin a grievance proceeding.**

The State Bar Defendants argue generally that trial courts cannot enjoin grievance proceedings, and claim this general proposition of law prevents this Court from hearing this Declaratory Judgment action. But because Doe does not seek (and has never sought) to enjoin any grievance proceeding, this argument is misplaced.

Defendants rely on *State Bar of Texas v. Gomez*, in which the plaintiffs asked a state district court to create a mandatory duty for attorneys to undertake *pro bono* representations. 891 S.W2d 243, 246 (Tex. 1994). The supreme court narrowly held that creating duties for attorneys is the sole province of the supreme court, and any attempt by a lower court to so regulate the legal profession is an impermissible usurpation of the supreme court's authority. *Id.* In other words, a trial court cannot "promulgat[e] policies and regulations governing Texas

lawyers." *Id.* For that reason, in *Gomez*, the district court could not grant the relief requested by the plaintiff—an injunction creating a mandatory pro bono program. *Id.* Thus, because the district court could not grant the relief request, the case before it was not justiciable, and that court lacked jurisdiction. *Id.*

*Gomez* is inapposite to this case. Doe is <u>not</u> asking the trial court to create a new rule, institute a new program, insert a new requirement, or promulgate a new policy or regulation. All the trial court is asked to do is declare that disclosure to a complainant is not prohibited by Rule 2.16.

The State Bar Defendants also cite *Favaloro v. Commission for Lawyer Discipline*, in which the plaintiff sought a court order enjoining the State Bar of Texas, the grievance committee, and others from enforcing the grievance rules against him. 13 S.W.3d 831, 836–37 (Tex. App.—Dallas 2000, no pet.). The Dallas Court of Appeals rejected the plaintiff's argument, holding that a district court does not have jurisdiction to enjoin the "grievance procedures authorized by the State Bar Act." *Id.* (citations omitted).

*Favaloro* is likewise inapposite to this case. In this case, Doe is merely asking the Court to declare rights under a rule of disciplinary procedure. Unlike the plaintiff in *Favaloro*, Doe is not seeking an order from the Court halting or forbidding the State Bar Defendants from enforcing the disciplinary rules against him.

Defendants cite *no* cases which have held that a district court may not interpret a rule of disciplinary procedure, and the trial court is well-within its power to make such a declaration.

## CONCLUSION

The trial erred when it dismissed Doe's claims for lack of jurisdiction, and this Court should reverse and remand to the trial court for further proceedings.

## PRAYER

Appellant John Doe prays that this Court reverse the trial court's dismissal and remand this case for further proceedings.

Respectfully submitted,

**WEST, WEBB, ALLBRITTON & GENTRY, P.C.**
1515 Emerald Plaza
College Station, Texas 77845-1515
Telephone: (979) 694-7000
Facsimile: (979) 694-8000

By: /s/ Gaines West
    GAINES WEST
    State Bar No. 21197500
    gaines.west@westwebblaw.com

    JENNIFER D. JASPER
    State Bar No. 24027026
    jennifer.jasper@westwebblaw.com

    ROB GEORGE
    State Bar No. 24067623
    rob.george@westwebblaw.com

## CERTIFICATE OF COMPLIANCE

I certify that this **BRIEF OF APPELLANTS** complies with the typeface and word-count requirement set forth in the Rules of Appellate Procedure. This motion has been prepared, using Microsoft Word, in 14-point Times New Roman font for the text and 12-point Times New Roman font for any footnotes. This motion contains 2,862 words, as determined by the word count feature of the word processing program used to prepare this document, excluding those portions of the notice exempted by TEX. R. APP. P. 9.4(i)(1).

/s Gaines West
Gaines West

## CERTIFICATE OF SERVICE

On April 9, 2015, the undersigned certifies that he served a copy of this Brief of Appellee on the following in the manner listed below, in compliance with Texas Rules of Appellate Procedure 9.5 and 25.1(e):

PAUL HOMBURG, III
Disciplinary Counsel
Office of the Chief Disciplinary Counsel
State Bar of Texas
711 Navarro, Suite 750
San Antonio, Texas 78205

Via email: phomburg@texasbar.com
and Certified Mail, RRR

Rebecca Stevens
Disciplinary Counsel
Office of the Chief Disciplinary Counsel
State Bar of Texas
P. O. Box 12487
Austin, Texas 78711-2487

Via email: bstevens@texasbar.com
and Certified Mail, RRR

/s Gaines West
Gaines West

# HYPERLINKED

# CASE LAW

111 S.W.3d 274
Court of Appeals of Texas,
Texarkana.

Odell TERRELL, on Behalf of the ESTATE
OF J.R. TERRELL, Jr., and on Behalf of
the Estate of Virginia Terrell, David Elkins,
and Jimmy Wayne Terrell, Appellants,

v.

Robert M. SISK and Rains County, Texas, Appellees.

No. 06–02–00174–CV. | Submitted
June 19, 2003. | Decided July 16, 2003.

Survivors of motorists killed in collision with county employee brought action against county and county judge alleging failure to supervise, failure to train, failure to control, negligent implementation of policy, and negligent hiring. The 402nd Judicial District Court, Wood County, G. Timothy Boswell, J., dismissed for lack of subject matter jurisdiction. Survivors appealed. The Court of Appeals, Ross, J., held that: (1) county employee driving her own car to doctor's appointment was not acting within scope of her employment; (2) joint enterprise did not exist between employee, judge, and county; (3) judge did not act in bad faith by failing to request drug test of employee; and (4) official immunity barred negligence claims against judge.

Affirmed.

### Attorneys and Law Firms

**\*276** Christopher A. Kalis, Law Offices of Christopher A. Kalis, Dallas, for appellants.

Robert T. Bass, Allison, Bass & Associates, LLP, Austin, for appellees.

Before MORRISS, C.J., ROSS and CARTER, JJ.

### OPINION

Opinion by Justice ROSS.

Odell Terrell, on behalf of the estates of J.R. Terrell, Jr., and Virginia Terrell, David Elkins, and Jimmy Wayne Terrell (the Terrell family) [1] appeal from an order granting a plea to the

jurisdiction filed by Rains County and Robert M. Sisk, the county judge of Rains County, and dismissing the Terrell family's lawsuit. We affirm.

The lawsuit stemmed from an automobile accident resulting in serious personal injuries to, and ultimately the deaths of, J.R. Terrell, Jr., and his wife, Virginia. The accident was caused by June Goble, Judge Sisk's secretary, while on her way to a doctor's appointment. The Terrell family alleged that Goble was in a drug-induced stupor, that Judge Sisk knew she had been misusing prescription drugs but made no effort to control the situation through her employment, and that her medical visit on the date of the accident was "in furtherance of County business." The lawsuit was filed against Rains County and Judge Sisk. [2] The County and Judge Sisk raised sovereign immunity and official immunity as defenses.

In the sole issue presented for review, the Terrell family challenges the trial court's order granting the plea to the jurisdiction. The Terrell family has presented a number of arguments in an effort to support that contention. We will address those as necessary, but recognize that the main thrust of their contentions is that, as to the County and Judge Sisk, sovereign immunity has been waived by the Texas Tort Claims Act. [3] They contend there is a cause of action for failure to supervise, for failure to train, for failure to control, for negligent implementation of policy, negligent hiring (or retention), and that "joint enterprise" applies.

 **[1]** As to the claims against Rains County, the only question is whether sovereign immunity has been waived. If not, then no claim against the County can prevail. Under the doctrine of sovereign immunity, a governmental unit is not liable for the torts of its officers or agents in the absence of a constitutional or statutory provision creating such liability. *Dallas County Mental Health & Mental Retardation v. Bossley,* 968 S.W.2d 339, 341 (Tex.1998). In the absence of the state's consent to suit, a trial court lacks subject matter jurisdiction and must dismiss. The Tort Claims Act creates that limited waiver of sovereign immunity. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 101.021 (Vernon 1997).

As a governmental unit, Rains County is immune from both suit and liability unless the Tort Claims Act has waived that immunity. **\*277** Section 101.021 of the Tort Claims Act has been interpreted as waiving sovereign immunity in three general areas: "use of publicly owned automobiles, premises defects, and injuries arising out of conditions or use of property." *Tex. Dep't of Transp. v. Able,* 35 S.W.3d

608, 611 (Tex.2000), *quoting Lowe v. Tex. Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976). Pursuant to Section 101.021, a governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

TEX. CIV. PRAC. & REM.CODE ANN. § 101.021.

The lack of subject matter jurisdiction is properly raised by a plea to the jurisdiction. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999) (correcting a number of misunderstandings on that point). [4] The plaintiff has the burden to show that jurisdiction exists by alleging facts that affirmatively demonstrate that the trial court has subject matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993); *City of Midland v. Sullivan,* 33 S.W.3d 1, 6 (Tex.App.-El Paso 2000, pet. dism'd w.o.j.). In the context of suit against a governmental unit, the plaintiff must allege consent to suit either by reference to statute or express legislative permission. *Jones,* 8 S.W.3d at 638; *Sullivan,* 33 S.W.3d at 6.

In our analysis, the question of subject matter jurisdiction is a legal question which we review de novo. *Sullivan,* 33 S.W.3d at 6. We examine the pleadings, taking as true the facts pled, and we determine whether those allegations of fact support jurisdiction in the trial court. *Tex. Ass'n of Bus.,* 852 S.W.2d at 446. In so doing, we construe the pleadings in favor of the pleader. *Id.* If necessary, we may review the entire record to determine if there is jurisdiction. *Id.* If the petition does not allege jurisdictional facts, the plaintiff's suit is subject to dismissal only when it is impossible to amend the pleadings to confer jurisdiction. *See id.* In this case, special exceptions directed at this matter were raised, and the Terrell family had the opportunity to amend their pleadings.

The facts alleged by the Terrell family are that the damage was caused by the private vehicle of the driver (Judge Sisk's secretary) while that driver was on her way to a doctor's appointment. There is no allegation of an express waiver of immunity. Thus, in order to fall under the Tort Claims Act exception, the Terrell family must show that the use of the vehicle was part of the scope of the driver's employment by the County. "Scope of employment" is defined as "the performance for a governmental unit of the duties of an employee's office or employment **\*278** and includes being in or about the performance of a task lawfully assigned to an employee by competent authority." TEX. CIV. PRAC. & REM.CODE ANN. § 101.001(5) (Vernon Supp.2003).

There are no allegations in the Terrell family's pleadings that can reasonably be interpreted as showing that the driver was acting within the scope of her employment at the time of the accident. She was not traveling at the direction of her employer. There is nothing to suggest this trip to the doctor was any part of the performance of her duties as an employee; rather, the pleadings show conclusively it was a personal activity away from the workplace.

The Terrell family also alleged, however, that Goble's trip to the doctor was a part of her employment—and thus her use of her car was actionable under the vehicle exception to the Tort Claims Act. They argue that this theory applies because Judge Sisk had, on an earlier occasion, directed Goble to go home, and because he permitted her to leave on this occasion.

The underlying principle is that an employee is generally not in the course and scope of employment while driving his or her own vehicle to or from his or her place of employment. *Mata v. Andrews Transp., Inc.,* 900 S.W.2d 363, 366 (Tex.App.-Houston [14th Dist.] 1995, no writ). This rule is based on the premise that an injury occurring while traveling to or from work has nothing to do with the risks associated with a place of employment. *Smith v. Tex. Employers' Ins. Ass'n,* 129 Tex. 573, 105 S.W.2d 192, 193 (1937).

There is an exception to this rule that applies when an employee undertakes a special mission for his or her employer. *Direkly v. ARA Devcon, Inc.,* 866 S.W.2d 652, 654 (Tex.App.-Houston [1st Dist.] 1993, writ dism'd w.o.j.). A special mission is a specific errand that an employee undertakes at the specific request of the employer. *Wilie v. Signature Geophysical Servs., Inc.,* 65 S.W.3d 355, 359

Terrell ex rel. Estate of Terrell v. Sisk, 111 S.W.3d 274 (2003)

(Tex.App.-Houston [14th Dist.] 2001, pet. denied); *Upton v. Gensco, Inc.,* 962 S.W.2d 620, 621–22 (Tex.App.-Fort Worth 1997, pet. denied). However, the Terrell family's counsel has explicitly stated in a post-submission letter to this Court that the "special mission" concept does not apply to the facts of this case. We will therefore not further address that theory.

There is no allegation of fact to show that, on the occasion of this accident, the employee went to the doctor at the specific request of Judge Sisk. There is also no allegation of fact to support the Terrell family's theory that Rains County had a duty to keep Goble from leaving her workplace. There is nothing in the Terrell family's pleadings that can be read to support the application of the Tort Claims Act to allow them to pursue a cause of action against Rains County. The plea to the jurisdiction was therefore properly granted.

 **[2]**    The Terrell family also contends the County has waived its sovereign immunity because it was in a joint enterprise with Goble. They so contend because Judge Sisk allowed Goble to use her personal vehicle to occasionally run errands for the County and because the County's health insurance plan provided the drugs Goble was taking, and Judge Sisk allowed her to go to the doctor to obtain those drugs and did not attempt to stop her.

In *Able,* the Texas Supreme Court held that "a governmental unit that enters into a joint enterprise can be liable under the waiver of sovereign immunity found in the Tort Claims Act." *Able,* 35 S.W.3d at 610. In that case, the plaintiffs alleged a premises defect involving a state highway. *See id.* at 612. The plaintiffs also alleged that a joint enterprise existed between the Texas **\*279**  Department of Transportation (TxDOT) and the Houston Metropolitan Transit Authority (Metro) with respect to the highway. *See id.* at 610. As a party to a joint enterprise with Metro, the plaintiffs contended TxDOT was equally responsible for the premises defect. *See id.* at 613.

 **[3]**    A plaintiff must show four elements to prove the existence of a joint enterprise: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. *Id.*; *Tex. Dep't of Transp. v. City of Floresville Elec. Power & Light Sys.*, 53 S.W.3d 447, 456 (Tex.App.-San Antonio 2001, no pet.).

Arguably, there was an agreement, and a common purpose, between Goble and the County, as the Terrell family alleges. However, neither the "pecuniary interest" nor the "equal right to control" elements make any sense in the context of a benefit provided for an employee by an employer. There is no real pecuniary interest involved as a profit-making business arrangement between the parties. The County provided health insurance as a benefit. That was arguably a pecuniary benefit to Goble. The health benefits are provided by doctors, who presumably receive a pecuniary benefit from their use. In return, the County receives—not money—but a worker who is more satisfied with his or her employment and is thus more likely to remain employed by the County.

Further, the mere fact that an employee has the ability to choose the doctor whom he or she will visit does not indicate such employee has "control" over a joint enterprise. It simply shows that the employee has the ability under the provided insurance contract to choose which doctor he or she will visit.

In light of the fact the Texas Supreme Court has held that even business relationships such as a franchisor, wholesaler, or supplier do not have a "community of pecuniary interest" adequate to show the existence of a joint enterprise, neither can we find any indication a joint enterprise exists in this situation. *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 528 (Tex.2002).

 **[4]**    The Terrell family then takes a different direction in their pleadings concerning Judge Sisk. They allege that Judge Sisk was the negligent party and that his negligence was the proximate cause of the deaths because of his failure to enforce the County's drug-testing policy. The policy, as stated in the Terrell family's brief, provided that an "employee suspected of drug/alcohol abuse may be requested to take a test. If an employee refuses to take this test or fails a test, they are subject to immediate dismissal."

The initial question is whether this alters the analysis set out above for Judge Sisk in his official capacity as the county judge. Article IX, Section 1 of the Texas Constitution provides that counties are legal subdivisions of the state. TEX. CONST. art. IX, § 1. A suit against a government official in his or her official capacity seeks to impose liability only on the governmental entity the official represents, and any judgment in this type of suit is collectible only against the governmental entity, not against the official's personal assets. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Herring v. Houston Nat'l Exch. Bank,* 113 Tex.

264, 253 S.W. 813 (1923); *Harris County v. Walsweer,* 930 S.W.2d 659, 665 (Tex.App.-Houston [1st Dist.] 1996, writ denied); *Winograd v. Clear Lake City Water* **\*280** *Auth.,* 811 S.W.2d 147, 162 (Tex.App.-Houston [1st Dist.] 1991, writ denied); *see also Bowles v. Reed,* 913 S.W.2d 652, 655 (Tex.App.-Waco 1995, writ denied) (suit against county official is a suit solely against the county); *Bowles v. Wade,* 913 S.W.2d 644, 649, 649 n. 13 (Tex.App.-Dallas 1995, writ denied) (suits against public officials are suits against the entities for whom they work and official-capacity judgments impose liability on the entity).

 **[5]**    As a public official sued in his official capacity, Judge Sisk is protected by the same sovereign immunity enjoyed by the state agency he represents. *Tex. Dep't of Health v. Rocha,* 102 S.W.3d 348, 353 (Tex.App.-Corpus Christi, 2003, no pet.); *Denson v. T.D.C.J.-I.D.,* 63 S.W.3d 454, 460 (Tex.App.-Tyler 1999, pet. denied); *Morris v. Copeland,* 944 S.W.2d 696, 698–99 (Tex.App.-Corpus Christi 1997, no writ). Because a suit against a state officer in his or her official capacity is equivalent to a suit against the state, employees acting in their official capacity share their employer's sovereign immunity. *Rocha,* 102 S.W.3d at 353; *Denson,* 63 S.W.3d at 460; *Morris,* 944 S.W.2d at 698–99; *see also Sykes v. Harris County,* 89 S.W.3d 661, 669 (Tex.App.-Houston [1st Dist.] 2002, pet. filed); *Univ. of Tex. Med. Branch at Galveston v. Hohman,* 6 S.W.3d 767, 775 (Tex.App.-Houston [1st Dist.] 1999, pet. dism'd w.o.j.) (holding employee sued in her official capacity was shielded by sovereign immunity). Accordingly, a plea to the jurisdiction is procedurally the proper method of contesting the propriety of the lawsuit against him or her as a public official.

The Terrell family alleges Judge Sisk is liable to them for two main reasons: 1) the judge knew his secretary at least occasionally had problems (i.e., sleeping on the job) caused by her use of prescription medications, but had negligently failed to exercise the County's policy to require her to undergo drug testing; and 2) the judge knew on that particular occasion that his secretary was in no condition to drive her automobile and was thus negligent in allowing her to drive to her doctor's appointment. We will first analyze these allegations as viewed through the window of sovereign/official immunity of a public servant.

 **[6]**    In determining whether a waiver of the application of sovereign immunity is shown in this context, a critical question is whether the employee of a governmental unit

would be personally liable under Texas law. A government employee is entitled to official immunity for (1) the performance of discretionary duties (2) that are within the scope of the employee's authority, (3) provided the employee acts in good faith. *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex.1994); *see also DeWitt v. Harris County,* 904 S.W.2d 650, 652 (Tex.1995).

In deciding whether the facts alleged fall outside the scope of official immunity, we recognize that the basis for alleged liability is the County's policy, which explicitly provides that requiring a drug test of an employee is absolutely discretionary, and that the Terrell family has alleged the accident was caused by Judge Sisk while acting within the scope of his official duties. The sole disputed question then becomes whether he acted in good faith.

If Judge Sisk was performing a discretionary function, then he is protected by official immunity, regardless of whether he was negligent in the exercise of his public duties. *See City of Wichita Falls v. Norman,* 963 S.W.2d 211, 215 (Tex.App.-Fort Worth 1998, pet. dism'd w.o.j.). The Terrell family cannot breach the immunity wall merely because Judge Sisk was negligent—they can only do so if Judge Sisk exercised his discretionary authority in **\*281** bad faith. *See Harless v. Niles,* 100 S.W.3d 390 (Tex.App.-San Antonio 2002, no pet.).

The Terrell family must do more than show that a reasonably prudent supervisor could have acted differently; they must show that no reasonable person in Judge Sisk's position could have thought the facts were such that they justified his acts. *See Chambers,* 883 S.W.2d at 657. Good faith is not defeated simply by a showing of negligence. *Wadewitz v. Montgomery,* 951 S.W.2d 464, 467 n. 1 (Tex.1997).

Good faith is established when it is proved that a reasonably prudent government official, under the same or similar circumstances, could have believed that his actions were justified. *Chambers,* 883 S.W.2d at 656. A government employee acts in bad faith only if that employee could not have reasonably reached the decision in question. *Univ. of Houston v. Clark,* 38 S.W.3d 578, 581 (Tex.2000). Good faith can be established as a matter of law when the factual recitation by the governmental unit's employee is otherwise supported by the evidence. *Dovalina v. Nuno,* 48 S.W.3d 279, 283 (Tex.App.-San Antonio 2001, no pet.); *Alamo Workforce Dev., Inc. v. Vann,* 21 S.W.3d 428, 434–35 (Tex.App.-San Antonio 2000, no pet.). The Terrell family alleged negligence. Although they also used the term "good faith" throughout

their pleadings, the allegations involving that language are the same ones used in their allegations of negligence. [5]

The facts concerning the accident alleged by the Terrell family do not support a finding that Judge Sisk acted in bad faith, either for failing to require Goble to undergo a drug test, or in connection with her driving to her doctor's office in her own vehicle. Requiring a drug test was discretionary on the part of the county judge, and there are no facts alleged showing any directive by Judge Sisk to Goble to drive her automobile. Taking the allegations at their most extreme possible meaning, with maximal inferences applied, they at most show questionable judgment, and thus possibly show negligence. They do not show the absence of good faith, which is necessary to avoid the sovereign immunity bar. Accordingly, the trial court did not err by concluding Judge Sisk, riding on the coattails of sovereign immunity of his county, is not amenable to suit in his official capacity.

 **[7]**     **[8]**     We next consider whether claims were raised against Judge Sisk in his individual capacity. State employees sued in their individual capacities may be liable for their negligence if they do not have official immunity. *Sykes,* 89 S.W.3d at 669; *Denson,* 63 S.W.3d at 460.

We have reviewed the pleadings in detail. Although there are places where the Terrell family referred to claims against Judge Sisk in his personal capacity, there were no claims raised involving any act by the judge outside of his public servant persona. This is not a situation where there is a mixture of allegations, some of which are directed at actions taken outside a public capacity. In this case, all allegations were of claimed wrongdoing or negligence by Judge Sisk in actions he was able to take only because of his position as a public servant. Under these circumstances, we conclude that a fair reading of the Terrell family's pleadings is that there **\*282** was no effective pleading against Judge Sisk in his individual capacity.

 **[9]**     **[10]**     The Terrell family has also raised a federal Section 1983 claim against Judge Sisk. A suit against a state official in his or her official capacity is not a suit against the official, but against the official's office and the state for which the official is an agent. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *City of Hempstead v. Kmiec,* 902 S.W.2d 118, 122 (Tex.App.-Houston [1st Dist.] 1995, no writ). The suit is therefore the same as one brought directly against the state. *Will,* 491 U.S. at 71, 109 S.Ct. 2304; *Kmiec,* 902 S.W.2d at 122. The United States Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will,* 491 U.S. at 71, 109 S.Ct. 2304; *see Harrison v. Tex. Dep't of Criminal Justice–Institutional Div.,* 915 S.W.2d 882, 889–90 (Tex.App.-Houston [1st Dist.] 1995, no writ). The Court went on to explain that, "As such, it is no different from a suit against the State itself." *Will,* 491 U.S. at 71, 109 S.Ct. 2304.

Therefore, as a government official in his official capacity, Judge Sisk is not a "person" under Section 1983. Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C.A. § 1983 (West Supp.2003).

Section 1983 was not designed to override sovereign immunity. *Will,* 491 U.S. at 66, 109 S.Ct. 2304. Accordingly, the Section 1983 claim made against Judge Sisk in his official capacity could not serve to avoid the application of sovereign immunity and the claim was properly the subject of the plea to the jurisdiction.

We affirm the judgment.

Footnotes

1     Odell Terrell is a surviving brother of J.R. Terrell, Jr. David Elkins is the surviving son of Virginia Terrell, and Jimmy Wayne Terrell is the surviving son of J.R. Terrell, Jr.

2     The style of the lawsuit in the Terrell family's pleadings does not specify whether Judge Sisk was sued in his personal capacity or in his capacity as county judge (and the supervisor of his secretary). We will therefore review the pleadings to determine the nature of the Terrell family's claims.

3     TEX. CIV. PRAC. & REM.CODE ANN. § 101.021(1)(A), (B) (Vernon 1997).

4     Since as early as 1847, the law in Texas has been that, absent the state's consent to suit, a trial court lacks subject matter jurisdiction. *Tex. Dep't of Transp. v. Jones,* 8 S.W.3d 636, 638 (Tex.1999). A party may contest a trial court's subject matter jurisdiction by filing a plea to the jurisdiction. *Id.*

5     "When a petition fails to specify the capacity in which a person is sued, we will look at the 'course of the proceedings' to determine the nature of the liability the plaintiff seeks to impose." *Harless v. Niles,* 100 S.W.3d 390 (Tex.App.-San Antonio 2002, no pet.), *quoting Nueces County v. Ferguson,* 97 S.W.3d 205, 215 (Tex.App.-Corpus Christi 2002, no pet.).

---

**End of Document**                                             © 2015 Thomson Reuters. No claim to original U.S. Government Works.

13 S.W.3d 831
Court of Appeals of Texas,
Dallas.

Richard W. FAVALORO, Appellant,
v.
COMMISSION FOR LAWYER DISCIPLINE,
Appellee.

No. 05–96–01627–CV.   |   Feb. 28, 2000.

Attorney disciplinary action was brought. Following jury trial, the 95th District Court, Dallas County, Tony Lindsay, J., entered judgment on jury verdict that attorney committed misconduct and suspended him from practice of law, probated for three years. Attorney appealed, and Commission for Lawyer Discipline cross-appealed. The Court of Appeals, Bridges, J., held that: (1) trial court had jurisdiction over proceedings; (2) investigatory committee was not required to make an express finding of "just cause" for bringing complaint; (3) attorney had fair notice of charges against him; (4) scheduling order entered by first assigned judge became a nullity once attorney objected to judge and replacement judge was appointed; and (5) of stay judgment of suspension pending appeal was not warranted.

Affirmed.

**Attorneys and Law Firms**

 **\*834**  Richard W. Favaloro, Attorney at Law, Dallas, for Appellant.

David M. Pruessner, Pruessner & Shilling, Dallas, for Appellee.

Before Justices KINKEADE, BRIDGES, and ROACH.

**OPINION**

Opinion By Justice BRIDGES.

On the Court's own motion, we **VACATE** our September 10, 1999 opinion. We also **VACATE** our September 10, 1999 judgment. This is now the opinion of this Court.

The State Bar of Texas filed a disciplinary petition in the name of the Commission for Lawyer Discipline against attorney Richard W. Favaloro, alleging professional misconduct. The trial court found that Favaloro committed misconduct in violation of rules 3.03(a)(1), 8.02(a), and 8.04(a)(3) of the e Texas Disciplinary Rules of Professional Conduct and suspended Favaloro form the practice of law, probated for three years. In twenty-four points of error, Favaloro argues generally that the trial court (1) lacked jurisdiction, (2) erred in charging the jury and entering judgment because he had no fair notice of the charges against him, (3) erred in overruling his evidentiary objections, (4) erred in entering judgment on the jury's verdict, (5) erred in charging the jury, (6) erred in refusing his jury issues and definitions, (7) erred in overruling his motion for continuance, (8) erred in failing to file findings of fact and conclusions of law, (9) erred in overruling his objections to opposing counsel, (10) erred in sustaining the Commission's objections to his exhibits, (11) erred in disregarding the jury's finding on attorney's fees, and (12) erred in failing to stay judgment pending appeal. In a single cross-point, the Commission argues that the trial court erred in fully probating Favalor's suspension. We affirm the trial court's judgment. We publish this opinion pursuant to Texas Rules of Disciplinary Procedure 6.06. See Tex. R. Disciplinary P. 6.06, reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A-1 (Vernon 1998).

**BACKGROUND**

The underlying disciplinary proceeding arose out of Favaloro's representation of a client in a wrongful termination of employment case. Opposing counsel filed a grievance against Favaloro. A district grievance committee determined that there was just cause to believe that Favaloro had violated the Texas Disciplinary Rules. However, before the committee notified Favaloro of its determination, Favaloro filed suit in the 191 [st] District Court of Dallas County against the State Bar of Texas, the grievance committee, and the committee chairperson. Favaloro gave the following notice in the final paragraph of his petition against the State Bar: "Under Rule 2.14, Plaintiff [Favaloro] refuses any further proceedings before the District 6A grievance committee or any other grievance committee regarding the Grievance."

The Commission subsequently filed a disciplinary petition against Favaloro in the 95 [th] District Court of Dallas County. A jury found, among other things, that Favaloro had made certain false statements in the course of the underlying suit,  **\*835**  and the trial court entered judgment that Favaloro had

committed professional misconduct. Favaloro now brings this appeal.

## JURISDICTION

We first address Favaloro's arguments that the trial court lacked jurisdiction over this case. In his first point of error, Favaloro argues the trial court lacked jurisdiction because the Commission did not plead all "statutory conditions precedent." In his second point of error, Favaloro argues the trial court erred in entering judgment because it failed to find these same "conditions precedent." The "conditions precedent" to which Favaloro refers are the Texas Rules of Disciplinary Procedure pertaining to the composition and operation of district grievance committees. *See* TEX.R. DISCIPLINARY P. 2.01, 2.02, 2.03, 2.05, 2.06, 2.07, 2.09, 2.10, 2.11, 2.12, 2.13, 2.14, 2.15. Among other things, Favaloro argues that the disciplinary petition against him did not allege that the grievance against him was assigned to a properly-appointed district grievance committee or that the committee classified the grievance as a complaint and assigned a properly-constituted panel that reviewed the complaint as provided in the Texas Rules of Disciplinary Procedure.

Section 3.01 of the Texas Rules of Disciplinary Procedure sets out the contents of a disciplinary petition as follows:

A. Notice that the action is brought by the Commission for Lawyer Discipline, a committee of the State Bar.

B. The name of the Respondent and the fact that he or she is an attorney licensed to practice law in the State of Texas.

C. The residence and principal place of practice of the Respondent, or other allegations necessary to fix venue.

D. A description of the acts and conduct that gave rise to the alleged Professional Misconduct in detail sufficient to give fair notice to Respondent of the claims made, which factual allegations may be grouped in one or more counts.

E. The specific rules of the Disciplinary Rules of Professional Conduct allegedly violated by the acts or conduct, or other grounds for seeking Sanctions.

F. A demand for judgment that the Respondent be disciplined as warranted by the facts and for any other appropriate relief.

G. Any other matter that is required or may be permitted by law or by these rules.

TEX.R. DISCIPLINARY P. 3.01.

**[1]** **[2]** Favaloro argues that rule 3.01(G), in providing that the disciplinary petition contain "any other matter," requires that the petition allege every requirement under the rules governing district grievance committees. *See* TEX.R. DISCIPLINARY P. 3.01(G). We disagree. The disciplinary petition in this case met the requirements of rule 3.01 which prescribes the contents of the petition. *See* TEX.R. DISCIPLINARY P. 3.01. We do not read rule 3.01(G) to require that a disciplinary petition allege that every aspect of every rule pertaining to the administration and organization of district grievance committees has been satisfied. We overrule Favaloro's first point of error. Similarly, nothing required the trial court to expressly find in its judgment that the requirements concerning district grievance committees had been met. We overrule Favaloro's second point of error.

**[3]** **[4]** In his seventeenth and nineteenth points of error, Favaloro argues the trial court erred when it acted outside its judicial and "temporal" jurisdiction. In particular, Favaloro complains that the Supreme Court of Texas did not appoint a replacement judge within thirty days of Favaloro's February 14, 1995 "Respondent's Objection to Visiting Judges." Therefore, Favaloro argues, the supreme court's appointment of a replacement judge on October 10, 1995, was void because it came outside the statutory thirty-day limitations period. *See* TEX.R. DISCIPLINARY **\*836** P. 3.02. With respect to "temporal" jurisdiction, Favaloro argues that the trial court was prohibited from resetting the April 1995 trial date because the trial court was required to begin trial no later than 180 days after the disciplinary petition was filed with the district clerk. *See* TEX.R. DISCIPLINARY P. 3.07. However, Texas Rule of Disciplinary Procedure 15.07, regarding the effect of time limitations, does not include rules 3.02 or 3.07 among those rules with mandatory time periods. *See* TEX.R. DISCIPLINARY P. 15.07. Instead, rules 3.02 and 3.07 fall within the provision that "all other time periods herein provided are directory only and the failure to comply with them does not result in the invalidation of an act or event by reason of the noncompliance with those time limits." *Id.* Thus, even though the appointment of a replacement judge was somewhat delayed, this delay did not result in the invalidation of the trial court's jurisdiction. *See id.* Likewise, although trial in this case was reset on a date outside the 180–day period, this delay did not result in the invalidation of

the trial court's jurisdiction. *See id.* We overrule Favaloro's seventeenth and nineteenth points of error.

 **[5]**    In Favaloro's eighteenth point of error, he argues that the court acted outside of its geographic jurisdiction when it conducted judicial appointments in Travis County and hearings in Harris County, not Dallas County. To support this argument, Favaloro cites rule 3.03's provision that all proceedings incident to the trial de novo must take place in the county of respondent's principal place of practice. *See* TEX.R. DISCIPLINARY P. 3.03. Although Favaloro complains of appointments and hearings conducted outside Dallas County, he fails to provide any citations to the record in support of this point of error. The rules of disciplinary procedure require that the supreme court, which sits in Travis County, appoint an active district judge who does not reside in the Administrative Judicial Region in which the Respondent resides to preside over a disciplinary case. TEX.R. DISCIPLINARY. P. 3.02. ppellant cites no authority, nor have we found any, to support the proposition that rule 3.02 prohibits the supreme court from conducting judicial appointments in Travis County. In this case, Judge John Montgomery resided in Harris County and Favaloro resided in Dallas County. Thus, Judge Montgomery's appointment complied with rule 3.02. Additionally, we note that Favaloro filed an objection to Judge Montgomery who then removed himself from the case and referred the matter to the Supreme Court for appointment of a replacement judge. Thus, we conclude Favaloro's challenge to the trial court's jurisdiction on this basis is without merit. We overrule Favaloro's eighteenth point of error.

 **[6]**    **[7]**    In his twentieth point of error, Favaloro argues the trial court erred when it interfered with the 191 [st] District Court's jurisdiction. On April 14, 1994, Favaloro filed in the 191 [st] District Court an original petition against the State Bar of Texas, the grievance committee, and Eleanora Duncan, chairperson of the grievance committee. In his petition, Favaloro sought temporary relief enjoining the State Bar, the grievance committee, and Duncan from (1) enforcing against Favaloro the rules of disciplinary procedure relating to the confidentiality of the investigatory panel's proceedings, *see* TEX.R. DISCIPLINARY P. 2.07, 2.11, 2.15, 15.10, 15.11, and (2) proceeding further with the grievance against him. On December 16, 1994, the Commission for Lawyer Discipline filed a disciplinary petition against Favaloro in the 95 [th] District Court of Dallas County. Favaloro contends that the 191 [st] District Court had dominant jurisdiction

because of his prior suit against the State Bar, the grievance committee, and Duncan. We disagree. A district court does not have jurisdiction to interfere with the grievance procedures authorized by the State Bar Act. *See Board of Disciplinary Appeals v. McFall,* 888 S.W.2d 471, 472 (Tex.1994); **\*837** *State Bar of Tex. v. McGee,* 897 S.W.2d 437, 438–39 (Tex.App.-Corpus Christi 1995, writ dism'd w.o.j.).* Thus, Favaloro's suit in the 191 [st] District Court did not impact the jurisdiction of the 95 [th] District Court over the disciplinary petition filed therein. We overrule Favaloro's twentieth point of error.

## THE JUDGMENT

 **[8]**    Having resolved Favaloro's jurisdictional points of error against him, we turn now to consider his points of error complaining about the judgment against him. In his third point of error, Favaloro argues the trial court erred in entering judgment because the court did not find that any of the steps in Texas Rules of Disciplinary Procedure 3.01 through 3.14, pertaining to trial de novo in the district court, were followed. *See* TEX.R. DISCIPLINARY P. 3.01–3.14. Favaloro does not argue that any violation of the rules pertaining to trial occurred, merely that the trial court erred in refusing Favaloro's request for findings on each of the steps in rules 3.01 through 3.14. While the trial court was required to *follow* the rules concerning the conduct of trial, along with pretrial and post-trial matters, we find no support for Favaloro's argument that the trial court was also required to *find* that it had followed the rules, nor does Favaloro cite us to any authority imposing such a requirement. We overrule Favaloro's third point of error.

 **[9]**    **[10]**    In his fourth point of error, Favaloro first argues the trial court erred in entering judgment and charging the jury because the grievance committee never found just cause on the charges. Favaloro's "just cause" argument refers to the requirement under the Texas Rules of Disciplinary Procedure that the grievance committee appoint an investigatory committee to determine whether "just cause" exists for a complaint against an attorney. *See* TEX.R. DISCIPLINARY P. 2.11. However, nothing in the Texas Rules of Disciplinary Procedure specifically requires the Commission to plead and prove a finding of just cause. *Wade v. Commission for Lawyer Discipline,* 961 S.W.2d 366, 371 (Tex.App.-Houston [1 [st] Dist.] 1997, no pet.).* In fact, by the time a complaint reaches the district court, other rules, such as 2.11 and 2.13, have

ensured that the finding of just cause has already been made. *Id.; see* TEX.R. DISCIPLINARY P. 2.11, 2.13. Moreover, the record in this case contains letters from the Office of the General Counsel of the State Bar of Texas indicating that the grievance committee believed Favaloro violated rules 3.01, 3.02, 3.03(a)(1), 3.04(c)(1), 3.04(c)(2), 8.02(a), 8.04(a)(1), 8.04(a)(2), and 8.04(a)(3) of the Texas Disciplinary Rules of Professional Conduct and that the Grievance Committee Panel's decision in the matter was unanimous. While the letters do not use the words "just cause," they constitute sufficient evidence to show the investigatory committee made such a finding. *See Wade,* 961 S.W.2d at 372. We overrule Favaloro's fourth point of error to the extent it complains about a finding of "just cause."

## NOTICE

**[11]** **[12]** In the second part of his fourth point of error, Favaloro argues he did not have fair notice of the charges against him until the court read the charges to the jury. Similarly, in his thirteenth point of error, Favaloro complains that the trial court erred in charging the jury because no pleadings supported the charge. We liberally construe pleadings in favor of the pleader, particularly when the complaining party has not filed any special exceptions. *Boyles v. Kerr,* 855 S.W.2d 593, 601 (Tex.1993) (op. on reh'g); *Spiers v. Maples,* 970 S.W.2d 166, 168 (Tex.App.-Fort Worth 1998, no pet.); *Bank One, Tex., N.A. v. Stewart,* 967 S.W.2d 419, 431 (Tex.App.-Houston [14 <sup>th</sup> Dist.] 1998, no pet.) (op. on reh'g). Pleadings shall give fair notice of the claim or defense asserted to provide the opposing party with enough information to enable him to prepare a defense or answer to the defense asserted. TEX.R. CIV. P. 45(b), 47(a); *Bank One,* 967 S.W.2d at 430. A petition is sufficient if a **\*838** cause of action or defense may be reasonably inferred from what is specifically stated. *Bank One,* 967 S.W.2d at 430.

**[13]** The original disciplinary petition filed against Favaloro specified that he had violated rules 3.01, 3.02, 3.03(a)(1), 3.04(c)(1), 3.04(c)(2), 8.02(a), 8.04(a)(1), 8.04(a)(2), and 8.04(a)(3) of the Texas Disciplinary Rules of Professional Conduct. The trial court charged the jury on the issues of whether Favaloro had violated these rules by, among other things, making false statements to the tribunal, engaging in conduct involving deceit or misrepresentation, making statements concerning the qualifications or integrity of a judge with reckless disregard as to their truth or falsity,

and filing frivolous motions. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 3.01, 3.03(a)(1), 8.02(a), 8.04(a)(3), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 1998) (TEX. STATE BAR R. art. X, § 9). Under these circumstances, we conclude Favaloro had fair notice of the charges against him, and the pleadings supported the jury charge. We overrule Favaloro's fourth point of error to the extent it argues Favaloro did not receive fair notice of the charges against him and Favaloro's thirteenth point of error.

## THE SCHEDULING ORDER

**[14]** In his fifth point of error, Favaloro complains that the trial judge who ultimately presided over this case erred in setting aside a January 27, 1995 scheduling order entered by the first judge appointed to hear this case and overruling Favaloro's objections to witnesses and other matters regarding the order. Favaloro appears to complain that the Commission should not have been allowed to call witnesses at trial in April 1996 because it did not comply with the disclosure requirements imposed by the January 27, 1995 scheduling order. We disagree.

**[15]** **[16]** **[17]** The record contains a January 27, 1995 scheduling order entered by Judge Montgomery setting an April 3, 1995 deadline for the Commission to disclose its fact and expert witnesses. However, on February 14, 1995, Favaloro objected to Judge Montgomery under section 74 of the Texas Government Code. *See* TEX. GOV'T.CODE ANN. § 74.053 (Vernon 1998). Once a party makes a timely objection to an assigned judge, the assigned judge's disqualification is mandatory. *Amateur Athletic Found. v. Hoffman,* 893 S.W.2d 602, 602–03 (Tex.App.-Dallas 1994, no writ). An objection to an assigned judge is timely if made before the assigned judge, sitting on the bench in open court, calls the case to hearing or to trial. *Id.* at 603 Any order entered by the assigned judge then becomes a nullity. *Id.* Judge Montgomery entered an order referring this case back to the supreme court for appointment of a replacement judge. The supreme court appointed a replacement judge on October 10, 1995. Thus, by Favaloro's request, there was no judge assigned to try the case in April 1995. At trial on April 15, 1996, Favaloro argued that the Commission did not comply with the January 27, 1995 scheduling order. However, the scheduling order was a nullity once Favaloro objected to Judge Montgomery and the supreme court appointed a replacement. *See id.* Accordingly, we overrule Favaloro's fifth point of error.

**[18]** **[19]** In his fifteenth point of error, Favaloro argues the trial court erred in denying his motion for continuance after refusing to enforce the January 27, 1995 scheduling order. The record contains Favaloro's oral request for a continuance in order to designate witnesses. This oral motion does not satisfy the provisions of rule 251 of the Texas Rules of Civil Procedure. *See* TEX.R. CIV. P. 251. When the provisions of rule 251 have not been satisfied, it will be presumed that the trial court did not abuse its discretion in denying a continuance. *Metro Aviation, Inc. v. Bristow Offshore Helicopters, Inc.,* 740 S.W.2d 873, 874 (Tex.App.-Beaumont 1987, no writ); **\*839** *Ohlhausen v. Thompson,* 704 S.W.2d 434, 436 (Tex.App.-Houston [14 th Dist.] 1986, no writ). We overrule Favaloro's fifteenth point of error.

## THE VERDICT

**[20]** In his sixth point of error, Favaloro argues the trial court erred in entering judgment on the verdict and charging the jury because the judgment references the verdict, the verdict does not conform to the pleadings, and the judgment therefore does not conform to the pleadings. Favaloro does not direct us to any place in the record where he objected to the jury charge and obtained a ruling. Instead, Favaloro cites generally to the jury charge, the judgment, the first and second amended disciplinary petitions, and the trial amendment to the disciplinary petition. A comparison of these documents shows that the judgment stated Favaloro had violated rules 3.03(a)(1), 8.02(a), and 8.04(a)(3) of the Texas Disciplinary Rules of Professional Conduct, the jury found that Favaloro had violated these rules, and the disciplinary petition alleged that Favaloro had violated these rules, among others. We overrule Favaloro's sixth point of error.

## MATTERS NOT PRESERVED FOR REVIEW

**[21]** In his seventh, eighth, and ninth points of error, Favaloro complains that the trial court erred in entering judgment on the verdict because the verdict was never rendered, the judge erroneously created a hung jury, and the judge discharged the jury without returning them for further deliberation on an incomplete verdict. In raising these arguments, Favaloro does not cite to the clerk's record or the reporter's record. In his tenth, eleventh, and twelfth points of error, Favaloro complains that the trial court erred in entering judgment on the verdict and charging the jury under

rule 8.02 [1] of the Texas Disciplinary Rules of Professional Conduct. Favaloro discusses the jury's findings and quotes excerpts from the jury charge but does not support his arguments with any authority. In his fourteenth point of error, Favaloro complains that the trial court erred in refusing his jury issues and definitions. He does not explain, nor does he provide any support for, the proposition that his submitted issues and definitions were "proper." In his twenty-first point of error, Favaloro complains that the trial court erred in overruling his objections to the Commission's counsel. In his twenty-second point of error, Favaloro complains that the trial court erred in sustaining the Commission's objections to his exhibits. Favaloro does not explain or support his contention that the trial court erred in overruling his objections to the Commission's counsel, and he does not set forth with any particularity the reasons why the trial court erred in sustaining the Commission's objections to Favaloro's exhibits. We are not responsible for making Favaloro's argument for him.

**[22]** Former rule of appellate procedure 74(f) [2] required that a brief to this Court contain, among other things, a statement of the facts of the case, supported by record references, and a clear and concise argument for the contention made with appropriate citations to authorities and the **\*840** record. *See* TEX.R.APP. P. 74(f) (former rules). Because, in these points of error, Favaloro does nothing more than summarily state his point of error, without citation to legal authority or substantive analysis, we conclude he has failed to preserve these arguments for review. *See Trenholm v. Ratcliff,* 646 S.W.2d 927, 934 (Tex.1983); *Bowles v. Clipp,* 920 S.W.2d 752, 756 (Tex.App.-Dallas 1996, writ denied); *Tacon Mechanical Contractors, Inc. v. Grant Sheet Metal, Inc.,* 889 S.W.2d 666, 671 (Tex.App.-Houston [14 th Dist.] 1994, writ denied). Accordingly, we overrule Favaloro's seventh, eighth, ninth, tenth, eleventh, twelfth, fourteenth, twenty-first, and twenty-second points of error.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**[23]** In his sixteenth point of error, Favaloro complains of the trial court's failure to file findings of fact and conclusions of law. Rule 296 of the Texas Rules of Civil Procedure provides for requests for findings of fact and conclusions of law. *See* TEX.R. CIV. P. 296. By its terms, it is only applicable in a case tried without a jury. *Id.* Thus, the rule does not apply in this case which was, as previously discussed, a jury trial. We overrule Favaloro's sixteenth point of error.

## ATTORNEY'S FEES

 **[24]** **[25]** **[26]** In his twenty-third point of error, Favaloro complains that the trial court erred in disregarding the jury finding on attorney's fees. Favaloro's complaint addresses the trial court's decision, reflected in the final judgment, that "the uncontroverted evidence established that a reasonable fee for preparation and prosecution of this suit was $25,000." We note that Favaloro has only provided this Court with a partial reporter's record, and his only citation to the record under this point of error is to the trial court's final judgment. Points of error dependent on the state of the evidence cannot be reviewed without a complete record. *Dob's Tire & Auto Ctr. v. Safeway Ins. Agency,* 923 S.W.2d 715, 720 (Tex.App.-Houston [1 [st] Dist.] 1996, writ dism'd w.o.j.). If the appellant fails to bring forward a complete record, the points of error dependent on the state of the evidence will be deemed to have been waived. *See id.* Because Favaloro has not provided this Court with a complete reporter's record with which to review the trial court's award of attorney's fees, he has waived review. We overrule Favaloro's twenty-third point of error.

## STAY OF JUDGMENT

 **[27]** Although the trial court fully probated his suspension, Favaloro raises the argument in his twenty-fourth point of error that the trial court erred in failing to stay judgment pending appeal, citing rule 3.14 of the Texas Rules of Disciplinary Procedure. Rule 3.14 provides that a judgment of suspension may be stayed during the pendency of appeals therefrom if the district court finds, upon competent evidence, that "the Respondent's continued practice of law does not pose a continuing threat to the welfare of Respondent's clients or to the public." TEX.R. DISCIPLINARY P. 3.14. After judgment was entered against him, Favaloro had the burden to prove his continued practice of law did not pose a threat. *See id.; Wade,* 961 S.W.2d at 373. Favaloro has failed to direct us to any place in the record where he filed a motion or requested that his suspension be stayed. Under these circumstances, we conclude that Favaloro failed to carry his burden of proving that his continued practice of law did not pose a threat. *See Wade,* 961 S.W.2d at 373. We overrule Favaloro's twenty-fourth point of error.

## PROBATED SENTENCE

 **[28]** In a single cross-point, the Commission argues that the trial court erred in fully probating Favaloro's suspension from the practice of law. The trial court has broad discretion to determine whether an attorney guilty of professional misconduct should be reprimanded, suspended, or disbarred. *Butler v. Commission for Lawyer* **\*841** *Discipline,* 928 S.W.2d 659, 666 (Tex.App.-Corpus Christi 1996, no writ). After reviewing the record, we cannot conclude that the trial court's decision to probate Favaloro's suspension was an abuse of discretion. We overrule the Commission's sole cross point.

We affirm the trial court's judgment.

Footnotes

1    Although Favaloro's eleventh point of error refers to rule 8.03(a), which imposes a duty on lawyers to report the misconduct of other lawyers, we conclude Favaloro's eleventh point of error actually relates to rule 8.02(a) prohibiting false statements concerning the qualifications or integrity of a judge. We note that violation of rule 8.03(a) was not alleged in the disciplinary petition and was not submitted to the jury.

2    Effective September 1, 1997, the Texas Supreme Court repealed the then-existing rules of appellate procedure and replaced them with the current rules of appellate procedure. In civil cases, the current rules of appellate procedure apply to cases in which the notice of appeal or the brief (depending on the circumstances) was filed after September 1, 1997. In all other civil cases, the repealed rules apply. In this case, the appeal was perfected on April 17, 1996, and Favaloro's brief was filed on February 7, 1997. Therefore, the former rules of appellate procedure apply to this case.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

19 S.W.3d 249
Supreme Court of Texas.

In re Jane DOE.

No. 00–0140. | Feb. 25, 2000.

Pregnant minor filed application for a court order authorizing her to consent to abortion without notifying her parents. The trial court denied application, finding that minor was not sufficiently well informed to make decision without notifying her parents. Minor appealed. The Court of Appeals affirmed. Granting minor's petition for review, the Supreme Court, Phillips, C.J., held, as matters of first impression, that: (1) Family Code did not prohibit Supreme Court from releasing opinion to public; (2) review of denial of order was subject to legal and factual sufficiency standards; (3) requirements to be mature and sufficiently well informed would be met if minor was capable of reasoned decision making and decision was not based on impulse; and (4) trial court must consider totality of circumstances in making decisions as to whether minor was mature and sufficiently well informed.

Reversed and remanded to the trial court.

Enoch, J., concurred in part and filed a separate opinion, in which Baker, Hankinson, and O'Neill JJ., joined.

Owen, J., concurred in part and filed a separate opinion, in which Phillips, C.J., joined in part.

Hecht, J., filed a dissenting opinion, in which Abbott, J., joined.

**\*250 OPINION**

Chief Justice PHILLIPS delivered the opinion of the Court as to Parts I–VI and a concurring opinion as to Part VII, all of which Justice GONZALES joins. Justice ENOCH, Justice BAKER, Justice HANKINSON, and Justice O'NEILL join in Parts I, II, and IV–VI of the Court's opinion and in the judgment. Justice OWEN joins in Parts I, II, and III of the Court's opinion and in the judgment. Justice HECHT and Justice ABBOTT join in Parts II and III of the Court's opinion.

This is a confidential appeal from a court of appeals' decision affirming a trial court's **\*251** denial of a minor's application

for a court order authorizing her to consent to an abortion without notifying her parents. Our Court is called upon to determine what the Legislature intended in Texas's parental notification statute when it wrote that a court "shall enter an order" that a minor is "authorize[d] ... to consent to the performance of [an] abortion" if she demonstrates "by a preponderance of the evidence [that she] is mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents...." TEX. FAM.CODE § 33.003(i). We are not called upon to decide the constitutionality or wisdom of abortion. Arguments for or against abortion do not advance the issue of statutory construction presented by this case. Instead, our sole function in this case is to interpret and apply the statute enacted by our Legislature.

The trial court in this case concluded that although the minor "shows signs of being mature, she has not demonstrated that she is sufficiently well informed about the medical procedures and the emotional impact of the procedure." The court of appeals affirmed, and the minor has appealed to this Court. We conclude that in this case, the minor has not met the statutory standard. Because this Court has not previously provided guidance to trial and appellate courts about what a minor must show under section 33.003 of the Texas Family Code to demonstrate that she is mature and sufficiently well informed, we remand this case to the trial court in the interest of justice. In so doing, we direct that upon remand, the proceedings in the trial court must be concluded as if Doe's application had been filed the day after our opinion issues. *See* TEX. FAM.CODE § 33.003(h). In the event that the minor requires additional time after issuance of this opinion to prepare for a hearing, she may, of course, request an extension of time. *See id.*

**I**

Jane Doe is a pregnant, unmarried minor. Her eighteenth birthday will occur within a few months. She lives at home with her parents, and she has not been emancipated. Pursuant to Family Code section 33.003, she sought an order from the trial court allowing her to consent to an abortion without having to notify either of her parents. *See* TEX. FAM.CODE § 33.003.

Jane Doe was represented by counsel of her choice, and as the Family Code requires, the trial court appointed a guardian ad litem. *See id.* § 33.003(e). At the conclusion of

a hearing, the trial court denied Jane Doe's application and issued written findings and conclusions in accordance with Texas Family Code section 33.003(h). Jane Doe appealed to the court of appeals, which affirmed the trial court's judgment without an opinion. She now appeals to this Court. *See id.* § 33.004(f). She contends that she has conclusively established that she is mature and is sufficiently well informed to make a decision about terminating her pregnancy without notifying her parents. She also has presented a limited argument that the trial court erred in failing to conclude that notification would not be in her best interest. *See id.* § 33.003((i). Because she did not present this latter issue to the court of appeals, we will not consider it.

Before we turn to the merits of the issues before us, however, there are two significant procedural matters that we must resolve. The first is whether the Family Code prohibits us from releasing our opinions to the public in these types of matters. The second is what standard of appellate review applies in cases arising under sections 33.003 and 33.004 of the Family Code.

## II

 **[1]**  Family Code sections 33.003 and 33.004 contain many provisions designed to ensure the minor's anonymity and the confidentiality of the judicial bypass proceeding. **\*252** Among these are provisions that, in effect, direct the trial court and the court of appeals not to publicly disseminate their rulings. *See* TEX. FAM.CODE §§ 33.003(k),(*l* ); 33.004(c).

Family Code section 33.003 directs that a minor's application to the trial court, all other documents pertaining to the proceedings, and the trial court's ruling are confidential and privileged. *See* TEX. FAM.CODE §§ 33.003(k), (*l* ). The statute is explicit about those who may receive notice of the trial court's ruling:

> (*l* ) An order of the court issued under this section is confidential and privileged and is not subject to disclosure under Chapter 552, Government Code, or discovery, subpoena, or other legal process. The order may not be released to any person but the pregnant minor, the pregnant minor's guardian ad litem, the pregnant minor's attorney, another

> person designated to receive the order by the minor, or a governmental agency or attorney in a criminal or administrative action seeking to assert or protect the interest of the minor.

TEX. FAM.CODE § 33.003(*l* ).

Similarly, Family Code section 33.004(c) prohibits the court of appeals from publishing its ruling:

> (c) A ruling of the court of appeals issued under this section is confidential and privileged and is not subject to disclosure under Chapter 552, Government Code, or discovery, subpoena, or other legal process. The ruling may not be released to any person but the pregnant minor, the pregnant minor's guardian ad litem, the pregnant minor's attorney, another person designated to receive the ruling by the minor, or a governmental agency or attorney in a criminal or administrative action seeking to assert or protect the interest of the minor.

TEX. FAM.CODE § 33.004(c).

The Code's judicial bypass provisions concerning appeals in this Court do not, however, contain directives regarding dissemination of opinions or rulings. The Family Code requires only that a "confidential appeal" shall be available to any pregnant minor to whom a court of appeals denies consent:

> (f) An expedited confidential appeal shall be available to any pregnant minor to whom a court of appeals denies an order authorizing the minor to consent to the performance of an abortion without notification to either of her parents or a managing conservator or guardian.

TEX. FAM.CODE § 33.004(f). The requirement of a "confidential appeal" is not an impediment to publishing our opinions. We can do so without disclosing the identity of the minor, the court of appeals, or the trial court.

As the head of the third branch of government with regard to civil matters, this Court has an obligation to provide guidance to lower courts through its published opinions. There would be no means of insuring consistency, uniformity, and predictability of the law if the court of last resort could not commit its analyses, reasoning, and decisions to writing in opinions and disseminate those opinions to the public. Without some explication from this Court of the meaning of "mature and sufficiently well informed," different courts around the state at both the trial and appellate level would surely arrive at very different constructions of what the statute requires. This result would undermine the rule of law that undergirds our whole system of justice.

By publicly announcing our construction of this statute, the Legislature and the public will know the meaning that we have ascribed to it, and can order their behavior accordingly. In particular, the people, through their elected representatives, will have full opportunity to change the law, if they so desire, in light of the way the judiciary is interpreting and applying it.

We note that we are not called upon to express an opinion about the constitutionality of the provisions of the Family Code **\*253** that prohibit the lower courts from making their rulings publicly available. Those questions must be decided another day.

### III

The second important procedural issue involves the standard of review that appellate courts are to apply in reviewing trial court rulings. Because section 33.004 is silent on this issue, we look to the standards of review we apply to other trial court decisions.

 **[2]**   First, we must determine whether the "mature and sufficiently well informed" requirement is a question of fact or of law. Section 33.003 provides that the trial judge should determine these questions by "a preponderance of the evidence." TEX. FAM.CODE § 33.003(i). This requirement implies that the trial judge is to weigh the evidence and determine the credibility of the minor or any other witnesses. These are typical fact-finding functions, performed by a trial court only after hearing the minor's live testimony and viewing her demeanor.

 **[3]**   Next, we determine whether the trial court's factual findings on these issues are subject to an abuse of discretion review standard or a legal and factual sufficiency review standard. The abuse of discretion standard applies when a trial court has discretion either to grant or deny relief based on its factual determinations. *See Bocquet v. Herring,* 972 S.W.2d 19, 20–21 (Tex.1998). This standard is especially appropriate when the trial court must weigh competing policy considerations and balance interests in determining whether to grant relief. *See General Tire, Inc. v. Kepple,* 970 S.W.2d 520, 526 (Tex.1998). Thus, the abuse of discretion standard is typically applied to procedural or other trial management determinations. *See, e.g., National Med. Enters., Inc. v. Godbey,* 924 S.W.2d 123, 128 (Tex.1996)(attorney disqualification); *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–54 (Tex.1995)(admission of evidence); *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 852 (Tex.1992)(discovery sanctions).

By contrast, in this case the trial court has no discretion over the order. The statute provides that if the court finds that the minor is "mature and sufficiently well informed," it "*shall* enter an order authorizing the minor to consent to the performance of the abortion without notification to either of her parents...." TEX. FAM.CODE § 33.004(i)(emphasis added). Furthermore, in determining whether a minor is "mature and sufficiently well informed," the trial court is not to weigh policy considerations; it simply makes a factual determination. When the trial court acts primarily as a factfinder, appellate courts normally review its determinations under the legal and factual sufficiency standards. *See Bocquet,* 972 S.W.2d at 21; *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). We therefore apply that standard of review to this appeal. [1]

Unlike the courts of appeals, our Court may only engage in legal sufficiency review. *See* TEX. CONST. art. V, § 6. In reviewing legal sufficiency, however, we may set forth factors and principles for lower courts to follow in determining and reviewing whether a minor is "mature and sufficiently well informed" to make this decision without parental notification. *See Bocquet,* 972 S.W.2d at 21 (reasonableness and necessity of attorney's fees); *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30–31 (Tex.1994)(gross negligence).

### *254 IV

We turn next to the standard of proof the Legislature intended to require in the parental notification statute. The Texas

parental notification statute was enacted against a backdrop of over two decades of decisions from the United States Supreme Court. One of the seminal opinions regarding minors and abortion is *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ). In *Bellotti* a state had enacted a statute that required parental consent before a physician could perform an abortion on a minor, with certain limited exceptions. A plurality of the Court reiterated in *Bellotti II* what a majority of the Court had previously held in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976): " '[T]he State may not impose a blanket provision ... requiring the consent of a parent ... as a condition for abortion of an unmarried minor,' " and that it would be "inappropriate 'to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent.' " *Bellotti II,* 443 U.S. at 643, 99 S.Ct. 3035 (plurality opinion) (quoting *Danforth,* 428 U.S. at 74, 96 S.Ct. 2831). The *Bellotti II* plurality further concluded that parental consent statutes would not pass constitutional muster unless the state provided an alternative procedure in which a minor could receive authorization for an abortion. *Id.* (plurality opinion).

Thus, the plurality concluded that a minor must be permitted an opportunity to show "either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests." *Id.* at 643–44, 99 S.Ct. 3035 (plurality opinion). With regard to the determination of maturity, "the peculiar nature of the abortion decision requires the opportunity for case-by-case evaluations of the maturity of pregnant minors." *Id.* at 643 n. 23, 99 S.Ct. 3035 (plurality opinion). The *Bellotti II* plurality also concluded that a parental bypass proceeding must maintain the anonymity of the minor and must be completed with "sufficient expedition to provide an effective opportunity for an abortion to be obtained." *Id.* at 644, 99 S.Ct. 3035 (plurality opinion). A majority of the United States Supreme Court has subsequently approved the *Bellotti II* parental bypass requirements. *See City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 439–442, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (*Akron I* ) (holding parental consent statute unconstitutional in light of *Bellotti II* ); *Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 511–13, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (*Akron II* ) (declining to decide whether parental bypass was

constitutionally required in a notification rather than a consent statute, but applying *Bellotti II* requirements). Our Legislature was obviously aware of this jurisprudence when it drafted the statute before us.

## V

Against this backdrop our Legislature, like the legislatures of a number of other states, has chosen to require only parental *notification,* not parental *consent.* And like the other states that require only parental notification, our Legislature did not specify the particular information a minor must have before she can be considered "sufficiently well informed" to make the decision independently. [2]

**\*255** **[4]** The parental notification statute forbids a physician from performing an abortion on a pregnant, unemancipated minor without giving notice to the minor's parents at least 48 hours before the procedure. *See* TEX. FAM.CODE § 33.002(a). But the act allows a pregnant minor who wants to have an abortion without notifying one of her parents to "file an application for a court order authorizing the minor to consent to the performance of an abortion without notification to either of her parents...." TEX. FAM.CODE § 33.003(a). When a minor files such an application, the court "shall determine by a preponderance of the evidence" whether:

1. The minor is "mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents;" or

2. Notification would not be in the best interest of the minor; or

3. Notification may lead to physical, sexual, or emotional abuse of the minor.

TEX. FAM.CODE § 33.003(i). If the court makes any of these determinations, the court "*shall* enter an order authorizing the minor to consent to the performance of the abortion without notification to either of her parents...." *Id.* Because the Legislature used the imperative word "shall," we conclude that when a minor meets the statutory threshold, the trial court must grant the application. *See* TEX. GOV'T CODE § 311.016(2).

**[5]** Our focus in construing this statute is to determine the Legislature's intent; this we discern primarily from the plain

meaning of the words chosen. *See, e.g., Surgitek, Bristol–Myers Corp. v. Abel,* 997 S.W.2d 598, 602 (Tex.1999); *Fitzgerald v. Advanced Spine Fixation Sys., Inc.,* 996 S.W.2d 864, 865 (Tex.1999); *Liberty Mutual Ins. Co. v. Garrison Contractors, Inc.,* 966 S.W.2d 482, 484 (Tex.1998). In section 33.003(i), the Legislature has succinctly stated that the minor must be "mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents...." TEX. FAM.CODE § 33.003(i). The brevity of the requirement does not, however, mean that it is insubstantial. The Legislature undoubtedly intended the bypass procedure to be a meaningful one. In requiring that a minor demonstrate that she is mature and sufficiently well informed, the Legislature took into account the gravity and potential consequences of the irreversible decision to terminate a pregnancy, and sought to assure that the minor's decision was thoughtful and informed.

 **[6]**    Thus, we conclude that a minor is "mature and sufficiently well informed to make the decision to have an abortion without notification to either of her parents" when the evidence demonstrates that the minor is capable of reasoned decision-making and that her decision is not the product of impulse, but is based upon careful consideration of the various options available to her and the benefits, risks, and consequences of those options. *See In re Anonymous,* 711 So.2d 475, 477 (Ala.Civ.App.1998); *In re Petition of Anonymous 1,* 251 Neb. 424, 558 N.W.2d 784, 788 (1997); *In re Petition of Anonymous 2,* 253 Neb. 485, 570 N.W.2d 836, 838–39 (1997); *In re Jane Doe,* 126 N.C.App. 401, 485 S.E.2d 354, 356 (1997). The decisions of a number of other state courts construing similar statutes, which were available to the Legislature at the time they enacted section 33.003(i), inform our interpretation. *See Ex Parte Anonymous,* 618 So.2d 722, 725 (Ala.1993); *In re Petition of Jane Doe for Waiver of Notice,* 19 Kan.App.2d 204, 866 P.2d 1069, 1074–75 (1994); **\*256** *In re Mary Moe,* 18 Mass.App.Ct. 727, 469 N.E.2d 1312, 1315 (1984); *Cf. In re Anonymous,* 674 So.2d 1317, 1318 (Ala.Civ.App.1995)*; In re Anonymous,* 655 So.2d 1052, 1054 (Ala.Civ.App.1995).

Obviously, whether a minor is mature and sufficiently well informed is a highly individualized decision that must take into account the diverse background and circumstances of each applicant for waiver of parental notification. An examination of decisions from other states' courts reveals consistent themes. All of the decisions wrestle with "mature" and "informed," two concepts that overlap to some extent, but which are also distinct. States make a distinction between the information, and the minor's ability to understand that information and deal with it responsibly.

The states that have written on this issue, including Alabama, Kansas, Massachusetts, Nebraska, North Carolina, and Ohio require that the minor has been informed as to the alternatives to abortion, to the nature of the abortion procedure and its risks, and the physical, emotional, and social consequences of either abortion or bringing the pregnancy to term. The Alabama Court of Civil Appeals has suggested that the information about the risks and options should be targeted to an individual's specific circumstances. *See In re Anonymous,* 650 So.2d 923, 925 (Ala.Civ.App.1994). But the courts are also careful to ensure that the minor understands that information, and has assimilated it in a mature way. To this end, they have inquired into how a minor might respond to certain contingencies, particularly assessing whether the minor will seek counseling in the event of physical or emotional complications. Many courts have assessed the minor's school performance and activities, as well as the minor's future and present life plans. A few courts have explicitly assessed the minor's character and judgment directly. Most of the decisions have also considered the minor's job experience and experience handling finances, particularly assessing whether the minor is aware of the financial obligations inherent in raising a child. Almost all courts conduct the maturity inquiry, either explicitly or implicitly, against the background circumstances of the minor's experience. These include the minor's relationship with her parents, whether she has social and emotional support, particularly from the male who would be a father, and other relevant life experiences.

## VI

 **[7]**    **[8]**    We conclude that a trial court should take into account the totality of circumstances the minor presents in determining whether she is mature and sufficiently well informed. In order to establish that she is sufficiently well informed, the minor must make, at a minimum, three showings.

First, she must show that she has obtained information from a health-care provider about the health risks associated with an abortion and that she understands those risks. That would include an understanding of the risks associated with the particular stage of the minor's pregnancy.

Second, she must show that she understands the alternatives to abortion and their implications. As with any medical procedure, part of making an informed decision is knowing the available alternatives. A minor should be able to demonstrate that she has given thoughtful consideration to her alternatives, including adoption and keeping the child. She should also understand that the law requires the father to assist in the financial support of the child. *See* TEX. FAM.CODE § 154.001; *see also* TEX. CONST. art. XVI, § 28 (garnishment of wages for court-ordered child support payments). She should not be required to justify why she prefers abortion above other options, only that she is fully apprised of her options.

Third, she must show that she is also aware of the emotional and psychological aspects of undergoing an abortion, which can be significant if not severe for some women. She must also show that she has **\*257** considered how this decision might affect her family relations. Although the minor need not obtain this information from licensed, professional counselors, she must show that she has received information about these risks from reliable and informed sources, so that she is aware of and has considered these aspects of the abortion procedure.

 **[9]** While a minor must demonstrate a knowledge and appreciation of the various considerations involved in her decision, she should not be required to obtain information or other services from any particular provider. Nor should she be required to meet with or review materials that advocacy or religious groups provide. The inquiry is whether she has obtained information on the relevant considerations from reliable sources of her choosing that enable her to make a thoughtful and informed decision.

 **[10]** **[11]** A determination of maturity necessarily involves more trial court discretion. However, if a court determines that a minor has not demonstrated that she is mature enough to make a decision to undergo an abortion, then the court should make specific findings concerning its determination so that there can be meaningful review on appeal. Similarly, if a court concludes that a minor is not credible in some respect that directly relates to its determination of maturity, the court should make specific findings in that regard as well.

 **[12]** A minor who can show that she is sufficiently well informed may also establish in the process that she is mature. In making a determination of maturity, there are, however, some criteria that should not be relied upon as conclusively

showing *immaturity*. The United States Supreme Court has said that one of those is the fact, standing alone, that the pregnant female is a minor. That Court has also admonished that states and courts "may not make a blanket determination that *all* minors ... are too immature to make this decision or that an abortion never may be in the minor's best interests without parental approval." *Akron I,* 462 U.S. at 440, 103 S.Ct. 2481. A child's age, educational background or grades in school, while indicative of some level of maturity, are not conclusive on the issue of maturity. Nor is participation in extra-curricular activities. It should also go without saying that a minor's socio-economic status should not bear on the decision.

## VII

As discussed earlier in this opinion, the standard of review is legal sufficiency. Thus, unless Jane Doe has shown as a matter of law that she is mature and sufficiently well informed, we would ordinarily affirm the judgment of the court of appeals. After reviewing this record, we conclude that she has not established as a matter of law that she is sufficiently well informed to make the decision to have an abortion performed without notifying her parents. But because this is a matter of first impression, in the interests of justice, we remand to the trial court for further hearing and consideration. [3]

## CONCLUSION

For the reasons we have discussed, we reverse the judgment of the court of appeals and remand this case to the trial court for further hearing and consideration. We have already indicated the time stricture within which further proceedings in the trial court must be concluded. Importantly, the court should schedule its proceedings with the additional consideration that it must maintain the minor's confidentiality. Section 33.003 allows the trial court to give proceedings of this type "precedence over other pending matters to the extent necessary to assure that the **\*258** court reaches a decision promptly." TEX. FAM.CODE § 33.003(h).

Justice ENOCH filed a concurring opinion, in which Justice BAKER, Justice HANKINSON, and Justice O'NEILL join.

Justice OWEN filed a concurring opinion, in which Chief Justice PHILLIPS joined as to Parts I and III.

Justice HECHT filed a dissenting opinion, in which Justice ABBOTT joins.

Justice ENOCH, joined by Justice BAKER, Justice HANKINSON, and Justice O'NEILL, concurring.

I join parts I, II, IV, V, and VI of the Court's opinion, and I join the Court's judgment remanding this appeal in the interests of justice. I disagree with parts III and VII for two reasons. One, I believe the standard of review on appeal in a proceeding under the parental notification act should be abuse of discretion, not factual or legal sufficiency. And two, I emphasize that in a proceeding under the parental notification act, our disposition today, remand, is inappropriate except in extraordinary circumstances. Because today we are construing the parental notification act for the first time, and because I agree it is in the interests of justice to give Jane Doe an opportunity to meet the statutory standard as the Court has construed it, I conclude this case presents exceptional circumstances warranting a remand.

I join the Court's construction of the statutory phrase "mature and sufficiently well-informed to make the decision to have an abortion performed without notification to either of her parents." [1] But I do not agree that the standard of review for appellate review of a trial court's decision that a minor is not mature or sufficiently well informed is factual and legal sufficiency. Because of the nature of the unusual proceedings contemplated under sections 33.003 and 33.004 of the Family Code, I would conclude that the appropriate standard of review is abuse of discretion.

Unlike virtually any other judicial proceeding I am aware of, this proceeding is not only "non-adversarial," but notice to the very persons (besides the minor) likely to have the most interest in the outcome of the hearing—the parents who stand not to be notified of their minor child's decision—is prohibited. And the secrecy of the proceeding assures that the hearing will be entirely one-sided.

Because of the nature of this proceeding, then, all the evidence in the record will be undisputed. But the standard the Legislature chose for trial courts to apply in determining whether a minor is "mature and sufficiently well informed"—preponderance of the evidence—is typically associated with weighing conflicting evidence after an adversarial proceeding. Thus, we have an anomalous situation—the

Legislature directs that the minor must demonstrate by a preponderance of the evidence (which generally means more likely than not) that she is mature and sufficiently well-informed, yet because the minor is the only party presenting evidence on these elements, there is no other evidence against which to weigh it to see if it is more likely than not.

A preponderance standard for trial court hearings cannot establish the standard of review on appeal, precisely because of the unique, unopposed nature of the proceedings. Since the hearing in the trial court is not adversarial and no weighing of disputed evidence can occur, there is no basis for appellate courts to defer to the trial courts' fact-finding function, as we would in any other ordinary appeal. In other words, unless the evidence in the record raises a question about the minor's credibility, the trial court is not free to simply disregard the undisputed facts provided by the minor. Whether those undisputed facts demonstrate that the minor is "mature and sufficiently well informed to make **\*259** the decision to have an abortion" is a legal question. And as we have said before, trial courts have no discretion in determining what the law is or in applying the law to the facts. [2]

Thus, in these unique, non-adversarial, parental notification proceedings, I would hold that Texas appellate courts must review a trial court's decision under an abuse of discretion standard. That is, did the trial court correctly apply the law to the undisputed facts in the record?

Moreover, again because of the unusual nature of the proceedings, I believe this Court should review the trial court's decision, rather than the court of appeals' ruling, for abuse of discretion because a case under the parental notification statute reaches us only when the court of appeals has affirmed the trial court's denial of a minor's application for waiver of parental notice. Thus, the focus in this Court should remain on whether the trial court misapplied the law to the undisputed facts. [3]

An abuse of discretion standard would not diminish the trial court's role under the statute. It remains the trial court's role to determine the witness's credibility, as the trial court hears the minor's testimony in person and is in the best position to assess the minor's credibility. But the trial court's discretion to make credibility determinations should not be unfettered. The trial court cannot simply disregard the minor's uncontested testimony. To decide otherwise—that a trial court is free to disregard the undisputed evidence despite no question of veracity—would put the trial court's legal decision beyond

review. Consequently, whether the trial court can disregard the undisputed evidence should depend on whether the record before the court raises a significant, legitimate question about the minor's veracity.

As mentioned, the parental notification statute prohibits not only general notice of the proceeding, but specific notice to the very people who likely would have the greatest interest in the minor's application—her parents.[4] It appears to me, therefore, that the Legislature intended for these proceedings to be unopposed in all circumstances. That means that the Legislature did not intend for the trial courts to assume the role of an opposing party and reject the undisputed evidence in the absence of a reasonable, factual basis to question the minor's credibility. Under similar circumstances, other courts have also concluded that the trial court may not simply choose to discredit the evidence offered by the minor unless it is "improbable or unreasonable or is shown to be untrustworthy."[5] In the case before us, for example, if the record revealed that, despite her testimony that she had conducted Internet research, Doe did not have access to a computer, the record itself would raise a significant, legitimate question about her veracity. (Of course, no such questions appear in this record.)

Furthermore, I note that throughout the Family Code a trial court makes decisions bearing on the best interests of a child. And appellate courts review those decisions under an abuse of discretion standard.[6] This fact strengthens my conviction that an abuse of discretion standard should apply here. In this case, the best interests of the child is the subject of two of the three inquiries that the statute sets forth. The same level of review should apply to the trial court's decisions regardless of the provision under review. But the Court would apply a different level of review to the trial court's decision relating **\*260** to maturity and adequacy of information. This cannot but lead to confusion and inconsistency.

Nonetheless, having concluded that the standard of review should be abuse of discretion, I cannot say that the trial court in this case demonstrably acted "without regard to guiding legal principles."[7] The primary reason for this is that we have not before had the opportunity to provide guiding legal principles. That this trial court may not have properly comprehended what the Legislature meant by the phrase "mature and sufficiently well informed" does not equate to an abuse of discretion in this instance, where no published appellate decision existed to guide the trial court. Thus, this

case presents just such an exceptional circumstance and a remand in the interest of justice is warranted.[8]

But now that this Court has announced the guiding legal principles, trial courts are not free to disregard those principles and substitute their own for determining whether a minor demonstrates that she is mature and sufficiently well informed to make this most difficult of decisions. And while the possibility exists that other exceptional circumstances in some future situation might also warrant a remand, I emphasize that such a result is contemplated neither by the statute[9] nor by our rules.[10] The time-sensitive nature of the proceedings and the constitutional implications of the specter of protracted hearings and appeals counsel very strongly against remand as an appellate disposition. And our rules expressly preclude a court of appeals from remanding.[11]

But here, where the minor has presented a record that demonstrates a high level of maturity, and where neither the minor nor the trial court had the benefit of guidance from this (or any other appellate decision) on the meaning of the phrase "mature and sufficiently well informed," I believe that it is in the best interest of justice to allow the minor the opportunity to meet the test the Court elaborates today for waiver under the act of notification to her parents to consent to the procedure. Thus, I join the Court's judgment.

Justice OWEN, joined by Chief Justice PHILLIPS as to Parts I and III, concurring.

I join in the Court's judgment reversing the court of appeals and remanding this matter to the trial court for further proceedings, but I cannot join the opinion of the Court in parts IV–VII. The Court refuses to give full effect to the statutory mandate that before a minor can obtain authorization to proceed with an abortion without notifying one of her parents, she must be "mature and sufficiently well informed to make the decision." TEX. FAM.CODE § 33.003(i). The Court's interpretation of "sufficiently well informed" falls short of what the Legislature had in mind. Most minors will, with the assistance of counsel, be able to meet the requirements set by the Court, which are minimal. The plain language of the Family Code and its historical backdrop require a more substantive showing.

**I**

The history of how and why the bypass procedure in section 33.003 of the Family Code came to be sheds light on how it should be construed. Over twenty years ago, the United States Supreme Court **\*261** handed down two landmark decisions dealing with minors and abortion. *See Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976) (*Bellotti I* ) (issued the same day as *Danforth* ). In *Danforth,* the Supreme Court held for the first time that a parent does not have an absolute "veto" over the decision of a minor to terminate her pregnancy:

> [T]he State may not impose a blanket provision ... requiring the consent of a parent ... as a condition for abortion of an unmarried minor.... [T]he State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding consent.

*Danforth,* 428 U.S. at 74, 96 S.Ct. 2831. The Court further concluded that "[a]ny independent interest the parent may have in the termination of the minor daughter's pregnancy is no more weighty than the right of privacy of the competent minor mature enough to have become pregnant." *Id.* at 75, 96 S.Ct. 2831.

In so holding, the Supreme Court said that it did not mean to suggest that "every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy." *Id.* at 75, 96 S.Ct. 2831. Consistent with that statement, the Court registered its concern that there are "unquestionably greater risks of inability to give an informed consent" for a minor. *See Bellotti I,* 428 U.S. at 147, 96 S.Ct. 2857. The Court suggested that a statute requiring parental consent before a minor could obtain an abortion might be constitutional if there were also a provision that allowed the minor to go to court to obtain consent. *Id.*

In *Bellotti II,* a plurality of the Supreme Court adopted what the Court had previously suggested in *Bellotti I* by holding that parental consent statutes would not pass constitutional muster unless the State provided an alternative procedure in which a minor could receive authorization for an abortion. *See Bellotti v. Baird,* 443 U.S. 622, 646–47, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion) (*Bellotti II* ). The

*Bellotti II* plurality concluded that a minor must be permitted an opportunity to show "either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests." *Id.* at 643–44, 99 S.Ct. 3035. With regard to the determination of maturity, *Bellotti II* stated that "the peculiar nature of the abortion decision requires the opportunity for case-by-case evaluations of the maturity of pregnant minors." *Id.* at 643 n. 23, 99 S.Ct. 3035. The *Bellotti II* plurality also concluded that a parental bypass proceeding must maintain the anonymity of the minor and must be completed with "sufficient expedition to provide an effective opportunity for an abortion to be obtained." *Id.* at 644, 99 S.Ct. 3035.

A majority of the United States Supreme Court has subsequently approved the *Bellotti II* parental bypass requirements. *See City of Akron v. Akron Ctr. for Reprod. Health, Inc.,* 462 U.S. 416, 439–42, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (*Akron I* ) (holding parental consent statute unconstitutional in light of *Bellotti II* ); *Ohio v. Akron Ctr. for Reprod. Health,* 497 U.S. 502, 510–13, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) (*Akron II* ) (declining to decide whether parental bypass was constitutionally required in a notification rather than a consent statute, but applying *Bellotti II* requirements).

A question specifically left open in United States Supreme Court decisions is whether the parental bypass procedure set forth above is constitutionally mandated when a statute requires only that a parent be notified that the minor is about to undergo an abortion as opposed to a statute **\*262** that requires parental consent. *See, e.g., Lambert v. Wicklund,* 520 U.S. 292, 295, 117 S.Ct. 1169, 137 L.Ed.2d 464 (1997) (per curiam); *Akron II,* 497 U.S. at 510, 110 S.Ct. 2972. Nevertheless, there is reasoning in *Bellotti II* that would suggest that the United States Supreme Court might hold that bypass procedures are necessary in notification statutes. The statute under consideration in *Bellotti II* required that a parent be notified when a minor brought judicial proceedings to obtain consent. *See* 443 U.S. at 646, 99 S.Ct. 3035. The Supreme Court struck down this provision, observing " 'there are parents who would obstruct, and perhaps altogether prevent, the minor's right to go to court.' " *Id.* at 647, 99 S.Ct. 3035 (quoting the district court). The Court continued, stating that every minor must have the opportunity to go to court without first notifying a parent:

[M]any parents hold strong views on the subject of abortion, and young pregnant minors, especially those living at home, are particularly vulnerable to their parents' efforts to obstruct both an abortion and their access to court. It would be unrealistic, therefore, to assume that the mere existence of a legal right to seek relief in superior court provides an effective avenue of relief for some of those who need it the most.

\* \* \*

*[E]very minor must have the opportunity—if she so desires —to go directly to a court without first consulting or notifying her parents.* If she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent.

*Id.* (plurality opinion) (emphasis added).

Undoubtedly cognizant of these holdings and admonitions of the United States Supreme Court, the Texas Legislature enacted amendments to the Family Code that require parental notification before a minor may obtain an abortion, but the Legislature also included a bypass provision. *See* TEX. FAM.CODE §§ 33.002, 33.003. The bypass procedures substantially track those set forth in *Bellotti II. See id.* § 33.003. A minor may apply to a court for an order authorizing her to consent to an abortion without notification of a parent or guardian. *See id.* The trial court may not authorize a minor to consent to an abortion unless it determines by a preponderance of the evidence

> whether the minor is mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents or a managing conservator or guardian, whether notification would not be in the best interest of the minor, or whether notification may lead to physical, sexual, or emotional abuse of the minor.

*Id.* § 33.003(i).

## II

The bypass procedure in section 33.003 does not mean, however, that the Legislature intended for a minor to proceed with an abortion based on a minimal showing. The Legislature has required that the minor be mature and sufficiently well informed to make the decision. In determining what the Legislature meant by those terms, it again must be borne in mind that decisions of the United States Supreme Court have dominated abortion law. There is a substantial body of law from that Court regarding what a state may and may not require to demonstrate a woman's informed consent to an abortion. That law should guide interpretation of section 33.003.

Given the context in which section 33.003 of the Family Code was enacted, I can only conclude that the Legislature intended to require minors to be informed about the decision to have an abortion to the full extent that the law, as interpreted by the United States Supreme Court, will allow. Accordingly, I turn to what the United States Supreme Court has said regarding **\*263** informed consent and what states may require.

## III

The United States Supreme Court has made it clear that when a woman is making a decision about abortion, particularly when she is a minor, a state can require consideration of factors in addition to the physical risks of the procedure. Those include recognition that there are profound philosophic arguments surrounding abortion, consideration of the impact that the procedure will have on the fetus, an understanding that there may be an emotional and psychological impact following an abortion and later in life, and consideration of how the decision to obtain an abortion may impact present and future familial relationships.

With regard to the philosophic aspects of the abortion decision, a majority of the Court observed in *Akron II* that:

> A free and enlightened society may decide that each of its members should attain a clearer, more tolerant understanding of the profound philosophic choices confronted by a woman who is considering whether to seek an abortion. Her decision will embrace her own destiny and personal dignity, and the origins of the other human life that lie within the embryo.

*Akron II,* 497 U.S. at 520, 110 S.Ct. 2972.

Other members of the Supreme Court again acknowledged the philosophic and social aspects of the abortion decision in *Planned Parenthood v. Casey,* 505 U.S. 833, 872, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion). They further acknowledged that when an adult woman is considering whether to have an abortion, a state may take steps to ensure that the decision is thoughtful and informed:

> Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed. Even in the earliest stages of pregnancy, *the State may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term* and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself. " '[T]he Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth.' " It follows that *States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning.* This, too, we find consistent with *Roe* 's central premises, and indeed the inevitable consequence of our holding that the State has an interest in protecting the life of the unborn.

*Id.* at 872–73, 112 S.Ct. 2791 (citation omitted) (emphasis added).

In *Casey,* the Chief Justice, joined by three other Justices, agreed with the plurality that the informed consent provisions at issue did not unduly burden the abortion decision. *See id.* at 969, 112 S.Ct. 2791 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part). In the Chief Justice's separate opinion, the concurring Justices observed that a state "has an interest in preserving unborn life," and that it may take steps to ensure "that a woman's decision to abort is a well-considered one, and reasonably furthers the State's legitimate interest in maternal health and in the unborn life of the fetus." *Id.* The Chief Justice's opinion further concluded that a 24–hour waiting period designed to give a woman time to reflect on her decision " 'is surely a small cost to impose to ensure that the woman's decision is well considered in light of its certain and irreparable consequences on fetal life, and the

possible effects on her own.' " **\*264** *Id.* at 969–70, 112 S.Ct. 2791 (quoting *Akron I,* 462 U.S. at 474, 103 S.Ct. 2481 (O'Connor, J., dissenting)).

Initially, the Supreme Court had struck down as unconstitutional statutes that were fairly specific in their requirements for informed consent to an abortion. *See Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 759–65, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986); *Akron I,* 462 U.S. at 442–45, 103 S.Ct. 2481. However, in *Casey,* a majority of the Justices overruled *Thornburgh* and *Akron I,* at least in part. *See Casey,* 505 U.S. at 881–87, 112 S.Ct. 2791 (plurality opinion); *id.* at 966–69, 112 S.Ct. 2791 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part). Although the constitutional limits on what a state may require for informed consent are not entirely clear after the Supreme Court's decision in *Casey,* it is clear that a state may require a "thoughtful and informed" decision that encourages a woman to consider that there are "philosophic and social arguments of great weight that can be brought to bear." *Casey,* 505 U.S. at 872, 112 S.Ct. 2791 (plurality opinion); *see also Akron II,* 497 U.S. at 520, 110 S.Ct. 2972. With regard to the emotional and psychological consequences of an abortion for a minor, a majority of the Supreme Court in *Akron II* said: " 'The medical, emotional, and psychological consequences of an abortion are serious and can be lasting; this is particularly so when the patient is immature.' " *Akron II,* 497 U.S. at 519, 110 S.Ct. 2972 (quoting *H.L. v. Matheson,* 450 U.S. 398, 411, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981)).

### IV

Today, this Court refuses to acknowledge the foregoing body of law or the likelihood that our Legislature relied on it when it said that a minor must be "sufficiently well informed to make the decision to have an abortion." The Court chooses to ignore that the Legislature intended section 33.003 to encompass factors other than physical risk to the pregnant minor and alternatives to abortion. The Legislature did not intend for the "mature and sufficiently well informed requirement" of section 33.003 to have as limited a focus as the Court ascribes to it. I would hold that a minor must demonstrate more.

The Court properly requires a minor to consult a health-care provider about the general risks of an abortion. But that is insufficient. There may be risks that are heightened for or unique to an individual. A minor cannot make a sufficiently

well-informed decision about an abortion if she does not know the risks to *her* of that procedure. In this regard, the Family Code expressly allows a pregnant, unmarried minor to consent to medical treatment by a physician, short of an abortion itself. *See* TEX. FAM.CODE § 32.003(a)(4).

The Court recognizes that just as there are physical risks associated with an abortion, there are emotional and psychological consequences, which can be significant for some women. But the Court's treatment of this aspect of the abortion decision—one of *the* most important considerations —is superficial. I would require a minor to demonstrate that she has sought and obtained meaningful counseling from a qualified source about the emotional and psychological impact she may experience now and later in her life as a result of having an abortion. She should be able to demonstrate to a court that she understands that some women have experienced severe remorse and regret. She should also indicate to the court that she is aware of and has considered that there are philosophic, social, moral, and religious arguments that can be brought to bear when considering abortion. *See generally Casey,* 505 U.S. at 872, 112 S.Ct. 2791 (plurality opinion). A court cannot, of course, require a minor to adopt or adhere to any particular philosophy or to profess any religious beliefs. But requiring a minor to exhibit an awareness that there are issues, including religious ones, surrounding the abortion decision is not prohibited by the **\*265** Establishment Clause. *Cf. Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (holding that a statute must have a secular legislative purpose, that its principal or primary effect must be one that neither advances nor inhibits religion, and that it must not foster an excessive government entanglement with religion). The State's statutorily expressed interest in section 33.003 is to ensure a well-informed decision, which includes a mature understanding of all issues surrounding the decision to have an abortion.

An informed appreciation of the emotional and psychological aspects of terminating a pregnancy includes an understanding of the impact the procedure will have on the fetus. As Justices O'Connor, Kennedy, and Souter observed in *Casey,* failure to obtain a full understanding of this aspect of the procedure can lead to "devastating psychological consequences" afterwards:

> Nor can it be doubted that most women considering a abortion would deem the impact on the fetus relevant, if not dispositive, to the decision. In attempting to ensure that a woman apprehend the full consequences of

her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed.

*Casey,* 505 U.S. at 882, 112 S.Ct. 2791.

In this same vein, these Justices explained, "[I]n order for there to be informed consent to a kidney transplant operation the recipient must be supplied with information about risks to the donor as well as risks to himself or herself." *Id.* at 883, 112 S.Ct. 2791. No less should be required for an abortion.

The Court today gives a nod to the fact that a decision to have an abortion may impact relationships with family members. I would require a minor to demonstrate that she has thoughtfully considered the potential impact on her relationships with her parents and other family members if they learn now or sometime in the future that she has had an abortion. She should also exhibit some consideration of how this decision may impact her future relationships, such as those she may have with a husband or future children. A minor should also have considered the impact that continuing her pregnancy would or might have on these relationships.

While a minor must demonstrate a knowledge and appreciation of the various considerations involved in her decision, I agree with the Court that she should not be required to obtain counseling or other services from a particular provider. The internet should not, however, suffice. Nor should advice from laypersons who are not specifically trained and experienced in counseling pregnant minors suffice. The "State's interest is in ensuring that the woman's consent is informed and unpressured; the critical factor is whether she obtains the necessary information and counseling from a qualified person, not the identity of the person from whom she obtains it." *Akron II,* 497 U.S. at 518, 110 S.Ct. 2972. I note, however, that a majority of the Supreme Court has observed that " '[i]t seems unlikely that [a minor] will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place.' " *H.L. v. Matheson,* 450 U.S. 398, 410, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981) (quoting *Planned Parenthood v. Danforth,* 428 U.S. 52, 91, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (concurring opinion)). By the same token, it seems unlikely that a minor would obtain all the information necessary for a well-informed decision about

proceeding with an abortion, such as medical information, solely from a religious organization or an advocacy group.

## V

I agree with the Court that Jane Doe has not established as a matter of law that **\*266** she is sufficiently well informed to make the decision to have an abortion performed without notification of one of her parents. With regard to the emotional and psychological consequences of an abortion, Jane Doe testified that she understood that there "is some emotional factor that can distress you and there is a slight risk of infection, not much." When asked if she anticipated seeking additional counseling if she were authorized by the Court to consent to an abortion, she said, "I haven't thought about it, but I think I do not need further counseling. I feel that my decision, and [sic] once it is followed through, would be fine. I am aware of it." She also testified that she had talked with an adult relative who had an abortion as a minor. That relative told Jane Doe that she has not regretted her decision. Jane Doe had also talked to two of her friends who had become pregnant as minors and were raising their respective children. One was of college age and told Jane Doe that "she really wishes that she hasn't [sic] had her child." This friend is currently unable to attend college or to support herself and her child, and she intends to move back in with her parents. Jane Doe's other friend is fifteen and has married the father of her child. Jane Doe perceives that they are having "a very hard life," and her friend told her that "they wish they could take it back." Jane Doe also talked to a friend who has had an abortion. That friend told her that her own decision to have an abortion was "a good thing" and that she does not regret it.

The fact that Jane Doe has sought advice from friends and family indicates that she is seeking information as a mature person would do. Minors in Jane Doe's position should not be discouraged from asking for counsel and support from people who know and care about them. But talking to friends and family and obtaining anecdotal information is not equivalent to receiving in-depth counseling and information from sources qualified by training and experience. She expressed no appreciation that many women experience emotional and psychological problems as a consequence of their decision or why that is so.

With regard to alternatives to abortion, Jane Doe exhibited only the most superficial consideration. Finally, she did not demonstrate that she has considered the impact a decision to have an abortion might have on her relationships with her parents or others or her future relationships.

Because Jane Doe's proof was deficient, the trial court did not err in denying her application. I agree with the Court, however, that because no court has ever construed section 33.003, this matter should be remanded in the interest of justice.

Accordingly, I join only in parts I, II, and III of the Court's opinion, and I join the judgment.

Justice HECHT, joined by Justice ABBOTT, dissenting.
The Court today deals a heavy blow to parents' fundamental, constitutional rights to raise their children, rights the Legislature had absolutely every intention of protecting by passing the Parental Notification Act in 1999. [1] Described by one of its sponsors, Senator Florence Shapiro, as a "parental rights bill", the Act was plainly meant to encourage minors to seek their parents' advice and counsel in making what the United States Supreme Court has sympathetically called the "grave and indelible" [2] decision whether to have an abortion. The Act permits a judge to authorize a minor to make the decision herself if she is "mature and sufficiently well informed". But, explains the Court, all that really means is that a minor must know something of the health risks of the abortion procedure (which is not too hard, **\*267** since for most women the physical risks are easily assessed), the alternatives to abortion (although she need not explain her choice among them), and, from "reliable and informed sources", [3] whatever that means, the emotional and psychological aspects of having an abortion. To think that a minor should choose abortion based merely on such antiseptic considerations trivializes the decision. As the Court reads the statute, no one need counsel a minor, as her parents should if they were told of her situation, that the family, social, moral, and religious aspects of her decision may radically affect her life, her family, and her future. Of such things—the really important part of the calculus of the abortion decision—a minor can be largely unappreciative and still be, in the Court's view, well informed. She need not have the benefit of differing viewpoints; she may obtain all her information from abortion proponents. "Well informed", for the Court, means only that a minor has thought about what she knows, not that she knows what to think about.

The Court does not base its statutory interpretation of "mature" and "well informed" on the ordinary meanings of

those words, or on the purposes the Legislature intended them to achieve, or on the United States Supreme Court cases from which they were undoubtedly drawn, but on its own predilections. Other states' laws cited by the Court vary widely, some specifying the information a woman must be given, others prescribing only a general standard, and none shedding more than a faint light on the proper construction of Texas' statute. The result of today's decision is that it is not much harder now for a minor to obtain an abortion without telling her parents than it was before the Parental Notification Act was passed. Mostly, the Legislature has wasted a lot of time and energy. Before the statute a minor needed a willing clinic; now she just needs a lawyer, whose fees will be paid by the State.

The essential intent of the Parental Notification Act, as I read it, is that if the State is going to cut off a parent's right to advise a minor about her pregnancy, and to authorize the minor to choose abortion without the benefit of parental involvement, then the State must ensure that the minor has had the same kind of assistance in making her decision that a parent should provide. The last thing the State should want to hear is a minor's belated cry: "Why didn't someone tell me?" It is precisely that kind of assistance that the Legislature intended to ensure but the Court ignores.

Because I believe the Court's construction of the Act conflicts with its language, purposes, and sources, I dissent.

# I

Jane Doe will be eighteen years old in a few months. She is a high school senior with a high-"B" or low-"A" grade average, is involved in some extracurricular activities, and has a part-time job. She has never been married and lives at home with both her parents. She has a boy friend, a recent high school graduate, who is attending college. Doe and her boy friend have been, in her words, "sexually active", and Doe thinks her mother is aware of that fact, although they do not discuss it. Doe is not sure whether her father is aware that she has had sex.

Doe has used birth control pills for years, but about ten weeks ago she discovered she was pregnant. About a month ago she went to a Planned Parenthood office where she received some information about abortion and, in her words, "partial counseling". A week later she applied to the trial court

for authorization to have an abortion without notifying her parents.

At the hearing, Doe was asked what kind of information she had obtained and how she had made her decision. Her entire testimony on this subject is as follows:

**\*268** Q And what kind of information did you look at to evaluate your options?

A I got information on abortion and that procedure and what goes on with it and process of adoption and what it would actually be to have the child and I looked them over and I decided the abortion would be the best for me personally.

Q Briefly describe for the Court, I mean briefly, your understanding of what the abortion procedure entails.

A Okay. Well, I know I would have to get up and go to Planned Parenthood early and take a slight sedative, so be less painful, and they would flush it out and suck out, remove it, and I would have to go out—to go back in a month to a checkup, make sure there is no infection, no hemorrhaging, and that's pretty much how they remove it.

Q Did the information that you examined include information about medical risks associated with abortion?

A Well, there is a slim chance of death, a very, very rare. It is a pretty safe procedure, safer than actually having a child. There is some emotional factor that can distress you and there is a slight risk of infection, not much. It is a pretty safe procedure.

Q Did you also attempt to find any information on alternatives to abortion?

A Yes, I looked at other information such as adoption and actually having the child.

Q And what information did you look at, what information did you evaluate in deciding to get an abortion as opposed to pursuing one of those other options?

A Well, I just thought about my options and what would be best for me and actually the child and abortion in the long run I see as being most positive and best one there is.

Q Could you explain to the Court why you made that decision?

A Well, for me I feel if I were to have the child, my parents, they would be slightly upset to actually know that I became pregnant and they are very against abortion. So, first of all, they wouldn't even give me that chance to have an abortion. And I am planning after I graduate this year to go off [from home] to college. And I would like to pursue my own career. And I feel if I had the child I couldn't do any of that now and be a major setback. And I don't favor the adoption. I know it could be done, but if I were to go nine months having this child, I would feel to keep it. But that is—I already decided that would be, would be holding me back from my future, what I want to become. So, I decided abortion would be overall the best solution.

Doe has not consulted a physician. She testified that she had talked with a close relative who had had an abortion when she was 17. Doe's entire account of the conversation was that "she told me how she felt about it and what went on." Doe's guardian told the trial court that Doe's conversations with her relative "were pretty limited in terms of having the real advice". Doe also testified that she had spoken with three friends. One, a high school graduate, had a child and could not go to college but had to move in with her parents. Another, age 15, was, in Doe's words, "trying to go to school and have her baby, you know," and her parents had forced her to marry. In Doe's words: "[T]hey both have a very hard life right now and they say they wish they could take it back." A third had had an abortion and felt strongly that it was, according to Doe, "a good thing that she had it done so she can look into the future and say she's glad she had this done". Doe did not talk with anyone else about her decision. No one she spoke with expressed any reservations about her having an abortion or about abortion in general.

Doe's guardian asked her to get counseling at a crisis pregnancy center, and she **\*269** made an appointment to do so, but she was unable to locate the office. She testified that she "did further research over the internet, different sites, different places, for how they feel about it, you know, what their procedures were about. So, I looked up on my own." Doe did not give further specifics about her internet research. Doe has not spoken with a member of the clergy. Asked whether she thought she needed any further counseling on the abortion procedure or alternatives to it, she said: "I haven't thought about it, but I do not think I need further counseling. I feel that my decision, and once it is followed through, would be fine. I am aware of it."

Asked why she did not want to involve her parents in her decision, Doe testified as follows:

Q Could you briefly describe for the Court, you have talked a little bit, but maybe a little bit more information, as to why it is you don't believe you can tell your parents about your decision to have an abortion?

A Okay. Both of my parents are active members at our church.... And they strongly believe that it's not a wise thing to do. It is something they do not believe in. They much rather me have a child. And they wouldn't even give me the opportunity to have this done. They have it set in their mind what would go on. It is something they strongly disapprove of.

* * *

Q You say that your parents, you seem pretty sure that they would not be in favor of abortion. Have you ... had some general discussion with them about how they would feel if someone in their family got an abortion, or what is your basis for that?

A Well, when my [relative] had her abortion ... my mom felt very strongly since then that it is something that she doesn't believe in, something that she doesn't want anyone else in the family to have done. She feels that the child would be a part of her and she would not give me that option. She's told me before that is not a thing that she does believe in. She doesn't want her daughter to go through that. It would be wrong. So, she just strongly disagrees with it.

* * *

Q And can you tell me if there is any reason that you wouldn't want to have your mother there when you wake up [from the sedative after the abortion procedure]?

A She wouldn't let me do it. I know for a fact she wouldn't. She is very against this and she would be disappointed in me. She wouldn't be there to support me with it. I know she wouldn't go along with it. She wouldn't be there in the first place. She totally detests the fact of people that actually do that.

Having heard this evidence, and after argument by the guardian and by Doe's attorney, the trial court made the following findings:

5. The applicant has not shown by a preponderance of the evidence that: Applicant is mature and sufficiently well informed to make the decision to have an abortion without notification to either of her parents, her managing conservator, or guardian.

6. The court finds that although applicant shows sign of being mature, she has not demonstrated that she is sufficiently well informed about the medical procedures and the emotional impact of the procedure.

7. The applicant has not shown by a preponderance of the evidence that: Notifying either of the applicant's parents, managing conservator or guardian would not be in her best interest.

## II

Texas' Parental Notification Act was enacted in the context of a developing body **\*270** of federal constitutional law that attempts to determine the extent of a woman's right to choose abortion and the kinds of limitations that can be placed on it. Understanding this context is necessary to construe and apply the Texas statute.

A woman's right to choose abortion that the United States Supreme Court has recognized is not absolute. [4] The Supreme Court explained in *Planned Parenthood v. Casey:*

At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life....

These considerations begin our analysis of the woman's interest in terminating her pregnancy but cannot end it, for this reason: though the abortion decision may originate within the zone of conscience and belief, it is more than a philosophic exercise. Abortion is a unique act. It is an act fraught with consequences for others: for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; for the spouse, family, and society which must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life; and, depending on one's beliefs, for the life or potential life that is aborted. [5]

When the woman is a minor, her right is subject to two important limitations: the State's interest in protecting the welfare of all its citizens and the life of the unborn, [6] and the interest of parents and families in living their lives free from undue state interference. [7] I examine each of these limitations in turn.

## A

The State has a legitimate interest in protecting its citizens' welfare, and it may constitutionally favor normal childbirth and encourage a woman to make that choice. In *Casey,* the Supreme Court explained:

Though the woman has a right to choose to terminate or continue her pregnancy before viability, it does not at all follow that the State is prohibited from taking steps to ensure that this choice is thoughtful and informed. Even in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself. " '[T]he Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth.' " It follows that States are free to enact laws to provide a reasonable framework for a woman to make a decision that has such profound and lasting meaning.

\* \* \*

What is at stake is the woman's right to make the ultimate decision, not a right to be insulated from all others in doing so. Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose.

**\*271** \* \* \*

It cannot be questioned that psychological well-being is a facet of health. Nor can it be doubted that most women

considering an abortion would deem the impact on the fetus relevant, if not dispositive, to the decision. In attempting to ensure that a woman apprehend the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed. If the information the State requires to be made available to the woman is truthful and not misleading, the requirement may be permissible.

\* \* \*

[W]e permit a State to further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed, even when in so doing the State expresses a preference for childbirth over abortion. In short, requiring that the woman be informed of the availability of information relating to fetal development and the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion. [8]

To sum up, the Supreme Court stated: "[t]he woman's liberty [to choose abortion] is not so unlimited ... that from the outset the State cannot show its concern for the life of the unborn...." [9] "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." [10]

The State's interest is particularly acute when the woman is a minor. The Supreme Court

has held that the States validly may limit the freedom of children to choose for themselves in the making of important, affirmative choices with potentially serious consequences. These rulings have been grounded in the recognition that, during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them. [11]

Among those choices, the Supreme Court has insisted, is abortion:

The State has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely. That interest, which justifies state-imposed requirements that a minor obtain his or her parent's consent before undergoing an operation, marrying, or entering military service, extends also to the minor's decision to terminate her pregnancy. [12]

**B**

A minor's right to choose to have an abortion can be restricted not only by the State's interest in her welfare but by the interest of her parents and the interest of the family unit. [13] These interests are subject to constitutional protection. The Supreme Court has stated:

[T]he demonstration of commitment to the child through the assumption of personal, financial, or custodial responsibility **\*272** may give the natural parent a stake in the relationship with the child rising to the level of a liberty interest.

\* \* \*

[T]he family has a privacy interest in the upbringing and education of children and the intimacies of the marital relationship which is protected by the Constitution against undue state interference. [14]

This Court has also recognized the constitutional rights of parents in the relationship with their children. [15]

Specifically with respect to parental involvement in a minor's decision whether to have an abortion, the Supreme Court has explained:

[T]he guiding role of parents in the upbringing of their children justifies limitations on the freedoms of minors.... "The child is not the mere creature of the State; those

who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." "The duty to prepare the child for 'additional obligations' ... must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." This affirmative process of teaching, guiding, and inspiring by precept and example is essential to the growth of young people into mature, socially responsible citizens.

We have believed in this country that this process, in large part, is beyond the competence of impersonal political institutions. Indeed, affirmative sponsorship of particular ethical, religious, or political beliefs is something we expect the State *not* to attempt in a society constitutionally committed to the ideal of individual liberty and freedom of choice. Thus, "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include *preparation for obligations the state can neither supply nor hinder."*

\* \* \*

[T]he parental role implies a substantial measure of authority over one's children. Indeed, "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society."

> Properly understood, then, the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter. Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding. Under the Constitution, the State can "properly conclude that parents and others, teachers for example, who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility."

\* \* \*

[P]arental notice and consent are qualifications that typically may be imposed by the State on a minor's right

to make important decisions. As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor. It may further determine, as a general proposition, that such consultation **\*273** is particularly desirable with respect to the abortion decision—one that for some people raises profound moral and religious concerns. [16]

The Supreme Court has held that a parent cannot have an absolute and arbitrary veto over a child's choice of an abortion. [17] But by the same token, a parent's right to be involved in a child's decisions cannot be abrogated without sufficient reason.

### III

In the context of this developing federal constitutional law, Texas' Parental Notification Act was passed, as its abundant history repeatedly emphasizes, to encourage parental participation in a minor's decision to have an abortion, to discourage abortion generally, and to discourage teen pregnancy with the warning that an abortion without parental involvement would not be readily available. The Act prohibits a physician, with certain exceptions, from performing an abortion on an unemancipated minor without giving a parent, managing conservator, or guardian at least 48 hours' actual notice. [18] One exception to this prohibition is that a court may grant a minor's application to consent to an abortion without the prescribed notice if the court determines, by a preponderance of the evidence, that either (1) "the minor is mature and sufficiently well informed to make the decision to have an abortion performed without notification to either of her parents or a managing conservator or guardian," (2) "notification would not be in the best interest of the minor," or (3) "notification may lead to physical, sexual, or emotional abuse of the minor." [19] As I have already noted, petitioner bases her application on the first two of these grounds. I consider each ground separately.

### A

The Legislature has not defined the phrase "mature and sufficiently well informed" in section 33.033(i). Accordingly, we are obliged to give the words their ordinary meaning, [20]

a requirement acknowledged by the Court and then wholly ignored.

According to the *Oxford English Dictionary,* the word "mature", used in describing a person, means "having the powers of body and mind fully developed." With reference to thought and deliberation, the word means "duly prolonged and careful." And as applied to "plans, conclusions, etc.," the word means "formed after adequate deliberation." The *Oxford English Dictionary* defines the word "well-informed" as: "Well equipped with information; fully furnished with knowledge, whether of a special subject or of things in general; having a well-stored mind." Thus defined, the statutory phrase, "mature and sufficiently well informed", refers to the basis for a decision—full information and knowledge of the subject—as well as the manner in which it is made—as by a person of ample years and experience.

A decision cannot be well informed if the person making it does not have a full knowledge of the relevant considerations. In the present context, this does not mean that a minor must know all there is to know about abortion as a medical procedure or the alternatives to it and the factors involved in a choice. Some of the relevant factors are not hard to assess, such as the health risks of the procedure to the woman. But many of the relevant factors involve more unknowns: the consequences to the fetus, the risks of psychological and emotional problems, the woman's ability to mother the child if it is born, **\*274** the availability of alternatives including adoption, the availability of financial assistance if the child is carried to term, the impact of the decision on the woman's present and future family, and the "philosophic and social" [21]—including religious—concerns that favor continuing the pregnancy to term. Mastery of these issues is not necessary for a person to be well-informed, but an appreciation of them is. A minor worried about the financial burdens of parenthood, for example, should know what support is available to her; that information could affect her decision. While people disagree about the more subjective factors, a minor should nevertheless have some awareness of the issues in the disagreement in making her decision. As the United States Supreme Court has observed, the State has a legitimate purpose in "reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." [22]

The abortion decision does not turn merely, or mostly, on simple facts, such as that in most instances abortion is a very safe medical procedure. The risks in a particular case may be greater and may determine the decision, but that is not true in most situations. Far more important are concerns about the family, social, psychological, emotional, moral, and religious implications of the abortion decision. Ordinarily, some of these issues are none of the State's business. A person's religious views, for example, are entirely a private and individual matter. But minors who have not yet thought seriously about such matters should be aware that their views may someday change. It is critical that a minor appreciate that decisions made today can have consequences decades into the future. The essential approach taken by the Legislature in the Parental Notification Act is that if a minor is to be allowed to choose abortion without the guidance parents should give a child in such circumstances, then she must have an appreciation of that guidance from somewhere else. Because there is deep disagreement over the subjective elements of a choice of abortion, a minor should be aware of and appreciate the differing views. She is free to credit some and discount others, of course, but she ought not to make a decision without knowing what others believe to be at stake. As the United States Supreme Court has observed, "It seems unlikely that [a woman] will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place." [23] The landscape is not revealed in any single setting.

Whether a minor is well informed is more of an objective determination than whether she is mature. As noted above, the latter quality is an ability to act as an experienced adult would. The United States Supreme Court has observed that "the fact that a minor may be very much an adult in some respects does not mean that his or her need and opportunity for growth under parental guidance and discipline have ended." [24] The Court fails to take this obvious fact into account. Maturity is not so much a matter of what a person knows as it is of how she thinks and acts. A trial judge who can watch a minor's demeanor and hear the inflections in her voice is in a far better position to determine her maturity than an appellate judge confined to the typed transcript of her testimony.

From the meanings of the words themselves and the purposes of the Parental **\*275** Notification Act, informed by the United States Supreme Court's reference to the same ideas in numerous opinions, I conclude that by "mature and sufficiently well informed" the Legislature means a minor who has obtained for herself the kind of complete and balanced information relevant to her decision and evaluate it as a person who no longer needed parental guidance on so

grave a matter. For reasons that I am about to explain, the Court reads the statutory standard to mean something far less.

**B**

Although petitioner in this case has not focused her arguments on appeal on the alternative ground on which she based her application—that notifying her parents of her intent to have an abortion would not be in her best interest—I address that ground briefly.

In essence, petitioner does not want to notify her parents because she fears they will not approve. This concern, standing alone, should not justify excluding her parents from her decision, as the trial court found. For one thing, petitioner may have judged wrongly. But assuming her fears are well founded, petitioner must choose between parental disapproval and the burden of knowing that she has kept something very important from them. The latter does not simply trump the former. A minor's concealment from her parents of so profound a decision, like the decision itself, may have lifelong, and unforeseen, consequences. The trial judge must ensure that the minor appreciates those consequences and must attempt to determine whether it would not be in a minor's interest to attempt to involve her parents in her decision despite their disappointment and disapproval.

**IV**

The Court's opinion minimizes what a minor must prove to show that she is "mature and sufficiently well informed" to choose abortion without involving her parents. This is not immediately apparent from all its language. For instance, at one point the Court states that a minor must demonstrate that her decision "is based upon careful consideration of the various options available to her and the benefits, risks, and consequences of those options."[25] But this broad statement is belied by the specific requirements set out in Part V. There are only three, and while they are what the Court would require "at a minimum",[26] they are nevertheless sufficient as a matter of law for a minor to obtain judicial authorization for an abortion.

This point is crucial: as the Court reads the statute, once a minor has proved what she must by a preponderance of the evidence, then she is *entitled as a matter of law* to an abortion without parental notification. The trial court has no discretion in the matter. Thus, if a minor offers evidence to satisfy the Court's three requirements, her application *must be granted.* This standard is, of course, foreign to the language, intent, and purposes of the Act.

The Court's first requirement is that a minor must obtain information about the health risks of the procedure. While such information is certainly essential to the minor's decision, it will not be significant in most instances. Abortion is, for the most part, a physically safe procedure. There are instances when this is not true, and a minor should be advised of the risks *to her,* but in most instances it will not be difficult for a minor to meet this requirement.

The Court's second requirement is that a minor should "have an understanding of the alternatives to abortion and their implications" and have given them "thoughtful consideration", although she need not "justify why she prefers abortion above **\*276** other options".[27] In the Court's view, this requirement can be satisfied by a simple declaration by the minor that she has thought long and hard about her decision. But in fact, a minor is not well informed merely because she knows that she can carry her pregnancy to term and then either keep the child or offer it for adoption. She should have an appreciation of what her options entail.

The Court's third requirement is that a minor should have received information "from reliable and informed sources" concerning the "emotional and psychological aspects of undergoing an abortion".[28] Just who such sources might be the Court does not say, but nothing prohibits them from all being promoters of abortion. A minor is not well informed simply because she has heard one side of a matter.

The Court acts as if these three requirements are significant, but they plainly are not. Any competent attorney representing a minor in a case like this can easily script testimony that will meet all three requirements. All a minor need tell the trial court is: that she has consulted with a clinician who told her that abortion presented insignificant physical risks to her, that some people regret having an abortion but not very often, and that she could always have the child and keep it or put it up for adoption; and that she carefully considered all the clinician said. Once the minor has covered these bases, she is *entitled* to an order authorizing her to consent to an abortion. A trial court that is convinced that a minor is not entitled to an abortion without parental notification must therefore base the decision on the minor's overall credibility and evidence of

her immaturity that cannot be fully reflected in the appellate record.

The Court refuses even to acknowledge that a minor's decision can profoundly affect her future and present family relationships. In the Court's mind, the most significant issues involved in the abortion decision do not even exist. According to the Court, a minor is well informed if she knows a little about a few things which may matter and nothing about the very profound consequences of her decision.

The Court completely ignores the fundamental, constitutional rights of petitioner's parents which must, as the United States Supreme Court has stated, [29] be balanced against petitioner's right to choose an abortion. The Legislature's express intent in passing the Parental Notification Act was to protect parents' rights to provide children guidance in making difficult decisions. In essence, the Court holds that minors can get by without the help.

## V

I have set out above in complete detail petitioner's testimony, omitting only those facts that tend to identify her. It is fair to say that she based her decision to have an abortion on what she called "partial counseling" one Saturday at a Planned Parenthood clinic; the unsurprising encouragement of her 19–year–old boy friend, who is the father of the child and now wants no part of the responsibility; a brief conversation with a relative who had an abortion when she was petitioner's age; conversations with three teenage friends, one of whom was glad she had had an abortion, and two of whom, one age 15, said they wished they had; and unspecified information obtained on the internet. I agree with the Court that this does not prove as a matter of law that petitioner is mature and sufficiently well informed to have an abortion without telling her parents.

Incredibly, the Court never hints at the specific deficiency in petitioner's proof. In this "matter of first impression" the Court hides any reasoning it has. Why has petitioner's proof failed? What was missing? **\*277** How much more, or how little, was required? Ordinarily, the Court would answer these questions, would apply its construction of the statute to the facts of the case and explain the consequences. But the JUSTICES in the majority cannot agree on enough issues, even after days of compromise among themselves, to come up with a single ecumenical justification for their result. The

Court says that it writes to give the lower courts guidance, and then in Part VII of its opinion, on the issue dispositive of the case, offers no explanation. None, except "Sorry, you lose, try again." To undertake an opinion in this case and then give no explanation for the result is a blatant abnegation of the Court's responsibility to the lower courts and the petitioner, and an affront to the Legislature.

I would hold that the trial court's decision to deny petitioner's application was based on some evidence, and I would deny her appeal. I do not agree that she should simply have a second try, especially since she will have no trouble improving her case. While the court's decision should be given res judicata effect, it would not bar petitioner from reapplying if her circumstances changed materially.

## VI

I agree with the conclusion in Part II of the Court's opinion that this Court must publicly explain its decisions, even in cases like this one in which there is a special need for confidentiality. [30] Neither our duty to the rule of law, nor our constitutional role in the government, nor our obligations to the people whose government it is, permit this Court to rule in secret. It may well be that the lower courts' rulings in cases like this cannot be secret either, but petitioner has not raised the issue, and no one else can raise it in this case, since no one besides her attorney and guardian will have known before today that the case was before us. So the issue must be left for another day. [31]

I also agree with the conclusion in Part III of the Court's opinion that the trial court's decision in this case should be affirmed on appeal if it finds sufficient support in the evidence. [32] Because our jurisdiction to review evidentiary sufficiency is limited, we must affirm the trial court's decision if there is any evidence to support it. We can reverse only if petitioner demonstrates that she has proven her right to an abortion without parental involvement as a matter of law, which I agree she has not done, for the reasons I have explained and the Court has not.

* * * * *

The people of Texas, like the American people, are deeply divided over abortion. That division will almost certainly

affect the present and future life of every minor who has an abortion. If the Legislature's mandate that a minor be well informed before choosing abortion without involving her parents does not mean that she be given the same guidance a child should have from her parents, then it offers her little protection. If the Legislature's mandate means that parents can be deprived of their fundamental right to guide their child's decisions when she has no more appreciation of her circumstances than the Court requires, then the statute is almost meaningless. I would not deny the Parental Notification Act its intended purposes. I dissent.

Footnotes

1   Justice Enoch's concurrence argues that the proper standard of review is abuse of discretion. Much of his argument is based on the premise that the facts will be undisputed. Although the hearing is unopposed, the testimony presented by the minor may be inconsistent, either on direct or after the trial court has posed questions. Therefore, rather than simply applying the law to undisputed facts, the trial court must weigh all the evidence before it, including demeanor and credibility, to determine if the minor, by a preponderance of the evidence, has demonstrated that she is mature and sufficiently well informed.

2   *See* ARK.CODE ANN. § 20–16–804(1)(A)(Michie 1999); COLO.REV.STAT. ANN . § 12–37.5–107(2)(a)(1999); FLA. STAT. §§ 390.01115(3)(a) & (4)(c)(1999); GA.CODE ANN. § 15–11–114(c)(1999); 750 ILL. COMP. STAT.. 70/25–25(d) (West 1999); KAN. STAT. ANN.. §§ 65–6705(a) & (d) (1998); MD.CODE ANN., HEALTH §§ 20–103(a) & (c) (1991); MINN.STAT. § 144.343(6) (1998); MONT.CODE ANN. §§ 50–20–212(4) & (5) (1999); NEB.REV.STAT. § 71–6903(1) (1999); NEV.REV.STAT. § 442.255(2) (1997); N.J. STAT. ANN.. § 9:17A–1.7(d) (West 1999); OHIO REV.CODE ANN. §§ 2151.85(A)(4) & (C)(1) (Banks–Baldwin 1999); S.D. CODIFIED LAWS §§ 34–23A–7(3) & 34–23A–7.1 (Michie 1999); VA.CODE ANN. § 16.1–241(V) (Michie 1999); W. VA.CODE § 16–2F–4(f) (1999); WYO. STAT. ANN. § 35–6–118(b)(v)(B) (Michie 1999).

3   Although Texas Parental Notification Rule 3.3(b) does not allow a court of appeals to remand, the rules are silent regarding this Court. Consequently, we are not prohibited from remanding.

1   TEX. FAM.CODE § 33.003(i).

2   *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

3   *See, e.g., Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 918 (Tex.1985).

4   *See* TEX. FAM.CODE § 33.003(k).

5   *In the Matter of the Petition of Jane Doe,* 19 Kan.App.2d 204, 866 P.2d 1069, 1074 (1994).

6   *See Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982); *Green v. Remling,* 608 S.W.2d 905, 908 (Tex.1980).

7   *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998).

8   *See* TEX.R.APP. P. 60.3.

9   *See* TEX. FAM.CODE § 33.004(b).

10  *See* TEX. PARENTAL NOTIFICATION RULES & FORMS 3.3(b).

11  *See id.* ("The court of appeals ... must issue a judgment affirming or reversing the trial court's order denying the application. If the court of appeals reverses the trial court order, it must also state in its judgment that the application is granted.").

1   TEX. FAM.CODE §§ 33.001–.011. All statutory references are to the Family Code unless otherwise noted.

2   *Bellotti v. Baird,* 443 U.S. 622, 642, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ).

3   *Ante* at 256–57.

4   *Planned Parenthood v. Casey,* 505 U.S. 833, 869, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion).

5   *Id.* at 851–852, 112 S.Ct. 2791.

6   *Id.* at 872–873, 112 S.Ct. 2791.

7   *Hodgson v. Minnesota,* 497 U.S. 417, 444, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (plurality opinion).

8   *Casey,* 505 U.S. at 872–883, 112 S.Ct. 2791 (citations omitted).

9   *Id.* at 869, 112 S.Ct. 2791.

10  *Id.* at 874, 112 S.Ct. 2791.

11  *Bellotti v. Baird,* 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ).

12  *Hodgson,* 497 U.S. at 444–445, 110 S.Ct. 2926 (plurality opinion) (citations omitted).

13  *Id.* at 444, 110 S.Ct. 2926.

14  *Id.* at 446, 110 S.Ct. 2926.

15  *E.g., Patterson v. Planned Parenthood,* 971 S.W.2d 439, 447 (Tex.1998) (Gonzalez, J., concurring); *In the Interest of J.W.T.,* 872 S.W.2d 189, 194–195 (Tex.1994); *Wiley v. Spratlan,* 543 S.W.2d 349, 352 (Tex.1976).

*Bellotti II,* 443 U.S. at 637–640, 99 S.Ct. 3035 (emphasis in original, citations omitted).

*Planned Parenthood v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

TEX. FAM.CODE § 33.002.

*Id.* § 33.003(i).

TEX. GOV'T CODE § 312.002(a); *Owens Corning v. Carter,* 997 S.W.2d 560, 577 (Tex.1999).

*Planned Parenthood v. Casey,* 505 U.S. 833, 872, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (plurality opinion).

*Id.* at 882, 112 S.Ct. 2791.

*H.L. v. Matheson,* 450 U.S. 398, 410, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981).

*Bellotti v. Baird,* 443 U.S. 622, 644 n. 23, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (*Bellotti II* ) (plurality opinion).

*Ante* at 255.

*Ante* at 256.

*Ante* at 256.

*Ante* at 256.

*Hodgson v. Minnesota,* 497 U.S. 417, 444, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (plurality opinion).

*Ante* at 251–52.

*See also* TEX. PARENTAL NOTIFICATION RULES & FORMS, Explanatory Stmt. ("such issues should not be resolved outside an adversarial proceeding with full briefing and argument").

*Ante* at 253.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**304 S.W.3d 871
Court of Appeals of Texas,
Austin.**

SAVE OUR SPRINGS ALLIANCE, INC., Appellant,

v.

CITY OF DRIPPING SPRINGS; Todd Purcell, in his
Official Capacity as Mayor of the City of Dripping
Springs; and Mak Foster Ranch, L.P., Appellees.

No. 03–04–00683–CV.　|　Feb.
11, 2010.　|　Order Denying
Reconsideration En Banc　Feb. 12, 2010.

## Synopsis

**Background:** Non-profit public interest group, dedicated to protecting a segment of an aquifer, filed suit against city and landowners, challenging city's authority to enter into agreements with landowners to develop portions of their property for residential, commercial, and recreational use. Group also sought declaration that agreements violated Texas Constitution, and alleged that public notices regarding city council's approval of agreements violated Texas Open Meetings Act. The 207th Judicial District Court, Hays County, Jack H. Robison, J., granted summary judgment to defendants on the Open Meetings Act claim, granted defendants' pleas to the jurisdiction on remaining claims, and awarded defendants attorney fees. Public interest group appealed.

**Holdings:** On motion for rehearing, the Court of Appeals, G. Alan Waldrop, J., held that:

[1] group lacked associational standing to bring its claims, other than the Open Meetings Act claim;

[2] notice of city council meeting to approve agreements did not violate Open Meetings Act; and

[3] trial court did not abuse its discretion in awarding attorney fees.

Affirmed; motion for reconsideration en banc denied.

Jan P. Patterson, J., dissented from the denial of reconsideration en banc and filed opinion in which Henson, J., joined.

**Attorneys and Law Firms**

**\*875** Brad Rockwell, Scanlon, Buckle & Young, Sarah Baker, Austin, for appellant.

Thomas W. Robertson, Baker & Associates, Dripping Springs, E. Lee Parsley, E. Lee Parsley, P.C., Howard S. Slobodin, Hazen & Terrell, P.C., Paul M. Terrill, III, The Terrill Law Firm, P.C., J. Bruce Scrafford, Jeffrey J. Hobbs, Armbrust & Brown, L.L.P., Austin, for appellee.

Before Chief Justice LAW, Justices PEMBERTON and WALDROP.

### *OPINION*

G. ALAN WALDROP, Justice.

We withdraw the opinion and judgment issued July 3, 2009, and substitute the following opinion and judgment in their place. We deny appellant's motion for rehearing.

The City of Dripping Springs entered into agreements with two landowners in the City's extraterritorial jurisdiction, Cypress–Hays, L.P. and Mak Foster Ranch, L.P. The agreements contemplated the landowners' development of portions of their property for residential, commercial, and recreational use. The agreements were approved by the city council in public meetings during April 2001. Appellant Save Our Springs Alliance, Inc. ("SOS Alliance") filed suit alleging that the agreements would result in added pollution to the environmentally sensitive Edwards Aquifer. In its petition, SOS Alliance sought a declaration that the agreements violated the Texas Constitution, and alleged that the public notices regarding the **\*876** city council's approval of the agreements did not sufficiently communicate the subject matter of the meetings as required by the Texas Open Meetings Act. The district court granted summary judgment to the defendants on SOS Alliance's Open Meetings Act claim, granted the defendants' pleas to the jurisdiction on the remaining claims based on SOS Alliance's lack of standing, and awarded the defendants attorneys' fees. We affirm the judgment of the district court.

### Factual and Procedural Background

After notice and a public hearing on April 10, 2001, the City of Dripping Springs entered into a "Development Agreement" with Cypress–Hays, L.P. This agreement authorized development on approximately 2,724 acres of land owned by Cypress–Hays in the City's extraterritorial jurisdiction in Hays County. After notice and a public hearing on April 19, 2001, the City entered into a similar "Development Agreement" with Mak Foster Ranch, L.P. This agreement authorized development on approximately 1,611 acres of land owned by Mak Foster in the City's extraterritorial jurisdiction in Hays County. Both Development Agreements contemplated development of the land as master-planned, mixed-use communities with commercial and residential uses, as well as park and recreational facilities. Under the Agreements, Cypress–Hays and Mak Foster could develop the land according to agreed-upon standards, in exchange for the City's pledge that the standards would remain consistent for a period of 15 years (with up to two 5–year extensions). [1]

SOS Alliance is a nonprofit corporation dedicated to protecting the Barton Springs segment of the Edwards Aquifer, which is located almost entirely in Hays and Travis Counties. According to SOS Alliance, water from the aquifer's "contributing zone." in which the City of Dripping Springs is located, flows eastward on creeks into the "recharge zone," where the water moves underground through caves, sinkholes, and other openings to fill or "recharge" the aquifer. Most of the water from this segment of the aquifer emerges at Barton Springs in Austin, Texas, which is on the northeast corner of the two zones.

In November 2002, SOS Alliance filed suit against the City of Dripping Springs and Todd Purcell in his official capacity as mayor of the City of Dripping Springs (collectively, the "City"), challenging the municipality's authority to enter into the Development Agreements and the sufficiency of the information in the public notices for the meetings at which the Agreements were considered and approved. [2] Four months later, SOS Alliance **\*877** added Cypress–Hays and appellee Mak Foster as defendants in the lawsuit.

Although some authority existed for cities to enter into certain types of development agreements for land in their extraterritorial jurisdiction, *see* Tex. Loc. Gov't Code Ann. § 42.044 (West 2008), the legislature expanded cities' authority to enter into such agreements during the 2003 legislative session. *See* Act of May 24, 2003, 78th Leg., R.S., ch. 522, § 1, 2003 Tex. Gen. Laws 1788, 1788–89 (codified at Tex. Loc. Gov't Code Ann. §§ 212.171–.174 (West 2008)). The 2003 legislation included a provision that resulted in the retroactive validation of the Development Agreements. *See* Tex. Loc. Gov't Code Ann. § 212.172(h).

After this legislation was enacted, on May 11, 2004, SOS Alliance filed its second amended petition—the live pleading in this case when judgment was entered—seeking declaratory and injunctive relief and attorneys' fees. In its petition, SOS Alliance alleged that the Development Agreements violate the Texas Constitution by impinging on the right of local self-government, impairing the preservation of a republican form of government, and contracting away legislative powers. SOS Alliance further alleged that the City violated the Texas Open Meetings Act by issuing public notices that insufficiently stated the subject of the Development Agreements.

The parties filed cross-motions for partial summary judgment, and the defendants also filed pleas to the jurisdiction challenging SOS Alliance's standing to pursue its claims. On July 26, 2004, the district court granted the defendants' pleas to the jurisdiction as to all of SOS Alliance's claims except the alleged violations of the Open Meetings Act and, after a hearing, granted summary judgment in favor of appellees as to the Open Meetings Act claim. The parties and the court agreed to try the remaining issue of attorneys' fees on written submission, and the court subsequently granted the defendants' requested fees. The district court entered a final judgment on November 29, 2004, incorporating all of its prior orders. SOS Alliance appeals. [3]

### Standing

[1] [2] [3] In its first and second points on appeal, SOS Alliance asserts that the district court's granting of appellees' pleas to the jurisdiction as to SOS Alliance's claims that do not relate to the Open Meetings Act was in error. A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of a specific cause of action. *See Texas Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 225–26 (Tex.2004)*. We review de novo whether a court has subject-matter jurisdiction and whether the plaintiff has alleged facts that affirmatively demonstrate subject-matter jurisdiction. *Id.* at 226. In deciding a plea to the jurisdiction, we are not to consider the merits of the plaintiff's claims beyond the extent necessary to resolve the jurisdiction issue, but consider the plaintiff's pleadings, construed in the

plaintiff's favor, and evidence pertinent to the jurisdictional inquiry. *Id.* at 227–28; *County of Cameron v. Brown,* 80 S.W.3d 549, 555 (Tex.2002). SOS Alliance contends that its pleadings and jurisdictional **\*878** evidence are sufficient to establish jurisdiction.

 **[4]** **[5]** **[6]** **[7]** Subject-matter jurisdiction is essential to the authority of a court to decide a case, and standing is a component of subject-matter jurisdiction. *See Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 443–45 (Tex.1993). A plaintiff must have standing for the court to have subject-matter jurisdiction to decide the merits of the plaintiff's claims. *See id.; Farmers Tex. County Mut. Ins. Co. v. Romo,* 250 S.W.3d 527, 532 (Tex.App.-Austin 2008, no pet.). The plaintiff must allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Texas Ass'n of Bus.,* 852 S.W.2d at 446. The general test for standing is whether there is a real controversy between the parties that will actually be determined by the judicial declaration sought. *Id.* Standing focuses on the question of who may bring a lawsuit. *Patterson v. Planned Parenthood,* 971 S.W.2d 439, 442 (Tex.1998).

 **[8]** **[9]** SOS Alliance sues on behalf of its members. An association has standing to sue on behalf of its members when (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Texas Ass'n of Bus.,* 852 S.W.2d at 447 (quoting *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). The first prong of associational standing may be satisfied if at least one of the organization's members would have standing individually. *See Hays County v. Hays County Water Planning P'ship,* 106 S.W.3d 349, 357 (Tex.App.-Austin 2003, no pet.). The Supreme Court has observed that the "irreducible constitutional minimum" of individual standing contains three elements: (1) the plaintiff must have suffered an "injury in fact," an invasion of a legally protected interest that is concrete and particularized, and that is actual or imminent rather than conjectural or hypothetical, (2) the injury is fairly traceable to the challenged action of the defendant and not the independent action of a third party not before the court, and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see Brown v. Todd,* 53 S.W.3d 297, 305 (Tex.2001)

("[W]e may look to the similar federal standing requirements for guidance.").

SOS Alliance alleges several distinct injuries to its members by which it asserts to have standing in this lawsuit: (1) members who enjoy Barton Springs pool and its surroundings for its recreational, scenic, or scientific value allege injury from increased pollution in the aquifer; (2) members who live near the land subject to the Development Agreements and who use well water express concern of pollution to the water; (3) members who are residents of Dripping Springs allege that the Agreements injured their procedural interests in using democratic means to prevent development activities that would further pollute Barton Springs; (4) members who pay property taxes to the City allege injury from the City's expenditure of public funds under the Agreements; and (5) members who live near the land subject to the Agreements express concern about increased lights during the nighttime, increased road traffic, and decreased property values.

### Injury to Environmental, Scientific, and Recreational Interests in Barton Springs

SOS Alliance argues that it has standing due to environmental injury related to the Barton Springs pool in Austin. SOS Alliance **\*879** alleges that many of its members regularly swim in the Barton Springs pool, and many of them enjoy Barton Springs and Barton Creek for other recreational activities and for purposes of observing and contemplating nature. One member claimed that, as a scientist, he has a professional and educational interest in the Barton Springs salamander. SOS Alliance alleges that the Development Agreements will result in an increase in pollution in the aquifer, which will contribute to the declining health of Barton Springs—including the reduction of water quality, plant life, numbers of fish, and population of the Barton Springs salamander—which will in turn injure SOS Alliance's members' "environmental, scientific, and recreational interests." SOS Alliance contends that injury to these types of interests has been "widely recognized" to confer standing.

The Texas cases cited by SOS Alliance to support standing based on environmental harm involve plaintiffs who own property affected by the defendant's actions. In *Lake Medina Conservation Society v. Texas Natural Resource Conservation Commission,* an organization sued for review of a state commission's order authorizing a water control and improvement district's diversion of water from a lake. 980

S.W.2d 511, 513–15 (Tex.App.-Austin 1998, pet. denied). This Court held that the organization's members would have standing in their own right because they owned waterfront property, waterfront businesses, and private wells in the area. *See id.* at 515–16. In *Heat Energy Advanced Technology, Inc. v. West Dallas Coalition for Environmental Justice,* an application for a renewal permit for a hazardous and industrial waste storage and processing facility was challenged by a coalition of nearby residents, but the administrative agency determined the coalition did not have standing to participate in the hearing. 962 S.W.2d 288, 289–90 (Tex.App.-Austin 1998, pet. denied). This Court held that the agency erred in its determination, concluding that the proximity of a member's home to the facility, combined with that member's allegation of odors affecting his breathing, was sufficient to confer standing. *See id.* at 295.

SOS Alliance also relies on this Court's opinion in *Texas Rivers Protection Ass'n v. Texas Natural Resource Conservation Commission,* 910 S.W.2d 147 (Tex.App.-Austin 1995, writ denied). In that case, a state commission granted a permit for the diversion of water from the Guadalupe River, despite a challenge by the Texas Rivers Protection Association (TRPA) to the application. *See* 910 S.W.2d at 150–51. On appeal, the party to whom the permit was issued challenged the TRPA's standing to seek judicial review of the permit. *See id.* at 151–52. A member of the TRPA owned property fronting the affected area of the river and testified that the diversion of water would injure his "aesthetic and recreational interests in the river." *Id.* at 151. This Court stated, "An injury need not affect 'vested' property rights to confer standing; the harm may be economic, recreational, or environmental." *Id.* at 151–52. SOS Alliance contends that because its members have alleged recreational and environmental harm, it has shown a sufficient injury in fact for purposes of standing. However, this Court's view of the type of harm that can constitute an injury in fact for purposes of standing in *Texas Rivers* was coupled with the determination that the TRPA member's "riparian ownership alone sufficiently distinguishes [his] injury from that of the public at large." *Id.* at 151. The plaintiff in *Texas Rivers* had no vested right in the river itself, but had property rights affected by the defendant's actions upstream.

The *Texas Rivers* case, therefore, does not stand for the proposition that an allegation **\*880** of any type of recreational or environmental impact, by itself, constitutes an injury in fact sufficient to confer standing. Instead, this Court in *Texas Rivers* concluded that while environmental

harm may be a cognizable injury for purposes of standing, it was the harm to the plaintiff's riparian interests that made the injury sufficiently particularized so as to distinguish the harm from that experienced by the general public. *See id.* at 151–52; *Brown,* 53 S.W.3d at 302 ("Our decisions have always required a plaintiff to allege some injury distinct from that sustained by the public at large."). In sum, we do not find any Texas case in which an alleged injury to a plaintiff's environmental, scientific, or recreational interests conferred standing in the absence of allegations that the plaintiff has an interest in property affected by the defendants' actions.

Lacking a member with a property interest in Barton Springs (the land alleged to be polluted as a result of the Development Agreements contrary to SOS Alliance members' environmental, scientific, or recreational interests) or with property rights otherwise affected by Baron Springs's alleged pollution, SOS Alliance turns to federal case law to support its assertion of environmental standing. SOS Alliance is correct that federal courts have recognized that environmental harm can constitute a cognizable injury for purposes of constitutional standing. *See Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ("We do not question that this type of harm [to scenery, natural and historic objects, and wildlife of a national park] may amount to an 'injury in fact' sufficient to lay the basis for standing...."). Moreover, federal courts have found standing for this type of harm in the absence of the plaintiff possessing a property right where harm occurs. Under federal case law, environmental plaintiffs adequately allege a particularized injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). SOS Alliance contends that we should follow the federal courts' lead on this issue by determining that SOS Alliance's members' environmental interests are particularized, legally protected interests, even in the absence of ownership of property impacted by the environmental harm. *See Texas Ass'n of Bus.,* 852 S.W.2d at 444 ("Because standing is a constitutional prerequisite to maintaining a suit under both federal and Texas law, we look to the more extensive jurisprudential experience of the federal courts on this subject for any guidance it may yield.").

However, the federal cases cited by SOS Alliance, in which environmental harm is held to constitute an injury in fact for purposes of standing, involve the application of federal

environmental-protection statutes that prohibited the types of conduct alleged by the plaintiffs in those cases to have occurred. The majority of the federal cases cited by SOS Alliance to demonstrate that an injury in fact for purposes of standing may be environmental involve claims under the federal Clean Water Act (CWA). [4] *See* 33 U.S.C. § 1251 *et* **\*881** *seq.* (2001). The CWA itself provides for a private right of action. A suit to enforce an effluent standard or limitation under the CWA may be brought by any "citizen," which is defined as "a person or persons having an interest which is or may be adversely affected." *Id.* § 1365(a), (g). This provision "confers standing to enforce the Clean Water Act to the full extent allowed by the Constitution." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 152 (4th Cir.2000). In these cases, then, the plaintiffs possessed a legally protected interest for purposes of standing by virtue of a federal statute. *See id.* at 156–57 ("injury required by Article HI may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing" (quoting *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975))). [5]

The few federal cases cited by SOS Alliance not involving the CWA—which has a citizen-enforcement provision— also involved environmental-protection statutes. In *Cantrell v. City of Long Beach,* 241 F.3d 674 (9th Cir.2001), for example, the federal law sought to be enforced—the National Environmental Policy Act—included a federal policy to "preserve important historic, cultural, and natural aspects of our national heritage." 241 F.3d at 679 (quoting 42 U.S.C. § 4331(b)(4) (2003)). Thus, the Ninth Circuit concluded that the plaintiffs sufficiently alleged an injury in fact for constitutional standing purposes in that they "observed and enjoyed" endangered birds that could be evicted by the defendants' actions. *Id.* at 679–82. In short, each of the federal cases cited by SOS Alliance that found the existence of standing where the alleged harm was to environmental, scientific, or recreational interests involved a federal statute protecting those same interests. [6]

**\*882** Based on this state and federal case law, we must address whether SOS Alliance has established standing under Texas law to pursue its claims under the Uniform Declaratory Judgments Act (UDJA). *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001–.011 (West 2008). Under the UDJA, SOS Alliance must establish standing by alleging an injury in fact to a "legally protected interest which is ... concrete and particularized." *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130; *see Bland Indep. Sch. Dist. v. Blue,* 34

S.W.3d 547, 555–56 (Tex.2000) (as general rule, standing requires interest distinct from general public, unless standing conferred by statute); *Texas Ass'n of Bus.,* 852 S.W.2d at 444 (UDJA "merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power"); *Frasier v. Yanes,* 9 S.W.3d 422, 427 (Tex.App.-Austin 1999, no pet.) ("A declaratory judgment declares the rights and duties or the status of parties in a justiciable controversy.").

 [10]     There is no Texas authority for the proposition that the type of injury alleged by SOS Alliance in this case—injury to its members' environmental, scientific, and recreational interests generally and without any interest in or connection to the real property involved—is the type of interference with a legally protected interest or injury that confers standing as a matter of state law. SOS Alliance must show a particularized, legally protected interest that is actually or imminently affected by the alleged harm. *See Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130. SOS Alliance has alleged neither an environmental interest provided for or protected by statute (as is present in the federal cases cited by SOS Alliance) nor a property interest subject to the recreational or environmental harm (as is present in the state cases cited by SOS Alliance). Absent such allegations, there is no particularized, legally protected interest at stake in this context, as there is nothing to distinguish the environmental, scientific, or recreational concerns of SOS Alliance's members from the same concerns experienced by the public in general. *See id.* at 560, 112 S.Ct. 2130; *Nobles v. Marcus,* 533 S.W.2d 923, 927 (Tex.1976). Based on the existing state and federal case law, to find standing under the circumstances here would, we think, be to expand Texas's standing jurisprudence, and it is not our proper role as an intermediate appellate court to do so. *See Petco Animal Supplies, Inc. v. Schuster,* 144 S.W.3d 554, 565 (Tex.App.-Austin 2004, no pet.). Therefore, we decline to conclude that the environmental, scientific, and recreational interests asserted by SOS Alliance result in a "concrete and particularized" injury in fact, as is necessary to establish standing under Texas law. [7]

**\*883** *Injury to Landowners' Well Water*
 [11]     SOS Alliance also bases its assertion of standing on its members' concern about pollution to their residential water use. SOS Alliance relies on the affidavits of two members who use well water for residential use. One member alleges that he lives "about one-quarter mile" west of the

Cypress Hays land and is "concerned" about "pollution from Cypress' proposed golf courses and other development," and the other member alleges that she lives "within the extraterritorial jurisdiction of the City of Dripping Springs," owns an undeveloped residential lot "within 200 feet" of the Cypress Hays development, and is "concerned" about "how pollution from a large development in the recharge zone of the Aquifer would [a]ffect the quality of the Aquifer water." We need not determine whether the members' "concern" about pollution to well water on their property is a sufficiently particularized injury in fact for purposes of standing, because we conclude that SOS Alliance has failed to demonstrate that the alleged harm is actual or imminent, rather than hypothetical or conjectural.

 **[12]**  To have standing, SOS Alliance must allege an injury that is "actual or imminent, not hypothetical." *See DaimlerChrysler Corp. v. Inman,* 252 S.W.3d 299, 304–05 (Tex.2008). The two members concerned about pollution to their water supply do not allege any connection between the Development Agreements and their well water. Neither member makes any reference to the property subject to the Mak Foster Development Agreement, and the only reference to the Cypress Hays Development Agreement property is one of proximity. According to SOS Alliance's experts' affidavits, the Mak Foster development is located in the contributing zone, the Rutherford Ranch development is located within the "uniquely sensitive" recharge zone, and both will "contribute to the pollution load within wells in the Barton Springs Edwards Aquifer." It is not enough, however, to allege that the Development Agreements will pollute *some* well water in the area and that an SOS Alliance member uses well water in the area. The potential harm to the members' well water must be more than speculative. There must be some allegation or evidence that would tend to show that the well water of the members in question will be affected by the action of which they complain.

According to SOS Alliance's experts' affidavits, rainfall on the contributing zone flows east to the recharge zone, where it enters the underground aquifer, and then flows north and mostly resurfaces at the Barton Springs pool. The experts further aver that pollutants from the developments would be added to this run-off into the aquifer, and that there is already evidence of increased pollutants at the Barton Springs pool. Given the specific description contained in SOS Alliance's jurisdictional evidence of the flow direction toward and within the aquifer, there must be evidence in the record to show that the properties of the members who express concern

about pollution to their water supply are in a location that is at least potentially "downflow" from the developments. SOS Alliance did not present any allegations or evidence on this point. [8] The fact that the **\*884** Mak Foster property is somewhere in the contributing zone and an SOS member's well is somewhere in the recharge zone is not, by itself, sufficient to show harm that is imminent and not merely conjectural or speculative. SOS Alliance has failed to allege or provide evidence of any actual or imminent impact from the approvals of the Development Agreements on the amount of pollution to SOS Alliance's members' residential water supply.

### *Procedural Injury*

SOS Alliance next points to its claims in its pleadings that the Development Agreements violate the Texas Constitution in that they impinge on the right of local self-government (citing Tex. Const. art. I, § 1), impair the preservation of a republican form of government (citing Tex. Const art. I, § 2), and contract away legislative and police powers (citing Tex. Const. art. I, § 17). According to SOS Alliance, some of its members reside within the city limits of Dripping Springs or its extraterritorial jurisdiction and are opposed to the developments, and their ability to act on their opposition has been eliminated as a result of the Development Agreements' "immediate and certain effect of closing off the democratic process and democratic controls over the development of that tract of property for at least 15 years."

To establish standing to assert these alleged constitutional violations, SOS Alliance must show an injury in fact *See Neeley v. West Orange–Cove Consol. Indep. Sch. Dist.,* 176 S.W.3d 746, 774 (Tex.2005) ("Standing to assert a constitutional violation depends on whether the claimant asserts a particularized, concrete injury."). While SOS Alliance contends that the Development Agreements "adversely and immediately impinge" on its members' constitutional rights, the only injury identified by SOS Alliance is "procedural injury" suffered by those members who reside within the city limits of Dripping Springs or its extraterritorial jurisdiction. SOS Alliance relies on two federal cases for the proposition that injury to its members' procedural interests can be an injury in fact sufficient to show standing—*Sierra Club v. Marita,* 46 F.3d 606 (7th Cir.1995), and *Natural Resources Defense Council v. Abraham,* 223 F.Supp.2d 162 (D.D.C.2002).

In *Marita,* the Seventh Circuit considered a "forest management plan" created by the defendant, a plan with which subsequent natural resource management activities in the covered area had to comply. *See 46 F.3d at 610–11.* The court concluded that, for purposes of standing, there was actual or imminent injury underlying the alleged procedural default even if the plan was not implemented immediately. **\*885** *See id. at 612.* The court was able to reach this conclusion because, as the Supreme Court has recognized, a plaintiff in federal court does not need to meet the normal standing requirement of imminence when he seeks to assert a procedural right. *See Defenders of Wildlife, 504 U.S. at 572 n. 7, 112 S.Ct. 2130.* However, for this to apply, the plaintiff must first be accorded the procedural right. *See id.* The National Environmental Policy Act, which the court in *Marita* was construing, *see 46 F.3d at 612–13,* is "essentially a procedural statute," such that "injury alleged to have occurred as a result of violating this procedural right confers standing." *Idaho Conservation League v. Mumma, 956 F.2d 1508, 1514 (9th Cir.1992).* Thus, the court in *Marita,* in concluding that the plaintiff had standing based on its procedural interests, was construing a statute that specifically provided for the procedural rights at issue, the violation of which could confer standing.

Likewise, in *Natural Resources Defense Council,* the court's conclusion that the plaintiffs had standing based on procedural injury was in the context of a statute that accorded the plaintiffs specific procedural rights. *223 F.Supp.2d at 178–79.* In that case, the plaintiffs alleged violations of the Federal Advisory Committee Act. *See id. at 167.* According to the court, this federal law established procedural requirements, the requirements were "designed to protect some threatened concrete interest" of the plaintiffs, and the plaintiffs sufficiently alleged harm from the defendant's failure to comply with those procedural requirements. *Id. at 178–80.*

 **[13]** Unlike in *Marita* and *Natural Resources Defense Council,* SOS Alliance does not sue based on a statute that accords SOS Alliance or its members specified procedural rights. SOS Alliance does not provide any argument or authority for the proposition that the constitutional provisions, under which SOS Alliance asserts its claims, provide procedural protections akin to the federal statutes at issue in the two federal cases cited, or that any such procedural protections exist in the absence of a statute that would accrue to the benefit of SOS Alliance or its members. Therefore, we decline to hold that SOS Alliance has standing based on

harm to its members' non-specified procedural interests. *See Tex.R.App. P. 38.1(i); Valadez v. Avitia, 238 S.W.3d 843, 845 (Tex.App.-El Paso 2007, no pet.)* ("Failure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the complaint.").

### Taxpayer Standing

 **[14]**  **[15]**  Next, SOS Alliance asserts standing based on the taxpayer status of its members. Taxpayer standing is an exception to the general rule that the plaintiff must show a particularized injury distinct from that suffered by the public. *See Bland Indep. Sch. Dist., 34 S.W.3d at 555–56; Hendee v. Dewhurst, 228 S.W.3d 354, 373–74 (Tex.App.-Austin 2007, pet. denied).* A plaintiff relying on taxpayer standing can seek to enjoin prospective expenditures of public funds, but cannot recover funds already expended. *Williams v. Huff, 52 S.W.3d 171, 180 (Tex.2001).* To establish taxpayer standing, the plaintiff must show that (1) he is a taxpayer, and (2) public funds are to be expended on the allegedly illegal activity. *Id. at 179.* SOS Alliance alleges that it has at least one member who resides within the City of Dripping Springs and who pays property taxes on her homestead. SOS Alliance further alleges that the Development Agreements obligate the City to spend money on attorneys' fees defending the Development Agreements from challenges such as this lawsuit.

 **\*886**  **[16]**  To show that the City will expend public funds on attorneys' fees, SOS Alliance refers to the Development Agreements' provision that in the event of a third-party lawsuit relating to a Development Agreement, the City and the developer "agree to cooperate in the defense of such suit or claim, and to use their respective best efforts to resolve the suit or claim." This provision, by its plain terms, does not require the expenditure of public funds. It does not address expenditures at all. Rather, a separate provision of the Development Agreements addresses expenditures. That provision requires the developer to pay the City a deposit "intended to cover all City legal ... fees and administrative expenses" associated with the Agreement. In the event fees and expenses incurred exceed the initial deposit, the developer is obligated to "pay the additional fees and expenses upon the City's request."

We decline to grant taxpayer standing based on expenses that taxpayers will never bear, given the developers' obligation to reimburse the City. SOS Alliance has not shown that any public funds have been or will be expended by the City as a result of the allegedly illegal Development Agreements.

Therefore, SOS Alliance has failed to establish taxpayer standing.

### Landowners' Non–Water–Related Concerns

 [17]    SOS Alliance also points to its members' concerns about injuries that are distinct from increased pollution to the water entering the aquifer, specifically: (1) increased traffic congestion caused by the new residents of the developments, which in turn might increase traffic safety hazards, (2) increased light interfering with appreciation of nighttime skies, and (3) decreased property value due to the prospect of nearby high-density development SOS Alliance asserts that it has standing because of these concerns of its members who live near the developments.

 [18]    Even assuming these members may have standing to sue in their own right, to have associational standing SOS Alliance must show that the interests it seeks to protect are germane to the organization's purpose (the second prong of associational standing). *See Texas Ass'n of Bus.,* 852 S.W.2d at 447. We note that, in this lawsuit, SOS Alliance seeks to protect its members' environmental interests, which *are* germane to its purpose. However, to have associational standing, we conclude that the interest that is "germane to the organization's purpose"—thereby satisfying the second prong—must also relate to the interest by which its members would "have standing to sue in their own right"—thereby satisfying the first prong. *See Hays County v. Hays County Water Planning P'ship,* 106 S.W.3d 349, 357 (Tex.App.-Austin 2003, no pet.)* (association was created to address "these kinds of community issues" by which its members showed standing to sue on their own behalf). We do not think the associational standing factors are intended to permit an association that has an interest against a challenged activity to obtain standing by adding a member who has individual standing to sue based on his own unrelated interest against the same activity. Therefore, SOS Alliance cannot satisfy the second prong of associational standing based on its members' environmental concerns, while satisfying the first prong solely based on certain members' unrelated concerns regarding their property values.

To establish standing based on its members' non-water-related concerns, then, SOS Alliance must show that *those* interests are germane to its purpose. According to its petition, SOS Alliance is "formed for the purpose of protecting the Edwards Aquifer with particular emphasis on preventing **\*887** further pollution of Barton Springs and reversing the water quality degradation of Barton Springs that has already occurred." We are unpersuaded that increased time and danger for automobile travel, impaired viewing of the night sky, and decreased property value for landowners in the Barton Springs contributing and recharge zones is "germane to" SOS Alliance's purpose of reducing water pollution in Barton Springs. We recognize that SOS Alliance's mission to protect the water that feeds Barton Springs would generally result in opposition to developments in the contributing and recharge zones. According to the affidavit of SOS Alliance's communications director, "[a] significant amount of the activities of SOS Alliance are devoted to preventing or stopping governments from granting special favors to landowners and developers that facilitate destructive development in the recharge and contributing zones." It is equally apparent that a successful opposition to development can, in turn, benefit such interests as low traffic and low light levels for residents in the area. However, the fact that SOS Alliance's mission would benefit a member's interest does not mean that particular interest is included in—or germane to— SOS Alliance's purpose. [9]

SOS Alliance refers to two federal cases in which members of an environmental organization had standing based on diminished property value resulting from the defendant's conduct. *See Laidlaw Envtl. Servs.,* 528 U.S. at 182–83, 120 S.Ct. 693; *Gaston Copper Recycling,* 204 F.3d at 156. Although neither case addresses the second prong of associational standing, we note that in both cases, the alleged decrease in property value was attributable to pollution by the defendant. *See Laidlaw Envtl. Servs.,* 528 U.S. at 182–83, 120 S.Ct. 693 (member "believed the pollutant discharges accounted for some of the discrepancy" in home value); *Gaston Copper Recycling,* 204 F.3d at 156 (member claimed "the pollution or threat of pollution has diminished the value of his property"). Therefore, in those cases, the interest of the members who had standing individually (combating the pollution that was lowering their property values) was germane to the purpose of the organization (combating pollution in general). Unlike in those cases, the SOS Alliance member who alleged a decrease in property value attributed the decrease solely to the fact that it was a "high-density development." SOS Alliance's members' concerns that neighboring high-density developments will cause artificial light sources to increase, road traffic to increase, and property values to decrease are not germane to SOS Alliance's mission to protect the Edwards Aquifer water. Therefore, SOS Alliance has not met the second prong of associational standing by alleging its members' concerns as landowners not related to Edwards Aquifer water.

We affirm the district court's granting of appellees' pleas to the jurisdiction as to SOS Alliance's claims that are not related to the Open Meetings Act. [10]

**\*888** *Sufficiency of City's Public Notices*

In its third point on appeal, SOS Alliance contends that the district court erred in granting summary judgment to appellees on SOS Alliance's cause of action under the Texas Open Meetings Act (the "Act"). In its petition, SOS Alliance alleged that the City's public notices regarding the Development Agreements failed to comply with the Act's requirement that the subject of a meeting be sufficiently set forth. Section 551.041 of the Act requires that a governmental body "give written notice of the date, hour, place, and *subject* of each meeting held by the governmental body." Tex. Gov't Code Ann. § 551.041 (West 2004) (emphasis added).

We review summary judgments de novo. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). Under the standard applicable to a traditional motion for summary judgment, the motion should be granted only when the movant establishes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *See* Tex.R. Civ. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985). When both parties move for summary judgment and the trial court grants one party's motion and denies the other party's, as occurred in this case, the reviewing court should review both sides' summary judgment evidence and determine all questions presented. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000). Thus, if the district court erred, we will reverse and render the judgment the court should have rendered. *Id.* In the event that the City's notices were insufficient under the Act, the City's actions taken in connection with the defective portions of the notices are voidable. *See* Tex. Gov't Code Ann. § 551.141 (West 2004); *Point Isabel Indep. Sch. Dist. v. Hinojosa,* 797 S.W.2d 176, 182–83 (Tex.App.-Corpus Christi 1990, writ denied).

The public notice concerning the Cypress–Hays Development Agreement stated as follows:

> Consider Approving a Development Agreement with Cypress–Hays, L.P., including adopting Ordinance No. 1280.1 Designating a District under

Section 42.044 of the Texas Local Government Code.

The public notice concerning the Mak Foster Development Agreement, posted ten days later, contained identical language, except that "Cypress–Hays, L.P." was replaced with "Mak Foster Ranch. L.P.," and "Ordinance No. 1280.1" was replaced with "Ordinance No. 1280.2." SOS Alliance complains that these notices insufficiently communicate the subject of the Development Agreements because they do not alert a member of the public to the Agreements' substantial impact—including thousands of homes, central water and wastewater systems, commercial development, and golf courses. Moreover, the notices do not refer to the property locations, the multiple variances from City ordinances, [11] or the time periods for which the Agreements could not be altered.

**\*889** The Texas Supreme Court has noted that, under the notice requirements of the Act, "less than full disclosure is not substantial compliance." *Cox Enters., Inc. v. Board of Trs. of Austin Indep. Sch. Dist.,* 706 S.W.2d 956, 960 (Tex.1986). However, the supreme court has also held that it is not necessary to "state all of the consequences which may necessarily flow from the consideration of the subject stated." *Texas Turnpike Auth. v. City of Fort Worth,* 554 S.W.2d 675, 676 (Tex.1977).

We are guided by this Court's analysis in *Friends of Canyon Lake, Inc. v. Guadalupe–Blanco River Authority,* 96 S.W.3d 519 (Tex.App.-Austin 2002, pet. denied). In that case, this Court concluded that the following notice sufficiently described the applicable subject matter of the meeting:

> Water Purchase Contract among GBRA, CRWA, City of Cibolo, City of Marion, City of Schertz, ECWSC, GVSUD, SHWSC, & BMWD; Outline of Preliminary Agreement concerning joint participation in a treated water supply for portions of Comal, Kendall, & Bexar Counties.

96 S.W.3d at 530. The plaintiff complained that the notice was insufficient to inform the public that the river authority would seek to double the amount of water to which it was entitled on an annual basis, sell a portion of the water outside its ten-county area, and require the construction of $75 million in improvements. *See id.* This Court recognized that the notice "might not inform the casual reader of the

precise consequences" of the agreements at issue, but held nonetheless that the notice was sufficiently descriptive to satisfy the Act *See id.* at 531 (citing *Texas Turnpike Auth.,* 554 S.W.2d at 676).

 **[19]**    In this case, like the notice at issue in *Friends of Canyon Lake,* the City's notices identified the applicable parties to the agreements and stated the type of agreement at issue—a development agreement. Moreover, just as the notice in *Friends of Canyon Lake* set out the counties affected without specifying the precise area, the notices here referenced section 42.044 of the local government code, which governs the creation of "industrial districts" within a municipality's extraterritorial jurisdiction. *See* Tex. Loc. Gov't Code Ann. § 42.044(b) (West 2008). Section 42.044 also provides that the municipality's contract with a landowner in the industrial district can guarantee the district's immunity from annexation by the municipality "for a period not to exceed 15 years." *Id.* § 42.044(c)(1). Therefore, a reader of the notices would be informed that the subject of the meetings would include the potential approval of agreements with Mak Foster and Cypress Hays that involved development, on property in the City's extraterritorial jurisdiction, and potentially with restrictions lasting up to 15 years. The City was not obligated to state all the consequences that would flow from these Development Agreements. *See Texas Turnpike Auth.,* 554 S.W.2d at 676. Indeed, had the notices listed all the consequences that would follow from the Development Agreements, including the variances to be provided and the other issues highlighted by SOS Alliance, the result may have been to overwhelm, rather than inform, the reader. *See City of San Antonio v. Fourth Court of Appeals,* 820 S.W.2d 762, 766 (Tex.1991) ("Far from serving the purposes of the Act, this degree of specificity would so overwhelm readers that it would prove even less informative than the current notice."); *see also Texas Turnpike Auth.,* 554 S.W.2d at 676 (not necessary to "post copies of proposed resolutions").

SOS Alliance argues that the notices' omission of the location or size of the property subject to the proposed Development **\*890** Agreements is at variance from the City's standard notice practice. SOS Alliance relies on *River Road Neighborhood Ass'n v. South Texas Sports,* which found a notice insufficient under the Act based on "the well established custom and practice" of the governmental body. 720 S.W.2d 551, 557 (Tex.App.-San Antonio 1986, writ dism'd w.o.j.). In that case, four public meetings had involved a similar subject matter, with the notices identifying the purpose as "discussion/action." Because the notice for

the fifth meeting stated only "discussion," the court held that the public was not properly alerted to the possibility that action would be taken. *See id.* Here, however, SOS Alliance does not identify a "well established custom and practice" applicable to development agreements. Instead, SOS Alliance refers to notice postings that involved zoning decisions. The Development Agreements do not involve zoning. *Cf.* Tex. Loc. Gov't Code Ann. § 212.003(a) (West 2008) (restricting municipality's ability to regulate in its extraterritorial jurisdiction). With no other public notice posting related to development agreements with the City in the record, SOS Alliance has not shown any well-established custom and practice that would be relevant to the notices' sufficiency. [12]

SOS Alliance also argues that a more detailed description of the subject matter was required because of the "high level of public interest in these developments." To show a heightened public interest, SOS Alliance relies on affidavits of residents in the extraterritorial jurisdiction who assert that they were among many citizens who attended subsequent city council meetings to raise their concerns regarding the Development Agreements.

Even assuming SOS Alliance has demonstrated a heightened public interest, we are not convinced that the notices' description of subject matter should be deemed insufficient as a result In *Cox Enterprises,* the Texas Supreme Court held that, taking into account an increased level of public interest, the bare description "personnel" was insufficient to describe the selection of a new school superintendent and the description "litigation" was insufficient to describe "a major desegregation lawsuit which has occupied the Board's time for a number of years, and whose effect will be felt for years to come." 706 S.W.2d at 959. The City's notices in this case are much more detailed than those in *Cox Enterprises.* The City's notices state the parties involved, the type of agreement at issue, that the extraterritorial jurisdiction would be impacted (based on the statute included in the notice), and that the agreements might be approved as a result of the meeting. A reader interested in development in the City's extraterritorial jurisdiction would have had sufficient notice that the City was considering action relevant thereto. *See Fourth Court of Appeals,* 820 S.W.2d at 766; *Rettberg v. Texas Dep't of Health,* 873 S.W.2d 408, 411 (Tex.App.-Austin 1994, no writ) ("notice is sufficient under the Act when it alerts a reader that some action will be taken relative to a topic").

Having concluded that the notices were sufficiently descriptive so as to state the subjects of the meetings in accordance with section 551.041 of the Open Meetings Act, we overrule SOS Alliance's third point **\*891** on appeal. [13]

### Attorneys' Fees

[20]   [21]   In its remaining points on appeal, SOS Alliance asserts that, even if we affirm the trial court's granting of appellees' pleas to the jurisdiction and motions for summary judgment, the district court erred in awarding attorneys' fees to Mak Foster. [14] In a proceeding under the Uniform Declaratory Judgments Act, a court may award "reasonable and necessary attorney's fees as are equitable and just" Tex. Civ. Prac. & Rem.Code Ann. § 37.009. A trial court's award of attorneys' fees under the UDJA is reviewed for an abuse of discretion. *See Bocquet v. Herring,* 972 S.W.2d 19, 20–21 (Tex.1998). A trial court abuses its discretion by awarding fees when there is insufficient evidence that the fees were reasonable and necessary, or when the award is inequitable or unjust *Id.* at 21.

[22]   As an initial matter, SOS Alliance argues that Mak Foster failed to segregate between its defense of claims for which recovery of attorneys' fees was proper and those for which such recovery was not proper. *See West Beach Marina, Ltd. v. Erdeljac,* 94 S.W.3d 248, 267 (Tex.App.-Austin 2002, no pet.). However, SOS Alliance fails to provide a reason for which any of its particular claims independently would not provide a valid basis for Mak Foster's recovery of attorneys' fees. Regarding its Open Meetings Act claim, SOS Alliance refers to section 551.142 of the Act, which permits a court to award the defendant reasonable attorneys' fees in an action by mandamus or injunction regarding a potential violation of the Act, provided that the court consider whether the action was brought in good faith. *See Tex. Gov't Code Ann. § 551.142 (West 2004).* According to its petition, however, SOS Alliance brought its Open Meetings Act claim as an action under the UDJA, not as an action by mandamus or injunction under section 551.142. *See Tex. Civ. Prac. & Rem.Code Ann. § 37.004(a).* Regarding its other claims, SOS Alliance questions whether the district court had jurisdiction to award attorneys' fees that were incurred in connection with claims over which the court determined it had no subject-matter jurisdiction. The district court did have this authority. [15] *See id.* § 37.009 (court may award attorneys' fees in *any* proceeding under the UDJA); *Galveston County Comm'rs' Court v. Lohec,* 814 S.W.2d 751, 755 (Tex.App.-Houston [14th Dist.] 1991) (op. on reh'g) (court may award

attorneys' fees incurred in defense **\*892** of UDJA claims brought by party without standing), *rev'd on other grounds,* 841 S.W.2d 361 (Tex.1992).

[23]   [24]   SOS Alliance also argues that Mak Foster failed to segregate between its defense of claims asserted by SOS Alliance and those asserted by Friendship Alliance, the co-plaintiff that settled with appellees. "A party seeking attorney fees has a duty ... to segregate the fees owed by different parties." *See French v. Moore,* 169 S.W.3d 1, 17 (Tex.App.-Houston [1st Dist.] 2004, no pet.). There is no duty to segregate, however, when the causes of action are dependent upon the same set of facts or circumstances and are intertwined to the point of being inseparable. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 11 (Tex.1991). Mak Foster relies on SOS Alliance's motion to consolidate to show that the claims asserted by the co-plaintiffs were intertwined, [16] but that motion is not in the appellate record. Similarly, Friendship Alliance's petition is not in the record for our review. We are limited to the appellate record provided. *See* Tex.R.App. P. 34.1; *Merchandise Ctr., Inc. v. WNS, Inc.,* 85 S.W.3d 389, 394 (Tex.App.-Texarkana 2002, no pet.) ("Materials outside the record ... that are improperly included in or attached to a party's brief ... may not be considered by an appellate court in its review of the appeal on its merits."). However, our review of what the record does contain gives us no reason to conclude that Friendship Alliance's lawsuit did not involve the same set of facts and circumstances. *See Enterprise Leasing Co. v. Barrios,* 156 S.W.3d 547, 550 (Tex.2004) ("If the pertinent summary judgment evidence considered by the trial court is not included in the appellate record, an appellate court must presume that the omitted evidence supports the trial court's judgment."). We conclude that Mak Foster had no duty to segregate the fees owed by the co-plaintiffs.

[25]   [26]   [27]   Next, SOS Alliance asserts that the evidence is insufficient to support an award of attorneys' fees in the amount requested by Mak Foster. As a general rule, the party seeking to recover attorneys' fees carries the burden of proof. *Stewart Title Guar. Co.,* 822 S.W.2d at 10. Whether an award of attorneys' fees is reasonable and necessary is a fact question. *Bocquet,* 972 S.W.2d at 21. SOS Alliance contends that Mak Foster's evidence of attorneys' fees "consists entirely of the conclusory, self-serving, affidavit[ ] of lead counsel[ ]." However, contrary to SOS Alliance's contention, that affidavit sets out the attorneys who performed the work, the number of hours billed by each, their hourly rates, and a description of the tasks for

which legal services were performed. The affiant stated his qualifications and experience, and averred that:

> I am familiar with usual and customary rates charged by attorneys in the area for cases with comparable complexity and amounts in controversy, and the fees described above are those customarily charged in this area for the same or similar services by those with similar experience, reputation, and ability, considering the type of controversy, the time limitations imposed, the work involved, the results obtained and length of the firm's relationship with Mak Foster.

SOS Alliance suggests that only fee bills with unredacted entries would be sufficient evidence of attorneys' fee amounts, but **\*893** does not base its position on any legal authority. We conclude that the evidence was sufficient to show Mak Foster's attorneys' fees were reasonable and necessary. *See Texas Commerce Bank v. New,* 3 S.W.3d 515, 517–18 (Tex.1999) (affidavit testimony in support of attorneys' fees legally sufficient where attorney detailed the services rendered and testified he was duly licensed attorney, he was familiar with usual and customary attorneys' fees in locality, and the fees sought were reasonable); *Brockie v. Webb,* 244 S.W.3d 905, 909–10 (Tex.App.-Dallas 2008, pet. denied) ("Generally, the nature and extent of the attorney's services are expressed by the number of hours and the hourly rate.").

 [28]  [29]  [30]  [31]  [32]  SOS Alliance also contends that the attorneys' fees amount awarded to Mak Foster—$86,200—is "inequitable and unjust under the circumstances of this case for a nonprofit organization dedicated to the public good." Similar arguments were stated by amicus curiae, who expressed concern that "full fee awards for bringing environmental and open government claims" are a "threat of financial intimidation" that "can only have a chilling effect on the ability of community organizations to bring citizen suits on behalf of their members." We review whether attorneys' fees awarded under the UDJA are equitable and just under an abuse of discretion standard. *See Bocquet,* 972 S.W.2d at 21. An award can be inequitable or unjust even when the fees are reasonable and necessary. *See id.* However, when reviewing matters committed to the trial court's discretion, an appellate court may not substitute its judgment for that of the trial judge, and a trial court

does not abuse its discretion merely because it decides a discretionary matter differently than the appellate court would under similar circumstances. *Baylor Univ. Med. Ctr. v. Rosa,* 240 S.W.3d 565, 569 (Tex.App.-Dallas 2007, pet. denied). The test for an abuse of discretion is whether the court acted without reference to guiding rules and principles. *See Cire v. Cummings,* 134 S.W.3d 835, 838–39 (Tex.2004).

To show that the attorneys' fees award was not just and equitable, SOS Alliance relies on its being a "nonprofit organization dedicated to the public good" and the "significance of the matters at stake in this lawsuit and that SOS Alliance was at least somewhat successfully addressed." We do not consider this, standing alone, to make the award of attorneys' fees to Mak Foster inequitable or unjust. It may very well have been equitable and just for the district court *not* to have awarded fees or to award some other amount, but that does not make this award inequitable or unjust. *See Save Our Springs Alliance, Inc. v. Lazy Nine Mun. Util. Dist.,* 198 S.W.3d 300, 318–19 (Tex.App.-Texarkana 2006, pet. denied) (holding that trial court did not abuse its discretion in awarding attorneys' fees to defendant in UDJA action, even though SOS Alliance was "a local nonprofit organization," because "reasonable minds can differ concerning whether the attorney's fees are just and equitable"). The award was a matter of the district court's discretion, and we do not consider the court to have abused its discretion in reaching the decision it did.

Having concluded that the district court did not err in awarding attorneys' fees to Mak Foster, we overrule SOS Alliance's remaining points on appeal.

### Conclusion

The judgment of the district court is affirmed.

Chief Justice LAW Not Participating.

Before Chief Justice JONES, Justices PATTERSON, PURYEAR, PEMBERTON, WALDROP and HENSON.

### \*894 *ORDER*

PER CURIAM.

Save Our Springs Alliance, Inc. has filed a motion for reconsideration en banc. The motion is denied.

It is ordered February 12, 2010.

Dissenting Opinion by Justice PATTERSON, Joined by Justice HENSON.

JAN P. PATTERSON, Justice, dissenting.
Review *en banc* is warranted to "secure or maintain uniformity" of this Court's decisions. *See* Tex.R.App. P. 41.2(c). Because the two-justice panel's decision is inconsistent with this Court's jurisprudence in an important and recurring area of law—an association's standing to pursue its member's claims of environmental harm—I respectfully dissent from the denial of appellant's motion for *en banc* reconsideration.

The panel holds that, in the absence of a statute conferring standing, appellant Save Our Springs Alliance, Inc. ("SOS Alliance") was required to show that one of its members had a property interest affected by appellees' actions. The panel's holding, narrowing the class of claimants with common law standing to assert recreational, scientific, and environmental harm, conflicts with other opinions of this Court. *See Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n,* 910 S.W.2d 147, 151–52 (Tex.App.-Austin 1995, writ denied).

In *Texas Rivers Protection Association,* this Court held that "[a]n injury need not affect 'vested' property rights to confer standing" and that "the harm [for purposes of standing] may be economic, recreational, or environmental." *See id.; see also Coastal Habitat Alliance v. Public Util. Comm'n,* 294 S.W.3d 276, 287 (Tex.App.-Austin 2009, no pet.) (recognizing this Court's holding in *Texas Rivers Protection Association* that "[a]n injury need not affect Vested' property rights to confer standing" and, thus, "the harm [for purposes of standing] may be economic, recreational, or environmental") [1] ; *Walker v. City of Georgetown,* 86 S.W.3d 249, 253 (Tex.App.-Austin 2002, pet. denied) (common law rule for standing to enjoin actions of governmental body satisfied if "the challenged action has caused the plaintiff some injury in fact, either economic, recreational, environmental, or otherwise"); *Lindig v. City of Johnson City,* No. 03–08–00574–CV, 2009 WL 3400982, at *6–7, 2009 Tex.App. LEXIS 8188, at *19–20 (Tex.App.-Austin Oct. 21, 2009, no pet.) (op. on reh'g) (citing common law rule for standing in *Walker* ).

The panel cites *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), and *Nobles v. Marcus,* 533 S.W.2d 923, 927 (Tex.1976), to support its holding that SOS Alliance was required to show that one of its members had an affected property interest to have standing. Neither case, however, supports curtailing common law standing here. That a party does not have standing to assert a fraud claim when he was not the defrauded party is not analogous to SOS **\*895** Alliance's alleged injury to its members' environmental, recreational, and scientific interests in public land. *See Nobles,* 533 S.W.2d at 927.

As to *Lujan,* the panel cites the Supreme Court's definition of "injury in fact." *See* 504 U.S. at 560, 112 S.Ct. 2130. In the context of standing under Article III of the United States Constitution, the Supreme Court defined "injury in fact" as "an invasion of a legally protected interest which is ... concrete and particularized" and " 'actual or imminent.' " *Id.* (citation omitted); *see also* U.S. Const. art. III. The panel focuses on the Supreme Court's requirement that the interest be "legally protected," but the Supreme Court did not purport to restrict standing to property owners affected by the challenged action there.

In that case, environmental associations on behalf of their members challenged a rule promulgated by the Secretary of the Interior concerning certain funded activities abroad that allegedly increased the rate of extinction of endangered and threatened species. *Lujan,* 504 U.S. at 562, 112 S.Ct. 2130. Although the Supreme Court concluded that the associations failed to show injury in fact to have standing to seek judicial review of the rule, the Supreme Court recognized that, "[o]f course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Id.* at 562–63, 112 S.Ct. 2130. The Supreme Court denied associational standing, not because a member did not have a property interest, but because the associations failed to demonstrate redressability and "actual or imminent" injury—i.e., that a member had "concrete plans" to visit an area affected by the rule. *Id.* at 564, 568, 112 S.Ct. 2130.

The Supreme Court more recently addressed injury in fact in the context of allegations of environmental harm to the national forests:

> It is common ground that the respondent organizations can assert the standing of their members. To establish the concrete and

particularized injury that standing requires, respondents point to their members' recreational interests in the National Forests. While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice.

See *Summers v. Earth Island Inst.,* 555 U.S. 488, ——, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)) ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."); *Bennett v. Spear,* 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (defining injury in fact as "an invasion of a judicially cognizable interest"). Consistent with its decision in *Lujan,* the Supreme Court

denied standing to challenge the regulations at issue because there was no live dispute over a concrete application of the regulations, not because the organizations failed to show a property interest by their members to confer standing. 129 S.Ct. at 1152–53. [2]

This Court's holding in *Texas Rivers Protection Association* that "an injury need not affect Vested' property rights to **\*896** confer standing" conforms with federal case law concerning standing under Article III. *See Summers,* 129 S.Ct. at 1149; *Lujan,* 504 U.S. at 562–63, 112 S.Ct. 2130; *Texas Rivers Prot. Ass'n,* 910 S.W.2d at 151–52. The panel's holding to the contrary here should not be sustained in the absence of review *en banc. See* Tex.R.App. P. 41.2(c).

Because the panel's decision is inconsistent with this Court's jurisprudence in an important and recurring area, I would grant appellant SOS Alliance's motion for *en banc* reconsideration. [3]

Joined by Justice Henson.

Footnotes

[1] Given that SOS Alliance's interests against the Development Agreements spring from environmental concerns, we note that the Agreements contain several environmental-protection provisions, requiring the developers to (1) comply with applicable state rules "designed to protect the quality of the Edwards Aquifer," (2) obtain and comply with any required "no-discharge" permits regarding treated sewage effluent, (3) comply with any U.S. Army Corps of Engineers authorizations under section 404 of the federal Clean Water Act, (4) prepare and implement a "storm water pollution prevention plan," (5) ensure no adverse effect on listed endangered species or their critical habitat in accordance with the federal Endangered Species Act, and (6) implement certain voluntary environmental protection measures, including an integrated pest management program at any golf course, education of property owners, and buffering of sensitive drainage areas.

[2] During the same time period, another organization, Friendship Alliance, filed suit against the City challenging the legality of the Development Agreements. The two lawsuits were consolidated in early 2003. Friendship Alliance settled its lawsuit in 2004 after certain amendments to the Agreements had been negotiated.

[3] SOS Alliance has dismissed its claims against Cypress–Hays, which is no longer a party to this case. *See Save Our Springs Alliance v. City of Dripping Springs,* No. 03–04–00683–CV (Tex.App.-Austin Dec. 7, 2007) (per curiam) (order). Also, on April 27, 2007, this Court issued an order staying the appeal due to SOS Alliance's declaration of bankruptcy. On September 15, 2008, on the motion of appellee Mak Foster, we reinstated the appeal.

[4] *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 173, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *American Canoe Ass'n v. Murphy Farms, Inc.,* 326 F.3d 505, 509 (4th Cir.2003); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 153 (4th Cir.2000); *Sierra Club v. Cedar Point Oil Co.,* 73 F.3d 546, 553 (5th Cir.1996), *cert. denied,* 519 U.S. 811, 117 S.Ct. 57, 136 L.Ed.2d 20 (1996); *Sierra Club v. Simkins Indus., Inc.,* 847 F.2d 1109, 1111–12 (4th Cir.1988), *cert. denied,* 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989); *Friends of the Earth, Inc. v. Chevron Chem. Co.,* 900 F.Supp. 67, 70 (E.D.Tex.1995).

[5] SOS Alliance asserts that section 26.177 of the Texas Water Code "articulates standing rights at least as broad as the standing granted under the federal Clean Water Act." Section 26.177 authorizes "[a]ny person affected by any ruling, order, decision, ordinance, program, resolution, or other act of a city relating to water pollution control and abatement outside the corporate limits of such city" adopted pursuant to statute to appeal such action to district court. Tex. Water Code Ann. § 26.177(d) (West 2008). However, such a lawsuit must be filed within 60 days of the challenged act of the city. *See id.* Regardless of whether section 26.177 could apply to SOS

Alliance and would provide standing as broad as the CWA, SOS Alliance does not allege that it satisfied the 60–day requirement. The Development Agreements were approved in April 2001. This lawsuit was filed in November 2002. SOS Alliance has not asserted any claims under section 26.177, nor could it have. Moreover, SOS Alliance does not allege any other statute on which its standing to assert its claims not related to the Open Meetings Act might be based.

We note that this Court's holding in *Texas Rivers* that harm for purposes of standing may be "economic, recreational, or environmental" appears to be connected to federal case law in which a federal statute protected such interests. The Texas case from which the "economic, recreational, or environmental" language originates is *Housing Authority of Harlingen v. State* in its general statement of the test for standing. 539 S.W.2d 911, 913–14 (Tex.Civ.App.-Corpus Christi 1976, writ ref'd n.r.e.). As authority for the language, the court in *Housing Authority of Harlingen* cited several United States Supreme Court opinions, and appears to have taken its description of the scope of an injury in fact from *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). In that case, the Supreme Court observed that the legal interest required for purposes of standing "may reflect 'aesthetic, conservational, and recreational' as well as economic values," provided that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." 397 U.S. at 153–54, 90 S.Ct. 827.

SOS Alliance contends that this conclusion ignores SOS Alliance's "long and proud history" of obtaining standing to challenge government actions. SOS Alliance relies on *Save Our Springs Alliance, Inc. v. Lowry,* 934 S.W.2d 161 (Tex.App.-Austin 1996, orig. proceeding), as indicative of such standing. However, that case involved standing based on a statute—the Texas Open Meetings Act. *See* 934 S.W.2d at 162. That Act authorizes an "interested person" to file suit. *See* Tex. Gov't Code Ann. § 551.142(a) (West 2004). According to *Lowry,* this statutory provision dispenses with the standing requirement of an injury distinct from that of the general public. *Lowry,* 934 S.W.2d at 163.

Similarly, the San Marcos River Foundation (SMRF) filed a letter brief as amicus curiae, expressing its concern that a determination in this case that SOS Alliance does not have standing based on environmental harm would impair SMRF's future ability to litigate. We note that in *City of San Marcos v. Texas Commission on Environmental Quality*—by which, SMRF asserts, it was successful in protecting the San Marcos River—a statute specifically authorized judicial review. 128 S.W.3d 264, 266 (Tex.App.-Austin 2004, pet. denied) (citing Tex. Water Code Ann. § 5.351 (West 2008)). Thus, our adjudication of SOS Alliance's standing in the absence of such statutory provision will not likely affect SMRF's future ability to again file suit under the same statute.

SOS Alliance argues that it should not be required to "hire experts to map and calculate local hydrogeological flows to engage in debates about gradients of flows" at this stage. Whether or not this is the case, SOS Alliance must at least provide evidence that a member "used an area subject to contamination from the discharge." *American Canoe Ass'n,* 326 F.3d at 520. In the cases SOS Alliance cites on this issue, unlike here, there was evidence from which the court could find that the consequences of the challenged action of the defendant would in fact extend to the plaintiff. *See id.* (members' use of river was downstream from polluting defendant); *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 624, 627 (Tex.1996) (landowner over Edwards Aquifer challenges constitutionality of statute governing entire aquifer); *City of Canyon v. McBroom,* 121 S.W.3d 410, 415 (Tex.App.-Amarillo 2003, no pet.) (landowner in flood plain complaining of increased risk of flooding); *Lake Medina Conservation Soc'y v. Texas Natural Res. Conservation Comm'n,* 980 S.W.2d 511, 515–16 (Tex.App.-Austin 1998, pet. denied) (owners of lakefront property challenging removal of water from lake); *Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n,* 910 S.W.2d 147, 151 (Tex.App.-Austin 1995, writ denied) (property owners "fronting the affected area of the river" challenging diversion of water from river).

In fact, it appears more feasible that many of these members' interests as landowners might even be *contrary* to SOS Alliance's purpose. SOS Alliance would likely welcome declining property values if they would enable SOS Alliance to place more watershed land into long-term conservation easements, and would likely welcome inconveniences such as increased traffic and light if the result was surrounding areas becoming less desirable for home buyers and future real estate developers. Moreover, in the event that Mak Foster and Cypress Hays successfully develop their properties in accordance with the Development Agreements, we question whether SOS Alliance would subsequently seek to protect those developments' interests in increasing property values as well.

In its second point on appeal, SOS Alliance contends that the district court erred in granting appellees' pleas to the jurisdiction based on the case not being ripe for adjudication as to any land that had not become subject to a finally approved plat, and based on the case being moot as to land that was subject to a finally approved plat that SOS Alliance neither appealed nor challenged. Given that we have determined that the court does not have subject-matter jurisdiction based on standing, we need not consider the issues of ripeness or mootness.

SOS Alliance alleges that the Cypress–Hays Development Agreement contains more than 32 variances, including reduction of minimum lot size, reduction of minimum setbacks, and reduction of plat review and approval time.

In fact, given that the Development Agreements were apparently without precedent as to the City (SOS Alliance itself describes the developments as "unprecedented in size and density for Dripping Springs"), it appears that the City actually followed its usual

custom and practice. The second notice—for the Mak Foster Development Agreement—was essentially identical to the first notice—for the Cypress Hays Development Agreement.

13    Appellees argue that any potential violations of the Act were validated by the legislature in 2003. *See* Tex. Loc. Gov't Code Ann. § 212.172(h) (West 2008) ("An agreement between a municipality and a landowner entered into prior to the effective date of this section and that complies with this section is validated."). Because we conclude that SOS Alliance has not shown a violation of the Act, we need not address this argument

14    Due to a partial settlement between SOS Alliance and the City, SOS Alliance does not seek appellate review of the attorneys' fees awarded to the City.

15    Neither of the cases cited by SOS Alliance suggests otherwise. In *Gregg County Appraisal District v. Laidlaw Waste Systems, Inc.,* the statute at issue allowed attorneys' fees for a property owner who prevailed in his tax appeal. 907 S.W.2d 12, 21 (Tex.App.-Tyler 1995, writ denied). To the extent the trial court did not have jurisdiction over the owner's claims, he did not "prevail" and, therefore, by statute was not entitled to attorneys' fees. *Id.* In *Lipshy Motorcars, Inc. v. Sovereign Associates, Inc.,* 944 S.W.2d 68 (Tex.App.-Dallas 1997, no writ), an *appellate* court determined it had no jurisdiction to consider a motion for sanctions and attorneys' fees against an appellant who attempted to appeal a non-appealable interlocutory order. 944 S.W.2d at 70–72.

16    According to Mak Foster, SOS Alliance represented in its motion to consolidate that the plaintiffs' lawsuits were "based on identical facts and circumstances," asked for "identical declaratory and nearly identical injunctive relief," and were based on "identical legal grounds."

1    In *Coastal Habitat Alliance,* this Court also cites *Cantrell v. City of Long Beach,* 241 F.3d 674, 681 (9th Cir.2001) ("That the litigant's interest [for purposes of standing] must be greater than that of the public at large does not imply that the interest must be a substantive right sounding in property or contract."), to support its conclusion that "[w]hether a plaintiff has standing in federal courts to assert a cause of action is not indicative of the deprivation of a vested property right." *Coastal Habitat Alliance v. Public Util. Comm'n,* 294 S.W.3d 276, 287 (Tex.App.-Austin 2009, no pet.).

2    In *Summers,* the government conceded that affidavits that a member had "repeatedly visited" a particular public site, that he had "imminent plans to do so again," and that "his interests in viewing the flora and fauna of the area" would be harmed were sufficient to establish standing under Article III. *Summers v. Earth Island Inst.,* 555U.S. 488, ——, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009).

3    Because I believe review *en banc* is warranted based upon the standing issue, I limit my review to this ground.

---

**End of Document**                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

221 S.W.3d 639
Supreme Court of Texas.

STATE of Texas, Texas General Land Office,
and Texas Land Commissioner, Petitioners,

v.

Herbert W. HOLLAND, Respondent.

No. 05–0292. | Argued Sept. 27,
2006. | Decided April 20, 2007.

**Synopsis**

**Background:** Holder of patent for polymer-based filters brought action against State, alleging State's refusal to pay for use of his patented process for cleaning oil-contaminated bilge water constituted a taking under the Texas Constitution. The 23rd District Court, Matagorda County, Craig Estlinbaum, J., denied State's plea to the jurisdiction, and State appealed. The Court of Appeals, 161 S.W.3d 227, affirmed. State appealed.

**Holdings:** The Supreme Court, O'Neill, J., held that:

[1] Supreme Court had jurisdiction because Court of Appeals' decision conflicted with prior Supreme Court holding, and

[2] State did not have requisite intent for takings claim because it acted under color of contract with patent holder's companies.

Reversed and dismissed.

**Attorneys and Law Firms**

**\*641** Greg Abbott, Attorney General of Texas, Barry Ross McBee, Edward D. Burbach, Rafael Edward Cruz, Office of the Attorney General, Kristofer S. Monson, Assistant Solicitor General, Austin, for Petitioners.

Thomas W. Sankey, Greg M. Luck, Godwin Gruber, LLP, Michael T. McLemore, Danny L. Williams, Williams Morgan & Amerson, Houston, Eric G. Walraven, Godwin, Pappas & Ronquillo, LLP, Dallas, for Respondent.

**Opinion**

Justice O'NEILL delivered the opinion of the Court.

Herbert Holland developed a cost-effective process to clean oil-contaminated bilge water. The State of Texas, seeking to abate oil pollution in its coastal waters, contracted with, and paid more than $160,000 to, Holland's companies for assistance in designing and constructing filtration units along the Texas Gulf Coast. Holland later received a patent on the decontamination process and began demanding additional payments as patent royalties. When the State refused to pay, Holland filed this suit claiming the State's unauthorized use of his patented technology constituted a taking under Article I, section 17 of the Texas Constitution. We must decide whether a takings claim is the proper avenue for a patentholder who performs services under contract with the State to assert patent rights. We hold that it is not when, as here, the State's use is pursuant to colorable contract rights. Because Holland cannot state a takings claim for the State's alleged unlawful use of his patent, the State is entitled to immunity from suit. Accordingly, we reverse the court of appeals' judgment and dismiss Holland's claim for want of jurisdiction.

**I. Background**

In the late 1990s, the General Land Office (GLO) began working on a project to abate pollution resulting from commercial fishing boats illegally discharging oily bilge water into coastal waters. The GLO contracted with two companies, Spill Removal Products, Inc. (SRP) and Pollution Prevention Products (PPP), to provide design services, components, installation and consulting services for the construction of three bilge water processing facilities located in Port Isabel, Port Lavaca, and Palacios. Herbert Holland developed the polymer-based pollution filters used in the facilities and the process for their installation. According to Holland, he was the "managing member" of PPP and the president of SRP, and it is undisputed that all of the GLO's contacts on the project were with him. The three processing facilities were completed by 2001, and all three used Holland's polymer-based filtration system to extract oil from contaminated bilge water. The GLO paid more than $160,000 to PPP and SRP pursuant to their agreement.

Holland applied for a patent on his filtration process in 1998, and in 2000 received Patent No. 6,027,653 for a "Method of Removing Organic Compounds from Air and Water

Columns," referred to as the "#653 patent." Claim 13 of the patent describes a method of removing and collecting **\*642** contaminants, first by pretreating the water and then directing it through a series of separation and filtration media. [1] Claim 19 describes the apparatuses used in the separation and filtration processes. The GLO facilities use the method and apparatuses described in Claims 13 and 19 of the patent. In 2002, Holland contacted the GLO and began demanding payment of patent royalties for the three facilities' use of his patented process. The GLO's contracts with PPP and SRP did not provide for the payment of patent royalties.

When the GLO refused to make any additional payments, Holland sued the State of Texas, the GLO, and the Texas Land Commissioner (collectively "the State") alleging that use of his patented process at the Palacios reclamation facilities infringed the '653 patent. [2] He further alleged that the State's use of his patented process constituted a taking of his property for public use without compensation in violation of Article I, section 17 of the Texas Constitution. After entering a general denial, the State filed a plea to the jurisdiction which the trial court denied. The court of appeals affirmed, holding that Holland had adequately pled a takings claim against the State for which immunity was waived. 221 S.W.3d at 643. We granted the State's petition for review to examine the State's sovereign immunity under the circumstances presented.

## II. Jurisdiction

 **[1]** Because this is an interlocutory appeal from the trial court's denial of a jurisdictional plea, and there was no dissent in the court of appeals, we have jurisdiction only if the court of appeals' decision conflicts with a prior decision of this Court or of another court of appeals. TEX. GOV'T CODE §§ 22.001(a)(1), (2). Decisions conflict for jurisdictional purposes "when there is inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants." *Id.* § 22.001(e). As we explain below, the trial court erred in denying the State's plea to the jurisdiction because the State was acting under color of contract in utilizing the treatment process that the '653 patent covers. Because Holland's claim does not arise as a taking under the constitution but sounds in contract, the court of appeals' decision conflicts with our decision in *General Services Commission v. Little–Tex Insulation Co.,* 39 S.W.3d 591 (Tex.2001), and we have jurisdiction to resolve the conflict.

## III. Standard and Scope of Review

 **[2] [3] [4] [5] [6]** A plea to the jurisdiction based on sovereign immunity challenges a trial court's jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225–26 (Tex.2004). A plea questioning the trial court's jurisdiction raises a question of law that we review *de novo. Id.* at 226. We focus first on the plaintiff's petition to determine whether the facts pled affirmatively demonstrate that jurisdiction exists. **\*643** *Id.* We construe the pleadings liberally, looking to the pleader's intent. *Id.* If the pleadings are insufficient to establish jurisdiction but do not affirmatively demonstrate an incurable defect, the plaintiff should be afforded the opportunity to replead. *Id.* at 226–27. In some instances, however, a plea to the jurisdiction may require the court to consider evidence pertaining to jurisdictional facts. *Id.* at 227; *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 555 (Tex.2000). A plea should not be granted if a fact issue is presented as to the court's jurisdiction, but if the relevant undisputed evidence negates jurisdiction, then the plea to the jurisdiction must be granted. *Miranda,* 133 S.W.3d at 227–28.

## IV. Analysis

The State contends Holland's petition does not present a viable takings claim because the State designed and constructed the bilge water reclamation facilities, which utilized the process described in Holland's patent, under color of contract. According to the State, it is of no moment that its contract was with Holland's companies rather than Holland himself; rather, the proper focus is whether the State had the requisite intent to take property for public use and thus was invoking its eminent-domain powers. Holland responds, and the court of appeals agreed, that the State did not establish as a matter of law that it was acting under color of contract with Holland rather than with PPP and SRP. 161 S.W.3d at 233. Holland contends the State's contract with his companies is immaterial because he holds the '635 patent individually, and whether or not the State was acting pursuant to an implied contract with him is a disputed fact question that the factfinder must resolve. We agree with the State.

 **[7] [8] [9] [10] [11]** Absent an express waiver of its sovereign immunity, the State is generally immune from suit. *State v. Shumake,* 199 S.W.3d 279, 283 (Tex.2006). But sovereign immunity does not shield the State from

a claim based upon a taking under Article I, section 17 of the Texas Constitution, known as the "takings clause." *Little–Tex Insulation Co.,* 39 S.W.3d at 598. The takings clause mandates that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17. To establish a takings claim under Article I, section 17, the claimant must show that a governmental actor acted intentionally to take or damage property for a public use. *Little–Tex Insulation Co.,* 39 S.W.3d at 598. When the government acts pursuant to colorable contract rights, it lacks the necessary intent to take under its eminent-domain powers and thus retains its immunity from suit. *Id.* at 598–99. This is because the State may "wear [ ] two hats: the State as a party to the contract and the State as sovereign. The State, in acting within a color of right to take or withhold property in a contractual situation, is acting akin to a private citizen and not under any sovereign powers." *Id.* at 599 (citations omitted).

Holland contends he had no contract with the State and therefore the State's use of his patent was unauthorized. But absence of an express contract between Holland and the State, or uncertainties about the existence of an implied contract between them, are immaterial to determining the capacity in which the State is acting. When we articulated the principle distinguishing the State's eminent-domain capacity from its contractual capacity in *Little–Tex,* we relied on *State v. Steck Co.,* 236 S.W.2d 866, 869 (Tex.Civ.App.-Austin 1951, writ ref'd). In that case, Steck, a printer, sought to recover from the State **\*644** the value of 39,603,690 cigarette tax stamps it had manufactured and delivered to the State. *Id.* at 867. The year before those stamps were delivered, Steck had manufactured, delivered, and been paid for 300,000,000 cigarette stamps under a competitively bid, one-year contract. *Id.* Pursuant to an oral agreement with the chief of the printing division of the Cigarette Tax Stamp Board, Steck continued to manufacture and deliver the stamps after the first year's contract had expired. *Id.* When the State refused payment, Steck sued. *Id.* The trial court determined that Steck was entitled to compensation under Article I, section 17. *Id.* at 867–68. We disagreed. First, we held there was no enforceable contract because the State had failed to abide by the legally required bidding procedures. *Id.* at 868. We also held that Steck could not assert a takings claim under Article I, section 17. *Id.* at 869. We reasoned that because Steck had delivered and the State had accepted the stamps under the purported, but nonexistent, contract, Steck could not contend

that the stamps had been taken under the State's eminent-domain power. *Id.*

Similarly, in *A.C. Aukerman Co. v. State of Texas,* 902 S.W.2d 576 (Tex.App.-Houston [1st Dist.] 1995, writ denied), the State paid independent highway-construction contractors who had used concrete roadway barriers manufactured according to a process over which Aukerman asserted patent rights. *Id.* at 577. Claiming the State had obtained the benefits of his patents without paying compensation, Aukerman sued the State for inverse condemnation. *Id.* The court of appeals affirmed the trial court's summary judgment in the State's favor, determining that any cause of action Aukerman might have was for patent infringement against the independent contractors. *Id.* at 578. Even if the contractors had infringed Aukerman's patent, the court held, the State was merely a party to contracts with them and, without more, could not be liable for patent infringement. *Id.* (citing *Am. Graphophone Co. v. Gimbel Bros.,* 234 F. 361, 368 (S.D.N.Y.1916) (holding that a purchaser of a product which has been made in infringement of a patented process cannot be liable as an infringer)). Having acquired the concrete barriers through its third-party contract, the court concluded the State lacked the intent necessary to establish a takings claim. *Id.* at 578–79.

In this case, the State presented uncontroverted evidence that Holland voluntarily provided, and the State accepted, his filtration process along with his design assistance pursuant to contractual agreements with SRP and PPP. Whether or not a contract may be implied between the State and Holland individually, the State accepted Holland's product and his services under color of its contracts with SRP and PPP, and not pursuant to its powers of eminent domain. Any claim for patent infringement Holland might have would be against SRP and PPP, not the State as a mere party to a contract with them. Lacking the requisite intent to take Holland's patented process under its eminent-domain powers, the State is not subject to liability under article I, section 17 of the Texas Constitution. Accordingly, the trial court erred in denying the State's plea to the jurisdiction.

## V. Conclusion

We reverse the court of appeals' judgment and dismiss the case for lack of jurisdiction.

**Parallel Citations**

50 Tex. Sup. Ct. J. 642

Footnotes

1    A patent "claim" sets forth an invention's parameters and describes in some detail "the subject matter which the [patent] applicant regards as his invention." 35 U.S.C. § 112; *see* 3 DONALD S. CHISUM, CHISUM ON PATENTS § 8.01 (2005).

2    The State submitted an affidavit attesting that the three facilities were completed in 1998. In response, Holland submitted an affidavit disputing the State's affidavit to the extent it asserted that the Palacios facility "currently in use and operating was completed in 1998." This dispute is irrelevant to our analysis, which focuses on the assistance Holland provided in designing the three facilities. Holland's petition in the trial court acknowledges that all three facilities use the same process and apparatus to process bilge water.

225 S.W.3d 828
Court of Appeals of Texas,
Houston (14th Dist.).

Dhiren S. SHETH, M.D., Appellant,
v.
Donald C. DEAREN, Appellee.

No. 14–07–00004–CV. | May 24, 2007.

**Synopsis**
**Background:** Patient brought medical malpractice action against surgeon, who performed surgery to repair hip fracture and, during the surgery, implanted orthopedic hardware device. The 334th District Court, Harris County, Sharon McCally, J., denied surgeon's motion to dismiss, and he appealed.

**[Holding:]** The Court of Appeals, Adele Hedges, C.J., held that patient alleged a misuse of tangible property causing his injuries, and these claims were within the scope of the Tort Claims Act waiver provisions, and as such, patient's malpractice suit could have been brought against state university medical center, which employed surgeon.

Reversed and remanded.

**Attorneys and Law Firms**

**\*829** Nancy Bolin Broaddus, Houston, for appellant.

John A. Davis, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices HUDSON and GUZMAN.

## OPINION

ADELE HEDGES, Chief Justice.

Appellant, Dhiren S. Sheth, M.D. ("Dr.Sheth") brings this appeal following the trial court's denial of his motion to dismiss pursuant to Section 101.106(f) of the Texas Tort Claims Act. In his sole issue, Dr. Sheth argues that the trial court erred in denying his motion to dismiss. We reverse and remand.

## I. BACKGROUND

In September of 2003, appellee, Donald C. Dearen, sustained a hip fracture and was taken into surgery at Memorial Hermann Hospital. Dearen was treated by Dr. Sheth, an orthopedic surgeon practicing at the University of Texas Health Science Center at Houston ("UTHSCH"). As part of Dr. Sheth's appointment at UTHSCH, he provided medical treatment to patients at Memorial Hermann Hospital.

In treating Dearen's hip fracture, Dr. Sheth performed surgery which involved the implantation of an orthopedic hardware device, known as a "short Gamma nail," into Dearen's body. [1] As a result of this surgery, Dearen brought suit alleging personal injuries caused by Dr. Sheth's negligence. Dr. Sheth filed a motion to dismiss, which the trial court denied.

## II. ANALYSIS

In Dr. Sheth's sole issue, he contends that the trial court erred in denying his motion to dismiss pursuant to Section 101.106(f) of the Texas Tort Claims Act. Section 101.106(f) provides that:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only. On the employee's motion, **\*830** the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

TEX. CIV. PRAC. & REM.CODE § 101.106(f). In this case, Dearen does not dispute that his suit was based on conduct within the general scope of Dr. Sheth's employment with UTHSCH. The parties disagree, however, as to whether

Dearen's suit could have been brought under the Tort Claims Act (TCA) against UTHSCH.

 [1]  [2]  In Texas, a governmental agency is not liable for the torts of its officers or agents unless there is a specific legislative waiver of immunity. *Lowe v. Texas Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976). Sovereign immunity can only be waived by clear and unambiguous language. *Univ. of Tex. Med. Branch at Galveston v. York,* 871 S.W.2d 175, 177 (Tex.1994). The Texas Legislature enacted the TCA to waive sovereign immunity in limited circumstances. *See Kerrville State Hosp. v. Clark,* 923 S.W.2d 582, 584 (Tex.1996).

 [3]  [4]  [5]  As the movant on the motion to dismiss, it is Dr. Sheth's burden to point to the facts evidencing that Dearen's suit could have been brought against UTHSCH. *See Phillips v. Dafonte,* 187 S.W.3d 669, 677 (Tex.App.-Houston [14th Dist.] 2006, no pet.) ("We find that the doctors failed to establish that Dafonte's suit is one that could have been brought against UTMB."); *Tejada v. Rowe,* 207 S.W.3d 920, 923 (Tex.App.-Beaumont 2006, pet. filed) ("We find that [the movants] met their burden of proof under section 101.106(f)."); *Williams v. Nealon,* 199 S.W.3d 462, 466 (Tex.App.-Houston [1st Dist.] 2006, pet. filed) ("[T]he doctors have not shown that Williams's claims could have been brought against UTHSCH under the Texas Tort Claims Act."). The primary source of those facts are the plaintiff's pleadings, however, other evidence is proper if relevant to the issue of waiver of sovereign immunity. *See Tex. Natural Res. Conservation Comm'n v. White,* 46 S.W.3d 864, 868 (Tex.2001) ("We must examine the plaintiff's pleadings and, to the extent relevant to the jurisdictional issue, the evidence submitted by the parties in order to determine if the government waived sovereign immunity."); *see also Phillips,* 187 S.W.3d at 676–77 (analyzing plaintiff's petition as part of its 101.106(f) analysis); *Tejada,* 207 S.W.3d at 922–23 (reviewing, as part of its 101.106(f) analysis, plaintiff's petition and two expert reports attached to that petition in deciding whether plaintiff's suit could have been brought under the TCA); *Franka v. Velasquez,* 216 S.W.3d 409, 412 (Tex.App.-San Antonio 2006, pet. filed) (reviewing "the petition and the evidence presented" in disposing of appellant's 101.106(f) issue). In determining whether the plaintiff alleges facts supporting a finding of waiver of sovereign immunity, we look at the substance of the plaintiff's pleadings rather than his characterizations of them. *See Phillips,* 187 S.W.3d at 676–77 (looking at "the real substance of [plaintiff's] petition" in determining, as part of its 101.106(f) analysis, whether plaintiff's claim could have

been brought under the TCA); *see also Dallas County Mental Health & Mental Retardation v. Bossley,* 968 S.W.2d 339, 343 (Tex.1998) ("The real substance of plaintiffs' complaint is that Roger's death was caused, not by the condition or use of property, but by the failure of Hillside's staff to restrain him once they learned he was still suicidal."); *Kerrville,* 923 S.W.2d at 585 ("The gravamen of their complaint is that KSH's non-use of an injectionable drug was the cause of their daughter's death."); *Univ. of Tex. Health Sci. Ctr. v.* **\*831** *Schroeder,* 190 S.W.3d 102, 106 (Tex.App.-Houston [1st Dist.] 2005, no pet.) ("Here, the gravamen of Schroeder's complaints amount to negligent supervision."). Where the facts taken from the plaintiff's pleadings are undisputed, the question of whether those pleadings support a jurisdictional finding of waiver of sovereign immunity is one of law and is thus reviewed *de novo. See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004) ("[W]hether undisputed evidence of jurisdictional facts establishes a trial court's jurisdiction is also a question of law."); *see also Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 855 (Tex.2002) (holding that the issue of whether a party has properly alleged a valid waiver of sovereign immunity is jurisdictional and is reviewed *de novo); Waxahachie Independent School District v. Johnson,* 181 S.W.3d 781, 787 (Tex.App.-Waco 2005, pet. filed) (same); *Kelso v. Gonzales Healthcare Sys.,* 136 S.W.3d 377, 381 (Tex.App.-Corpus Christi 2004, no pet.) (same). In this case, Dr. Sheth does not dispute the facts presented in Dearen's pleadings; rather, he disputes Dearen's characterization of those facts. As a result, we apply the *de novo* standard. *See Miranda,* 133 S.W.3d at 226. [2]

Dr. Sheth argues that Dearen's suit could have been brought against UTHSCH pursuant to Section 101.021(2) of the TCA, which waives governmental immunity for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM.CODE § 101.021(2). In his motion to dismiss, Dr. Sheth relied on Dearen's original petition, a report by Dearen's expert, and Dearen's responses to various discovery to support his contentions. Dr. Sheth contends that Dearen's pleadings allege the misuse of a device implanted into his body, which caused Dearen's injuries. We note that the plaintiff's pleadings should be the primary focus of our inquiry regarding this jurisdictional issue of waiver of sovereign immunity. *See White,* 46 S.W.3d at 868.

Dearen's expert wrote a report describing the procedure Dr. Sheth performed on Dearen. The report states that Dr. Sheth chose to stabilize Dearen's fracture by implanting a device, dubbed the "short Gamma Nail," into Dearen's body. The report further states that because the Gamma nail is short, it requires a distal interlocking screw for stability. Dearen's original petition summarized his negligence claims arising out of that surgery as:

(1) failing to initially align the nail hole and the hole in the jig in order to permit the placement of the intramedullary hip screw [3] to permit distal interlocking,

**\*832** (2) failing to correct the misalignment of the nail hole and the hole in the jig in order to permit the placement of the intramedullary hip screw to permit distal interlocking,

(3) failing to engage the distal interlock of the intramedullary hip screw in order to ensure proper leg alignment, and

(4) failing to properly follow the patient to provide early intervention that would have limited the scope and need for subsequent surgeries and would have limited his recovery time.

Such breaches of the standard of care were, among others, individually and collectively proximate causes of Plaintiff's injuries as claimed herein.

When Dearen's petition is viewed in conjunction with his expert's report, which provides the necessary background to understand the procedure, it becomes clear that Dearen is complaining that Dr. Sheth's failure to stabilize the short Gamma nail with the use of a distal interlocking screw caused his injuries.

[6] The dispositive controversy in this jurisdictional challenge is the characterization of Dr. Sheth's failure to stabilize the Gamma nail with the distal interlocking screw. A suit can only be brought under Section 101.102(2) when there is a *use* of property. *See Texas A & M Univ. v. Bishop,* 156 S.W.3d 580, 583 (Tex.2005) (finding that, because the governmental officials did not use the property, sovereign immunity was not waived thereby allowing suit to be brought against the university); *San Antonio State Hosp. v. Cowan,* 128 S.W.3d 244, 246 (Tex.2004) (finding that the governmental entity did not use the property as required to invoke waiver of immunity); *Kerrville,* 923 S.W.2d at 584 (holding that "mere non-use of property" [cannot] support a

claim under the Texas Tort Claims Act). Dr. Sheth frames Dearen's petition as alleging a misuse of property—the short Gamma nail was misused in that it was improperly secured thereby causing Dearen's injuries. Dearen characterizes his claims as a non-use of property—Dr. Sheth's failure to use the distal interlocking screw caused his injuries.

We find the characterization of Dearen's pleadings as alleging a misuse of the short Gamma nail to be a more accurate representation of the substance of Dearen's claims. *See Bossley,* 968 S.W.2d at 343 (looking at "the real substance of plaintiff's complaint" to determine whether a sufficient use was alleged as required by 101.021(2)); *Kerrville,* 923 S.W.2d at 585 ("The gravamen of their complaint is that KSH's non-use of an injectionable drug was the cause of their daughter's death."); *Phillips,* 187 S.W.3d at 676–77 (looking at "the real substance of [plaintiff's] petition" in determining, as part of its 101.106(f) analysis, whether plaintiff's claim could have been brought under the TCA).

The distal interlocking device is relevant only as a necessary [4] part of the larger device, the short Gamma nail. It is the proper use of the entire device (the short Gamma nail), which implicates the proper use of all the individual parts that aggregate to make the whole device effective, **\*833** that is crucial in stabilizing the hip thereby avoiding further injury. The use or misuse of the screw is of no consequence in and of itself: it is merely a piece of a larger, multi-part device and is not designed to function alone.

[7] The line of cases in which courts have found a non-use, and therefore non-waiver of immunity, is distinguishable. For instance, in *Texas Natural Resource Conservation Commission v. White,* White argued that TNRCC's failure to continue use of a pump which was installed on his property to dissipate gasoline vapors caused a fire which destroyed that property. [5] 46 S.W.3d at 870. The supreme court held that such a claim involves a non-use of property outside the scope of the sovereign immunity waiver statute. *Id.* Importantly, the unused device (the pump) was alleged to be the *direct* cause of damages. *Id.* In this case, however, the device that Dearen claims was not used (the distal interlocking screw) is only *a piece* of a larger device (the Gamma nail) that is alleged to be the direct cause of his injuries. In *Kassen v. Hatley,* the supreme court held that "the non-use of available drugs during emergency medical treatment is not a use of tangible personal property that triggers waiver of sovereign immunity." 887 S.W.2d 4, 14 (Tex.1994). Similarly, in *Kerrville State Hospital v. Clark,* the supreme court found that

the failure of the hospital to administer an injectionable drug to the plaintiff was a non-use of tangible personal property. 923 S.W.2d at 586. As a result, the court found that the plaintiff failed to plead facts sufficient to support a finding of waiver of sovereign immunity. *Id.* In reaching its conclusion, the court stated:

> There cannot be waiver of sovereign immunity in every case in which medical treatment is provided by a public facility. Doctors in state medical facilities use some form of tangible personal property nearly every time they treat a patient. Because of this fact, a patient suing for negligence could always complain that a different form of treatment than the one employed would have been more effective and still claim waiver under the Act. If such a complaint were enough to constitute the use of tangible personal property under the Act, the doctrine of sovereign immunity would be rendered a nullity.

*Id.* at 585–86. Dearen does not complain that a different "form of treatment" should have been used. Instead, Dearen complains that the treatment he received, implantation of the Gamma nail device, was improperly performed. As such, we find these cases to be inapplicable to the facts at hand. *See also Bishop,* 156 S.W.3d at 583 (finding that the knife alleged to be the cause of plaintiff's injuries was not used as required under Section 101.021(2) because the governmental officials merely *allowed* the students to use it as opposed to putting it in use themselves); *Cowan,* 128 S.W.3d at 246 (holding that allowing the patient to keep his suspenders and walker, which he later used to kill himself, was not a use of property).

Dearen argues that his amended petition, filed after Dr. Sheth filed his motion to dismiss, more clearly reflects his claim that Dr. Sheth's failure to use a distal interlocking screw, rather than the misuse of property, caused his injuries. Assuming without deciding that we can consider his amended petition, [6] we do not find it to be **\*834** additionally persuasive. Dearen's amended petition offers essentially the same facts and claims as his original petition; however, in the amended petition, he explicitly uses phrases such as "non-use" and "did not use." Despite these pointed characterizations, the gravamen of his petitions remains unchanged in pleading that Dr. Sheth's misuse of the nail device (in failing to secure it

with the screw) led to his injuries. *See Kerrville,* 923 S.W.2d at 585 ("The gravamen of their complaint is that KSH's non-use of an injectionable drug was the cause of their daughter's death."); *Phillips,* 187 S.W.3d at 676–77 (looking at "the real substance of [plaintiff's] petition" in determining, as part of its 101.106(f) analysis, whether plaintiff's claim could have been brought under the TCA).

 **[8]** Dearen also seems to contend that because some of his claims involved general negligence, his suit could not have been brought against UTHSCH under the TCA because such claims are outside the scope of the sovereign immunity waiver provisions. A suit can be brought under the TCA, however, when there are both claims within and outside the scope of the TCA's sovereign immunity waiver provisions. *See, e.g., Salcedo v. El Paso Hosp. District,* 659 S.W.2d 30, 33 (Tex.1983) (finding that plaintiff's allegations stated a claim within the scope of the TCA where plaintiff alleged non-use of property and misuse of property); *Tejada,* 207 S.W.3d at 922–23 (finding that plaintiff's claims could have been brought under the TCA where plaintiff pleaded claims of general negligence and negligence resulting from the use of tangible property). Because we find that Dearen's pleadings allege a misuse of tangible property causing his injuries, claims that are within the scope of the TCA waiver provisions, the fact that he also alleged general negligence is irrelevant. We sustain Dr. Sheth's sole issue.

### III. CONCLUSION

Because we find that Dearen's suit could have been brought against UTHSCH, we reverse the order of the trial court denying Dr. Sheth's motion to dismiss. This cause is remanded to the trial court with instructions to enter an order of dismissal of Dearen's claims against Dr. Sheth, with prejudice, and for such further proceedings and orders as the parties may show themselves justly entitled to receive in accordance with this opinion.

**Parallel Citations**

221 Ed. Law Rep. 967

Footnotes

1       It is not clear from the record where exactly the Gamma nail was placed.

2      In *Williams v. Nealon,* our sister court, in analyzing the appellee's 101.106(f) motion to dismiss, stated that "the proper standard of review for a motion to dismiss is abuse of discretion." 199 S.W.3d at 465. To the extent the court was holding that all motions to dismiss are reviewed for abuse of discretion, we disagree. The proper standard of review to be employed is dictated by the substance of the issue to be reviewed as opposed to the procedural vehicle through which that issue is developed. *See In re Doe,* 19 S.W.3d 249, 253 (Tex.2000) (stating that, in order to determine the proper standard of review, "we must determine whether the [issue] is a question of law or fact"); *Valley Baptist Med. Ctr. v. Stradley,* 210 S.W.3d 770, 773 (Tex.App.-Corpus Christi 2006, pet. filed) (finding that, while motions to dismiss are generally reviewed for abuse of discretion, the issue of whether plaintiff's claim is a health care liability claim in accordance with the statute at issue is a question of law and is thus reviewed *de novo* ). Because the issue in this case—waiver of sovereign immunity—is legal in nature, we apply the *de novo* standard.

3      To the extent there is a distinction, Dearen apparently intended to allege that Dr. Sheth failed to align the nail hole and the jig to permit the placement of the *distal interlocking* screw. As the expert's report states, the procedure itself was called an "intramedullary nailing" and involved the placement of a short Gamma nail which requires a distal interlocking screw to "lock" the nail in place. Dearen's amended petition further clarifies this by alleging the same facts, but substituting the term "distal interlocking screw" for "intramedullary hip screw."

4      Both Dearen, in his amended petition, and Dearen's expert, in his report, stated that the nail "*requires* the distal interlocking screw for stability (emphasis added)."

5      White also argued that the pump's use on his property caused the damages, however, this claim was not considered by the court because it involved factual allegations first raised on appeal. *White,* 46 S.W.3d at 870.

6      Dr. Sheth argues that once he filed his motion to dismiss pursuant to 101.016(f), his right to dismissal was perfected and any subsequent pleadings by Dearen could not effect that right. *See Villasan v. O'Rourke,* 166 S.W.3d 752, 758 (Tex.App.-Beaumont 2005, pet. filed) (finding that the defendant's right to dismissal under 101.106(e) was perfected upon the filing of his motion to dismiss and any subsequent pleadings "do not moot the right created by the filing of the motion under section 101.106"). Because we find that the amended petition provides no additional value, we need not address this argument.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

891 S.W.2d 243
Supreme Court of Texas.

THE STATE BAR OF TEXAS, James Parsons, III,
in his capacity as President of the State Bar of Texas
and Karen Johnson, in her capacity as Executive
Director of the State Bar of Texas, Petitioners,
v.
Maria GOMEZ, Alicia Naveja, and Leonardo
Chavez, on Behalf of Themselves and
Others Similarly Situated, Respondents.

No. D–4218. | Argued Jan. 20,
1994. | Decided Dec. 22, 1994.

Indigents brought action for declaratory and injunctive relief to require State Bar or Supreme Court to implement mandatory pro bono program for state lawyers. The 353rd Judicial District Court, Travis County, Joseph H. Hart, J., dismissed for lack of subject matter jurisdiction, and indigents appealed. The Court of Appeals, J. Woodfin Jones, J., 856 S.W.2d 804, reversed and remanded. On application for writ of error, the Supreme Court, Cornyn, J., held that indigents' action to compel State Bar or Supreme Court to implement mandatory pro bono program did not present justiciable controversy and, therefore, district court lacked jurisdiction over action.

Reversed and remanded.

Gonzalez, J., concurred and filed opinion.

Hightower, J., dissented and filed opinion in which Gammage and Spector, JJ., joined.

Doggett, J., noted his dissent.

**Attorneys and Law Firms**

**\*244** Lynn Liberato, Houston, Linda A. Acevedo, Austin, Alene Ross Levy, Jeffrey T. Nobles, Houston, Broadus A. Spivey, Eric R. Galton, James M. McCormack, Austin, for petitioners.

Virginia Agnew, Charles Herring, Jr., James C. Harrington, Austin, for respondents.

**Opinion**

CORNYN, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HECHT and ENOCH, Justices, join.

The sole question presented for our determination is whether the district court below has jurisdiction of this suit, which complains of the failure of the State Bar of Texas to compel member lawyers to provide free legal services to Texans who cannot pay for those services. We conclude that the district court correctly dismissed the case for lack of jurisdiction. Thus, we reverse the judgment of the court of appeals and remand this case to the district court with instructions to dismiss. [1]

After being refused free legal services, Maria Gomez, Alicia Naveja, and Leonardo Chaves, on behalf of themselves and others similarly situated (collectively, Gomez), filed suit in a Travis County district court against the State Bar of Texas and two of its officials at that time, James Parsons III, President, and Karen Johnson, Executive Director (collectively, State Bar). Gomez contends that the State Bar, by not effectively encouraging attorneys to volunteer free legal services, has illegally failed to meet the legal needs of indigent Texans. Specifically, Gomez alleges violations of the following provisions of the Texas Constitution: (1) Article I, Section 13 (open courts); (2) Article I, Section 3 (equal protection); (3) Article I, Section 3a (equal rights); (4) Article I, Section 19 (due course of law); and (5) Article I, Section 29 (inviolate nature of the Bill of Rights). Gomez further asserts violations of the Texas antidiscrimination statute, [2] the Texas Disciplinary Rules of Professional Conduct, [3] and the Texas Lawyer's Creed. [4]

The district court dismissed the case, concluding it lacked jurisdiction under Article V, Section 8, of the Texas Constitution. [5] The court of appeals reversed, holding that the district court had jurisdiction to decide the merits of Gomez's claims, but because of this Court's exclusive authority to regulate the legal profession in Texas, it held that the district court could levy only a prohibitory, and not a mandatory injunction against the State Bar. 856 S.W.2d 804 (Tex.1993). The court of appeals explained:

> We conclude that a district court does not have authority to grant relief that would **\*245** unreasonably usurp the

supervisory control vested exclusively in the supreme court. By vesting the supreme court with supervisory control of the practice of law, the constitution and the State Bar Act grant the supreme court *discretion* to decide issues concerning the State Bar and the practice of law. Whether a district court has authority to grant a particular form of injunctive relief depends, we believe, on whether granting such relief would effectively exercise the kind of supervisory discretion that is vested exclusively in the supreme court.

856 S.W.2d at 815. We agree with the court of appeals' identification of the issue but not its conclusion.

 [1]    [2]    The jurisdictional question presented is complex and in some ways unique. As a general proposition, before a court may address the merits of any case, the court must have jurisdiction over the party or the property subject to the suit, jurisdiction over the subject matter, jurisdiction to enter the particular judgment, and capacity to act as a court. *See Austin Indep. Sch. Dist. v. Sierra Club,* 495 S.W.2d 878, 881 (Tex.1973). Subject matter jurisdiction requires that the party bringing the suit have standing, that there be a live controversy between the parties, and that the case be justiciable. *See Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440, 443–46 (Tex.1993). If the district court lacks jurisdiction, in any of these senses, then its decision would not bind the parties. *See Austin Indep. Sch. Dist.,* 495 S.W.2d at 881 (noting that collateral attacks on a judgment are allowed when the district court lacked jurisdiction). And, a decision that does not bind the parties is, by definition, an advisory opinion prohibited by Texas law. *See Texas Ass'n of Business,* 852 S.W.2d at 444 (citing Article II, Section 1, of the Texas Constitution as prohibiting advisory opinions).

 [3]    [4]    The unique aspect of this jurisdictional inquiry, as the court of appeals recognized, arises out of this Court's power to regulate the practice of law in the State of Texas. This power is derived from both statutory and inherent powers. The primary statutory grant of power is found in the State Bar Act, which gives the Court administrative control over the State Bar and provides a statutory mechanism for promulgating regulations governing the practice of law. *See* TEX.GOV'T CODE § 81.011(c). The other source of this court's power to regulate the practice of law in this state, its inherent power, is not secured by any legislative grant or specific constitutional provision, but is necessarily implied to enable the Court to discharge its constitutionally imposed duties. *See Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398–99 (Tex.1979) (noting that doctrine of inherent power is derived, in part, from the separation

of powers dictated by Article II, Section 1 of the Texas Constitution). Those duties include our obligation, as the head of the judicial department, to regulate judicial affairs. Because the admission and practice of Texas attorneys is inextricably intertwined with the administration of justice, the Court must have the power to regulate these activities in order to fulfill its constitutional role. *See generally* JIM R. CARRIGAN, INHERENT POWERS OF THE COURTS 2 (1973) (defining inherent powers as those "reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its lawful actions effective"). The Court's inherent powers, such as the power to regulate the practice of law, are not *jurisdictional* powers. *See Eichelberger,* 582 S.W.2d at 399. These powers are *administrative* powers, necessary to the preservation of the judiciary's independence and integrity.

 [5]    [6]    Because the Court's power to regulate the practice of law is an administrative one, the exercise of that power does not in and of itself deprive lower courts of general subject matter jurisdiction over challenges to that governance. They do not, however, have jurisdiction over *all* such challenges because in every individual case, jurisdiction also depends on justiciability. And, as the court of appeals acknowledged, for a controversy to be justiciable, there must be a real controversy between the parties that will be actually resolved by the judicial relief sought. 856 S.W.2d 804, 811 (citing *Texas Ass'n of Business,* 852 S.W.2d at 446 and **\*246** *Board of Water Eng'rs v. City of San Antonio,* 155 Tex. 111, 283 S.W.2d 722, 724 (1955)). While we do not find it necessary to set the precise boundaries of the district court's jurisdiction under these circumstances, we hold that these facts do not present a justiciable controversy and that the district court therefore has no jurisdiction.

 [7]    Gomez seeks to compel either the State Bar or this Court to implement a mandatory pro bono program for Texas lawyers. To the extent a remedy is sought against the State Bar, Gomez seeks relief from an entity that is powerless, acting alone, to implement that remedy. The State Bar's authority is limited to proposing regulations to this Court, which may accept or reject any recommendation, in whole or in part. *See* TEX.GOV'T CODE § 81.024(a). For example, when the latest amendment to the rules governing lawyer advertising was recommended by the State Bar, we modified the proposed amendment before promulgation. *See* Amended Order of Promulgation and Adoption of Disciplinary Rules, West's Texas Cases Advance Sheet 884–885 issue 49, pp. LXIX–LXXXI. Thus, the relief sought against the State Bar,

even if granted by the trial court, could not resolve the dispute between these litigants.

 **[8]**    Moreover, to the extent the remedies are sought against the Supreme Court, they would clearly impinge on the Court's exclusive authority to regulate the practice of law. The Legislature itself implicitly acknowledged the Court's fundamental authority in this area when it enacted the State Bar Act as *an aid* to the Court in carrying out this function. *See* TEX.GOV'T CODE § 81.011(b). No subordinate court in Texas has the power to usurp our authority or responsibility in this area. The dissenting justices acknowledge this limitation when they say, "An injunction mandating this court or the State Bar to implement a mandatory pro bono program would be improper. It would inappropriately involve the district court in the regulation of the practice of law." *Infra,* 891 S.W.2d at 252 (citations omitted).

This is not to say that all remedies bearing upon the regulation of the legal profession would be unacceptable infringements on the inherent powers of the Court. Had this Court actually promulgated rules establishing a pro bono program and had Gomez challenged the constitutionality of such rules, the district court would have jurisdiction to decide, in the first instance, whether such rules met constitutional standards. *See O'Quinn v. State Bar,* 763 S.W.2d 397 (Tex.1988) (upholding the trial court's decision on a constitutional challenge to the rules of disciplinary conduct promulgated by the Court). In due course, we would review any adverse determination in our adjudicative capacity. *See Cameron v. Greenhill,* 582 S.W.2d 775, 777 & n. 3 (Tex.1979) (holding that the Court could both promulgate a rule and determine its constitutionality). The important distinction between such a case and the one at hand is that in the former case, the district court would not be cast in the impermissible role of effectively promulgating policies and regulations governing Texas lawyers. Such a case would be justiciable because the district court would be capable of rendering a judgment that accords the parties complete relief, subject of course to appellate review.

But when, as here, the essence of a complaint is that this Court has failed to establish rules governing some aspect of lawyer conduct, a district court has no authority to assume this Court's authority to regulate the legal profession. This prohibition includes the rendition of orders that would, as a practical matter, preempt this Court's authority. Because the district court cannot effect a remedy that would resolve this dispute, this case does not present

a justiciable controversy. Once again, acknowledging the limitations on the district court's authority in this area, the dissenting justices nevertheless contend, "The district court does, however, have jurisdiction to issue a mandatory injunction which requires the State Bar to implement a more effective *voluntary* pro bono program calculated to meet constitutional and statutory demands which may exist." *Infra,* 891 S.W.2d at 252 (emphasis added). We are at a loss to understand, and the dissenting justices do not explain, how a mandatory injunction to enforce a *voluntary* program could ever be enforced by any court. By limiting the district court's jurisdiction to such illusory relief, the dissenting justices have, in effect, conceded that the **\*247** trial court cannot grant plaintiffs the real relief they seek.

Our decision that the district court lacks jurisdiction does not, however, leave the parties without a forum in which to seek redress of their grievances. This Court, in the exercise of its constitutional responsibilities, wants and needs input from interested persons concerning its supervisory responsibility over Texas lawyers. Ordinarily, interested parties would be free to informally petition this Court in its administrative capacity, to urge reconsideration of the proper constitutional mandates for this Court's regulation of attorney conduct. However, given the potentially far-reaching effects of this particular challenge to our scheme of regulation, we direct that this matter be placed on the Court's administrative agenda for further consideration. All interested parties have until April 14, 1995, to submit their written arguments on the merits of the underlying claims. *Cf. Barger v. Brock,* 535 S.W.2d 337, 342 (Tenn.1976) (ordering a lower court to dismiss a challenge to the Supreme Court's rules but directing the lower court to forward the petitions for further consideration as a direct motion in the Supreme Court).

Accordingly, we reverse the judgment of the court of appeals and remand to the district court with instructions to dismiss for want of jurisdiction.

DOGGETT, J., dissents.

GONZALEZ, Justice, concurring.

This case presents significant issues of public policy. Respondents seek a court declaration that indigent citizens of our State are entitled to free legal services in civil cases. They also seek an injunction that would require the State Bar of Texas to implement a program mandating pro bono legal services from all attorneys licensed to practice law in Texas. [1]

For the reasons stated in the majority opinion, I agree with the trial court and this Court that this case does not present a justiciable controversy within the trial court's jurisdiction. I thus concur in the judgment.

I write separately because I disagree with the Court prolonging resolution of the mandatory pro bono issue by placing the matter "on the Court's administrative agenda for further consideration." 891 S.W.2d at 247. This procedure is unnecessary, and it gives Respondents false hope that a majority of the Court is seriously considering implementing such a sweeping change in the practice of law in Texas. As for the invitation for interested parties to submit more briefs to the Court, I think that any information which anyone gives the Court will merely duplicate what we already have for determining the merits of Respondents' request. The issue of how to provide legal services for the indigent is a problem in our society that has been widely debated and studied. More hearings, briefs, or argument before us will be of little utility.

Mandating any program for legal services to the poor is a political question, over which this Court in its administrative capacity and the Legislature would have jurisdiction. However, in my opinion, any attempt to draft and implement such a program would unnecessarily divert the Court from its primary business of adjudicating disputes. The Legislature is better suited to undertake the activities necessary for drafting and implementing a program to provide indigents legal services. Different program options, as well as their legal and constitutional ramifications, will need to be considered. Since the problem of access to legal services faces society as a whole, the burden of resolving it does not solely rest on the legal profession.

I acknowledge that a very real problem exists for individuals who seek legal representation but lack the financial resources to retain counsel. Studies clearly document that our poor citizens need greater access to legal services. *See, e.g.,* COMMITTEE ON LEGAL SERVICES TO THE POOR IN CIVIL MATTERS, STATE BAR OF TEXAS, REPORT ON MANDATORY PRO BONO (1991); STATE BAR OF TEXAS ET AL., LEGAL NEEDS OF THE POOR ASSESSMENT PROJECT (1991). This need led the Court to create the Texas Equal Access to Justice foundation in 1984 to administer the voluntary **\*248** IOLTA (Interest on Lawyers' Trust Accounts) program. [2] *See* TEXAS EQUAL ACCESS TO JUSTICE PROGRAM §§ 1–9 (effective May 19, 1994), *reprinted in* TEX.GOV'T CODE, tit. 2, subtit. G app. (STATE BAR RULESS art. XI, §§ 1–9). In December,

1988, we signed an order that made the IOLTA program mandatory. *Id.* (amended December 13, 1988). We took this action under our authority to regulate the practice of law.

Realistically, the Court has progressed as far as it can to extend legal services to the poor. A mandatory pro bono program is quite different from the IOLTA program. This Court lacks the resources and/or the political will to attempt further resolution of the profound problem of providing legal services for indigent citizens. I would tell Respondents frankly that we are not going to order mandatory pro bono. The Legislature is better suited to tackle this social problem.

HIGHTOWER, Justice, joined by GAMMAGE and SPECTOR, Justices, dissenting.

Because I believe that the district court has jurisdiction of this suit and that the Court would effectively deny the Plaintiffs' access to a meaningful forum in which to seek redress of their grievances, I respectfully dissent.

## I.

The jurisdictional inquiry begins with Article V, Section 8 of the Texas Constitution which provides in part:

> District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings and remedies, *except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal or administrative body.*

Tex. Const. art. V, § 8 (emphasis added). The district court held that it lacked jurisdiction because the legislature had conferred jurisdiction over matters concerning the administration of the State Bar upon this Court in the State Bar Act. *See* Tex.Gov't Code Ann. § 81.011(c) (West 1988). I disagree.

What the legislature conferred upon this Court was "*administrative control*" over the state bar." Tex.Gov't Code Ann. § 81.011(c) (West 1988) (emphasis added). "Jurisdiction" within the meaning of Article V, Section 8 includes only the *judicial* powers of the courts. These judicial powers are typically the only ones at issue when the Court

makes statements such as: "[J]udicial power is divided among the various named courts by means of express grants of 'jurisdiction.' " *Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398 (Tex.1979) (citing *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641 (1933)). But Texas courts have duties in addition to their judicial responsibilities.

I do not disagree that this Court's inherent power to regulate the practice of law is more expansive than the administrative authority that the legislature has "granted" to us. *See Daves v. State Bar,* 691 S.W.2d 784 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.) (noting the Court's inherent power to adopt rules governing the practice of law by extra-statutory means); *see also* Tex.Gov't Code Ann. § 81.011(b) (West 1988) (stating that the State Bar was a legislative creation passed to *aid* the Court in exercising its judicial power). *See State Bar v. Heard,* 603 S.W.2d 829, 831 (Tex.1980). Even so, it does not necessarily follow that this inherent power is so great that it deprives the state's courts of general jurisdiction of the authority to hear a challenge pertaining to the governance of the legal profession.

The proper question to determine whether the district court has jurisdiction over this case is not whether this Court, in its administrative capacity, *could* act in a manner that would decide or moot the issues raised. Rather, three questions must be asked: (1) **\*249** whether the State Bar and its officers are the proper parties in this case; (2) if so, whether the district court is an appropriate forum to hear a matter over which this Court exercises such extensive authority; and (3) whether the failure to act, as opposed to an affirmative action, nevertheless presents an issue over which the district court may exercise authority. I would answer all three questions in the affirmative.

However couched, the Plaintiffs' claims are actually directed not so much at the State Bar [1] as at an alleged deficiency in the current system of lawyer regulation established by this Court and the legislature. This Court, both by legislative grant and its inherent powers, possesses authority to regulate the practice of law and exercises control over the State Bar. *See* Tex.Gov't Code Ann. §§ 81.011, 81.024(a) (West 1988) (clarifying this Court's supervisory role over the State Bar); *State Bar v. Heard,* 603 S.W.2d at 831 ("The State Bar Act was passed in aid of this court's exercise of its inherent power to regulate the practice of law.") (footnotes omitted). The legislature recognized the Court's fundamental responsibility in this area when it passed the State Bar Act "in aid of the judicial department's powers under the constitution

to regulate the practice of law." Tex.Gov't Code Ann. § 81.011(b) (West 1988).

The State Bar's actual power in this regard is limited to proposing regulations to this Court, which could reject or amend any such recommendation. Under a strict concept of justiciability, one could argue that there is no justiciable controversy between the State Bar and the Plaintiffs. *See Board of Water Eng'rs v. City of San Antonio,* 155 Tex. 111, 283 S.W.2d 722, 724 (1955) (defining "justiciable controversy" as the requirement that there shall be a real controversy between the parties that will actually be determined by the judicial declaration sought). On the other hand, more modern notions of justiciability would acknowledge that the State Bar is an acceptable "surrogate defendant" for the Court in this matter. In fact, the State Bar has served as such a surrogate in several recent cases. *See, e.g., O'Quinn v. State Bar,* 763 S.W.2d 397 (Tex.1988); *State Bar v. Tinning,* 875 S.W.2d 403 (Tex.App.—Corpus Christi 1994, writ denied); *Musslewhite v. State Bar,* 786 S.W.2d 437 (Tex.App.—Houston [14th Dist.] 1990, writ denied); *Daves v. State Bar,* 691 S.W.2d 784 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.). [2] For these reasons, I conclude that the district court's jurisdiction is not suspect on this basis.

## II.

Next we must decide whether the district court has subject matter jurisdiction over a challenge to an administrative decision of this Court. I believe the answer is yes. Promulgating court rules in our administrative capacity does not and cannot imply a concomitant determination by this Court in its judicial capacity that such rules are constitutional in every respect. Hopefully, this Court does not abandon its collective knowledge of the Constitution when it exercises its rulemaking authority, and surely it would not knowingly promulgate any rule it regarded as violating the United States or Texas Constitutions. However, we are not omniscient. It is simply beyond the capacity of this or **\*250** any other court to envision every possible constitutional ramification or factual application of its orders or rules, particularly before it has the benefit of a case and controversy that vigorously explores both sides of the issues. *See* Order of the Supreme Court of February 28, 1966, Transmitting Amendments to Rules of Civil Procedure, 383 U.S. 1029, 1032 (Black, J., dissenting) (stating that "the Court's transmittal does not carry with it a decision that the amended rules are all constitutional" because "such a decision would be the equivalent of an advisory

opinion which, I assume the Court would unanimously agree, we are without constitutional power to give."); *Grand Bahama Petroleum Co. v. Canadian Transp. Agencies,* 450 F.Supp. 447, 450 (W.D.Wash.1978) (holding that the district court had jurisdiction to consider a constitutional challenge to a federal rule of civil procedure, noting that "[w]hile the [United States Supreme] Court certainly considers the constitutionality of a rule recommended by a committee, it is not possible for its members to anticipate every constitutional objection."). This is especially true when, as here, it is the *failure* to provide for some constitutionally mandated system that is alleged.

Nor would the mere determination by the district court that the current system is constitutionally deficient invade this Court's inherent power to regulate the practice of law. We have no inherent power to create a system that violates the Constitution, just as the legislature has no power to pass unconstitutional statutes. *See Reese v. State,* 772 S.W.2d 288, 290 (Tex.App.—Waco 1989, pet. ref'd) (reasoning that a court may not enact a procedural rule that conflicts with a provision of the constitution); *Picard v. State,* 631 S.W.2d 761, 763 (Tex.App.—Beaumont 1981, no writ) (holding that the rule-making authority of any court may not conflict with constitutional provisions and that any unconstitutional rule is inoperative). For example, the Constitution provides that this Court may not appoint to the State Commission on Judicial Conduct more than one judge from the same Supreme Judicial District. Tex. Const. art. V, § 1–a(2). If the Court breached this restriction, surely it would be answerable to the legal system. If this be conceded, there can be only two possible mechanisms to enforce constitutional restrictions on the Court acting in its administrative capacity: a suit against the Court in a lower court or an original proceeding in the Court itself. Either of these courses is permissible, but at least one is necessary. Under the Court's analysis, however, there is no mechanism to enforce constitutional restrictions on the Court acting in its administrative capacity. In this case, the Plaintiffs are left without a meaningful forum in which to seek redress of their grievances. The Court has directed "that this matter be placed on the Court's administrative agenda for further consideration." In essence, the Court suggests that the Plaintiffs directly petition the Court for redress of their "complaint." However, the Court is not required to consider or take any action on the "petition"—ever! Obviously this does not constitute a meaningful forum.[3] It is also unclear whether the Plaintiffs could seek redress of their grievances in the Legislature. Based upon the Court's expansive description of its inherent powers to regulate the practice of law, it

is doubtful that the Legislature has the power to impose a mandatory pro bono system upon the State Bar.

Some state supreme courts have expressly provided for the filing of petitions challenging their orders and rules directly with that court. *See, e.g., Aldridge v. Watling Ladder Co.,* 275 Ark. 225, 628 S.W.2d 322, 323 (1982) (holding that a case involving construction of supreme court rule should have been certified to supreme court under Supreme Court Rule 29(1)(c)); **\*251** *Goetz v. Harrison,* 153 Mont. 403, 457 P.2d 911, 912 (1969) (stating that questions involving the constitutionality of a supreme court rule should be presented to the supreme court in an "appropriate original proceeding.")

This Court has, with narrow exceptions, never provided such a procedure.[4] Because supreme court rules must comport with the Constitution and because the judicial branch is entrusted with interpreting the Constitution, jurisdiction to consider challenges to rules must exist at the district court level. This view comports with the general understanding of Texas law, and with what is probably the majority rule in most of the states that have been confronted with the issue. *See, e.g., Beard v. North Carolina State Bar,* 320 N.C. 126, 357 S.E.2d 694, 695 (1987) (holding that a "direct challenge of the constitutionality of an order of this Court ... must be litigated as an original action in the General Court of Justice."); *Berberian v. Kane,* 425 A.2d 527, 528 n. 2 (R.I.1981) (holding that a rule may be challenged in a case seeking declaratory judgment that the rule was unconstitutional).

### III.

The question remains whether this case is nonjusticiable because the district court does not have jurisdiction to grant the relief sought. Plaintiffs seek a declaratory judgment that the State Bar is violating their constitutional and statutory rights. Among other things, Plaintiffs requested that the district court "[d]eclare that the official policies, actions, and failure to act alleged herein, which involve the refusal to Defendants to adequately provide for the legal services needed by Plaintiffs and the class, violate the Texas Constitution and Tex.Civ.Prac. & Rem.Code § 106.001." Plaintiffs also seek an injunction prohibiting the State Bar from continuing to violate the rights of indigent citizens and an injunction mandating the State Bar to implement an adequate and more effective pro bono program. First, declaratory relief is proper whether or not further relief is or could be claimed. *See* Tex.Civ.Prac. & Rem.Code Ann.

§ 37.003(a). The district court has the authority to render a judgment declaring the constitutional and statutory rights of Plaintiffs and, also, to declare whether such rights have been violated. See Tex.Civ.Prac. & Rem.Code Ann. § 37.003. I fail to see the distinction between the district court's jurisdiction to determine the constitutionality of the official policies, actions, and failure to act caused by the refusal of the State Bar to adequately provide for the legal services needed by Plaintiffs *and* the district court's jurisdiction to determine the constitutionality of rules proposed by the State Bar and promulgated by this Court. In both cases, the district court's determination could be reviewed by this Court in its adjudicative capacity. Contrary to the Court's assertion, the determination of the constitutionality of the refusal to the State Bar to adequately provide for the legal services needed by Plaintiffs would not cast the district court in the role of effectively promulgating policies and regulations governing Texas lawyers.

Concerning injunctive relief, a prohibitory injunction, one prohibiting the State Bar from continuing to violate Plaintiffs' rights, would be proper in the event the district court holds such rights are being violated. It is axiomatic that a court has the power to enforce its orders determining the legal rights of the parties. *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 644–45 (1933). "Reason and experience argue that courts empowered ... [to decide] constitutional mandates cannot be left without the means to order appropriate relief." *Terrazas v. Ramirez,* 829 S.W.2d 712, 718 (Tex.1991). Furthermore, a mandatory injunction could also be proper. *See Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 399 (Tex.1989); *Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d 491, 494 (Tex.1991); *Terrazas,* 829 S.W.2d at 717–20. However, courts should tread lightly when dealing with powers traditionally reserved to other areas of government. For example, in *Terrazas,* although we held that the courts could order apportionment, we were careful to state,

> **\*252** [T]hat power ought to be used only after investigation and careful consideration of the many, diverse interests affected, after due deference to the Legislature to rectify its own statutes, and after due regard for the effect of the court's order on the election process.

829 S.W.2d at 718. Likewise, in *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d at 399, we stated, "Although we have ruled the school financing system to be unconstitutional, we

do not now instruct the legislature as to the specifics of the legislation it should enact...."

Moreover, a court should not overstep the line between adjudication and regulation. Regulation of the practice of law is within the exclusive control of this Court. Tex.Gov't Code Ann. § 81.011(c) (Vernon 1986); *Daves v. State Bar,* 691 S.W.2d 784, 788–89 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.). An injunction mandating this Court or the State Bar to implement a mandatory pro bono program would be improper. It would inappropriately involve the district court in the regulation of the practice of law. *See Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d at 399; *Edgewood Indep. Sch. Dist. v. Kirby,* 804 S.W.2d at 493–94. The district court does, however, have jurisdiction to issue a mandatory injunction which requires the State Bar to propose and implement a more effective voluntary pro bono program calculated to meet constitutional and statutory demands which may exist. *Id.* In addition, the district court would have jurisdiction to issue a mandatory injunction which requires the State Bar to propose regulations creating a mandatory pro bono program to this Court.

Finally the question remains whether this case is nonjusticiable because it alleges constitutional sins of omission. I believe that the Plaintiffs' complaint that the State Bar has failed to act as required by various constitutional and statutory provisions does not affect the justiciability of their claims. Distinctions between an act and an omission in this context are not helpful. *See generally* Lisa E. Heinzerling, Note, *Actionable Inaction: Section 1983 Liability for Failure to Act,* 53 U.CHI.L.REV. 1048, 1057–63 (1986) (criticizing the entire act/omission analysis in the context of governmental responsibilities under the Constitution, primarily because its tort-based reasoning is ill-suited to explain existing doctrine). If this Court concluded that the district court lacked jurisdiction over the Plaintiffs' claims because they allege an omission rather than an act, the Plaintiffs could simply recast their allegations. Thus, the difference between acts and omissions in this highly unusual context seems semantic. *See* David A. Fischer, *Causation in Fact in Omission Cases,* 1992 UTAH L.REV. 1335, 1339 ("[A]s a matter of semantics, any omission can be characterized as part of a larger encompassing act."). The mere fact that the Plaintiffs have alleged an unconstitutional omission cannot deprive the district court of jurisdiction when it clearly would have jurisdiction to review an unconstitutional act.

For the foregoing reasons, I respectfully dissent.

**Parallel Citations**

38 Tex. Sup. Ct. J. 140

Footnotes

1     This disposition of the limited issue before us means that we do not, as Justice Gonzalez's concurring opinion does, comment on the merits of the underlying claims.

2     TEX.CIV.PRAC. & REM.CODE § 106.001. This statute generally prohibits the state or its agents from discriminating against persons because of race, religion, color, sex, or national origin. Remedies available to a successful litigant include injunctive relief, attorney's fees, and court costs. *Id.* § 106.002. A person who knowingly violates this statute is subject to a fine and confinement in the county jail. *Id.* § 106.003.

3     TEX.DISCIPLINARY R.PROF.CONDUCT, pmbl. ¶ 6, *reprinted in* TEX.GOV'T CODE, tit. 2, subtit. G app. (West Supp.1992) (STATE BAR RULES art. X, § 9) ("The provision of free legal services to those unable to pay reasonable fees is a moral obligation of each lawyer as well as the profession generally.").

4     Texas Lawyer's Creed—A Mandate for Professionalism (adopted by the Supreme Court of Texas and the Court of Criminal Appeals of Texas, Nov. 7, 1989), *reprinted in* TEXAS RULES OF COURT 487 (West 1994). In the Creed, lawyers are urged to commit themselves "to an adequate and effective pro bono program." *Id.*

5     Section 8 defines the district courts' jurisdiction, but excepts those cases where jurisdiction has been conferred on some other court. *See* TEX. CONST. art. V, § 8. The district court held that this Court's power to regulate the practice of law was sufficient to bring this case within Section 8's exception.

1     Respondents deny that they are seeking a mandatory pro bono program, but they do not suggest any other method of providing legal services to the indigent.

2     The IOLTA foundation administers a program wherein lawyers convert their non-interest bearing trust accounts to interest bearing accounts. Financial institutions remit all interest earned on IOLTA accounts to the IOLTA foundation. The foundation in turn channels money to organizations that deliver civil legal services to the poor. Since inception of the mandatory IOLTA program, the foundation has distributed approximately $42 million to assist people unable to afford an attorney in civil actions.

1     The current pro bono policy was adopted by the State Bar of Texas Board of Directors in May 1992. The policy includes an aspirational goal of fifty (50) hours per year and an annual voluntary pro bono reporting system.

2     We need not decide in this case whether Plaintiffs could have proceeded against this Court itself. Like other state courts of last resort, we have been named defendants in district court at least once before. *Cameron v. Greenhill,* 582 S.W.2d 775 (Tex.1979); *see also CWA Local 1044 v. Chief Justice of the Sup. Ct.,* 118 N.J. 495, 572 A.2d 613 (1990) (challenging a New Jersey Supreme Court decision made in the course of labor negotiations with its judicial employees); *American Trial Lawyers Ass'n v. New Jersey Sup. Ct.,* 66 N.J. 258, 330 A.2d 350 (1974) (challenging a New Jersey Supreme Court order limiting contingent attorney's fees in certain tort cases); *Vermont Sup. Ct. Admin. Directive No. 17 v. Vermont Sup. Ct.,* 154 Vt. 217, 576 A.2d 127 (1990) (challenging a Vermont Supreme Court order postponing civil jury trials due to budgetary shortfalls). But some jurisdictions expressly proscribe suing the state's highest court. *See, e.g., Goetz v. Harrison,* 153 Mont. 403, 457 P.2d 911 (1969) (holding that a lower court has no supervisory control over the Supreme Court and thus cannot entertain a challenge to a Supreme Court rule relating to bar admissions).

3     It is unclear whether the Court is creating a "parallel administrative docket" in which interested persons could petition the Court for various forms of relief. Are these "petitioners" entitled to timely consideration of their petition and oral argument? *See Barger v. Brock,* 535 S.W.2d 337, 342 (Tenn.1976) ("[I]n order that the parties may have their insistences considered, we direct that all pleadings in this cause be delivered to the Clerk of this Court at Nashville forthwith. This Court will treat the pleadings as constituting a motion to vacate or modify Rule 42. This matter will be docketed for oral argument, in Knoxville, at the heel of the calendar on 7 May 1976. Briefs will be filed with the Clerk in Nashville by 23 April 1976. The sole issue before the Court is the constitutionality of Rule 42.").

4     Our lack of an original proceeding may actually be salutary. This Court's resolution of complex questions concerning the constitutionality of our rules would most likely be enhanced by the fuller development of issues and arguments that usually attend the appellate process.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

304 S.W.3d 896
Court of Appeals of Texas,
Austin.

TEXAS DEPARTMENT OF PUBLIC SAFETY;
Lt. Col. Lamar Beckworth, in his official
capacity as Interim Director of the Texas
Department of Public Safety; and Allan B.
Polunsky, in his official capacity as Chairman
of the Public Safety Commission, Appellants,
v.
Miguel SALAZAR; Edgar Soria; Francisco Avila
Trejo; Green Meadows Landscaping, Inc.;
Eustolio Galvan; and Jose Gomez, Appellees.

No. 03–09–00222–CV.   |   Dec. 31,
2009.   |   Rehearing Overruled Feb. 25, 2010.

## Synopsis

**Background:** Non-citizens and an employer relying on foreign temporary employees brought action challenging Department of Public Safety rules governing the issuance of driver's licenses to non-citizen drivers. The 345th Judicial District Court, Travis County, Orlinda Naranjo, J., temporarily enjoined Department from implementing and enforcing the rules. Department appealed.

**Holdings:** The Court of Appeals, Diane M. Henson, J., held that:

[1] where valid rule challenges were raised under the Administrative Procedure Act (APA), the trial court had subject-matter jurisdiction to consider claims for both declaratory and injunctive relief;

[2] APA waives agency's immunity with respect to challenges to the validity of an agency rule;

[3] internal memorandum providing that non-citizen driver's licenses were to be produced in a non-standard vertical format was not a "rule" subject to challenge under APA;

[4] plaintiffs did not have standing to challenge internal memorandum under Uniform Declaratory Judgments Act (UDJA);

[5] employer and non-citizens whose visas were issued for a period of less than one year had standing to challenge new rules under APA; and

[6] plaintiffs failed to establish entitlement to temporary injunction.

Reversed.

## Attorneys and Law Firms

 **\*900** Erika M. Kane, Assistant Attorney General, Austin, TX, for Appellants.

David G. Hinojosa, Mexican American Legal Defense & Educational Fund, Inc., San Antonio, for Appellees.

Before Chief Justice JONES, Justices WALDROP and HENSON.

## OPINION

DIANE M. HENSON, Justice.

The Texas Department of Public Safety, the Interim Director of the Texas Department of Public Safety, [1] and the Chairman of the Public Safety Commission (collectively, the "Department"), appeal from the trial court's order granting a temporary injunction sought by appellees Miguel Salazar, Edgar Soria, Francisco Avila Trejo, Eustolio Galvan, Jose Gomez, and Green Meadows Landscaping (collectively, the "Appellees"). The trial court's order temporarily enjoined the Department from implementing and enforcing Rule 15.24, as amended, and Rule 15.171 of chapter 37 of the Texas Administrative Code. *See* 37 Tex. Admin. Code § 15.24 (2009) (Tex. Dep't of Pub. Safety, Identification of Applicants) (hereinafter, "Rule 15.24"); *id.* § 15.171 (2009) (Tex. Dep't of Pub. Safety, Issuance of Driver Licenses & Identification Certificates to Non-citizens) (hereinafter, "Rule 15.171"). The trial court further enjoined the Department from issuing driver's licenses that are temporary or different in appearance from standard driver's licenses to individuals on the basis that they are not citizens or legal permanent residents of the United States or on the basis that they are legal permanent residents with an expiration date on their permanent resident card.

**\*901** We hold that the Appellees' claims, with the exception of the challenges to Rules 15.24 and 15.171 brought by Green Meadows, Salazar, Soria, and Trejo, are barred by sovereign immunity. With respect to those claims that are not barred by sovereign immunity, we hold that the trial court abused its discretion in granting injunctive relief. Accordingly, we reverse the trial court's order issuing the temporary injunction.

## BACKGROUND

The Department is authorized to adopt rules necessary to administer chapter 521 of the transportation code, governing the issuance of driver's licenses. *See* Tex. Transp. Code Ann. §§ 521.005, .291 (West 2007) (delegating rulemaking authority to the Department). Transportation code section 521.142 provides that an application for a driver's license must include any "information the [D]epartment requires to determine the applicant's identity, competency, and eligibility." *Id.* § 521.142(e) (West Supp. 2009); *see also id.* § 521.142(a) (requiring "presentation of proof of identity satisfactory to the [D]epartment"). Rule 15.24 describes the types of documents considered satisfactory proof of identity. In 2008, the Department amended the type of primary identification document described in subsection (1)(D) of Rule 15.24 from an "unexpired United States Bureau of Citizenship and Immigration Services document" to an "unexpired United States Bureau of Citizenship and Immigration Services document issued for a period of at least one year and must be valid for not less than six (6) months from the date presented to the [D]epartment with a completed application." [2]

Also in 2008, the Department adopted Rule 15.171, titled "Issuance of Driver Licenses and Identification Certificates to Non-citizens." Rule 15.171 provides that if an applicant has less than six months remaining on his lawful admission period in the United States, no driver's license may be issued. Rule 15.171(a)(2). The rule further provides that if the applicant's lawful admission period is more than six months but less than the full term of a driver's license, the applicant will be issued a driver's license "with a status date displayed that coincides with the expiration of the applicant's lawful admission period in the United States." *Id.* at (a)(1). If the applicant's lawful admission period has an indefinite expiration date, the driver's license will be issued with a status date of one year from the date of the application. *Id.* at (a)(3). If the applicant cannot show valid documentation of a change or extension within 45

days from the status date, his driver's license will be cancelled. *Id.* at (c).

In September 2008, the Department issued an internal memorandum stating that licenses issued to certain non-citizen drivers would differ in appearance from standard driver's licenses by being vertically oriented and bearing a stamp stating, "Temporary Visitor." The memorandum further provided that such licenses would display the license holder's status date as required by Rule 15.171. This memorandum was never memorialized in a Department rule.

In response to the Department's amendment of Rule 15.24, adoption of Rule 15.171, and September 2008 internal memorandum, the Appellees filed suit seeking declaratory and injunctive relief under the **\*902** Uniform Declaratory Judgments Act (UDJA), *see* Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001–.011 (West 2008), and section 2001.038 of the Administrative Procedure Act (APA), *see* Tex. Gov't Code Ann. § 2001.038 (West 2008).

The Appellees alleged that the enforcement of Rules 15.24 and 15.171 and the Department's policies as outlined in the memorandum would cause them probable injury. Specifically, Appellees Salazar, Soria, and Trejo assert that they are authorized workers under the federal H–2B work visa program, but cannot obtain driver's licenses under the new rules because their visas are only valid for ten months at a time. [3] Appellee Green Meadows, a landscaping business that relies on temporary employees working in the U.S. on H–2B work visas, alleges that the Department's new rules have prevented its H–2B workers from obtaining Texas driver's licenses, and therefore precluded Green Meadows from employing them as foremen, as that position requires the ability to drive work crews from one job site to another. Because of the resulting shortage of foremen, Green Meadows contends that it has been forced to forego obligations owed to its landscaping customers. Appellee Gomez, who holds a Class B commercial driver's license and resides in the United States with temporary protected status, alleges that he has been denied a Class A driver's permit as a result of the Department's new rules, despite having taken and passed the required written examination. [4] Finally, Appellee Galvan, a legal permanent resident of the United States, alleges that he was harmed by the Department's new rules and policies when he was mistakenly issued a non-standard driver's license indicating that he is a temporary visitor to the United States.

After a hearing, the trial court granted the Appellees' request for a temporary injunction, and this appeal followed. On appeal, the Department argues that the trial court did not have subject-matter jurisdiction to grant the temporary injunction because the Appellees' claims are barred by sovereign immunity. The Department further argues even if the trial court did have subject-matter jurisdiction, it abused its discretion in granting the temporary injunction.

## STANDARD OF REVIEW

 **[1]**  **[2]**  We review the grant or denial of a temporary injunction for an abuse of discretion. *See Walling v. Metcalfe, 863 S.W.2d 56, 58 (Tex.1993)* ("The decision to grant or deny a temporary writ of injunction lies in the sound discretion of the trial court, and the court's grant or denial is subject to reversal only for a clear abuse of that discretion."). A trial court abuses its discretion when it acts arbitrarily, unreasonably, and without reference to guiding rules or principles, or misapplies the law to the established facts of the case. *See Walker v. Gutierrez, 111 S.W.3d 56, 63 (Tex.2003); Walker v. Packer, 827 S.W.2d 833, 840 (Tex.1992)* (orig. proceeding).

 **[3]**  **[4]**  Sovereign immunity from suit defeats a trial court's subject-matter jurisdiction. **\*903** *State v. Gonzalez, 82 S.W.3d 322, 327 (Tex.2002).* Whether a trial court has subject-matter jurisdiction is a question of law we review de novo. *Westbrook v. Penley, 231 S.W.3d 389, 394 (Tex.2007).*

## DISCUSSION

### *Jurisdiction*

### 1. Subject–Matter Jurisdiction Under the APA
In its first issue on appeal, the Department contends that the Appellees' claims are barred by sovereign immunity. Specifically, the Department argues that the Appellees have failed to assert a valid ultra vires claim sufficient to waive sovereign immunity. *See City of El Paso v. Heinrich, 284 S.W.3d 366, 372 (Tex.2009)* (describing "ultra vires exception" to sovereign immunity for suits alleging that state official acted without legal authority or failed to perform purely ministerial act).

 **[5]**  However, if the Appellees have raised valid challenges to the Department's rules under the APA, then we need not determine whether the Appellees have properly alleged ultra vires claims because the trial court's subject-matter jurisdiction is established by section 2001.038 of the APA. *See Tex. Gov't Code Ann. § 2001.038.* Section 2001.038 allows a party to bring a declaratory-judgment action challenging the validity or applicability of an agency rule if it is alleged that the rule or its threatened application interferes with or impairs a legal right or privilege of the plaintiff. *See id.* Section 2001.038 is considered a legislative grant of subject-matter jurisdiction, so that valid claims raised pursuant to that provision are not barred by sovereign immunity. *See Combs v. Entertainment Publ'ns, Inc., 292 S.W.3d 712, 720 (Tex.App.-Austin 2009, no pet.)* (collecting cases).

 **[6]**  The Department argues that because the APA only expressly authorizes declaratory actions challenging agency rules, it does not establish subject-matter jurisdiction with respect to requests for injunctive relief. While section 2001.038 does not expressly mention injunctive relief, this Court has held that injunctive relief against a state agency is available under the APA, stating:

> The Commission's final point on appeal is that the trial court's order is void for attempting to enjoin a state agency. Ordinarily, a plaintiff must sue an individual in authority to enjoin the activities of a state agency. However, as discussed above, the trial court's jurisdiction over this matter was founded on the APA. It was therefore empowered to issue an injunctive order.

*Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex., Inc., 997 S.W.2d 651, 659 (Tex.App.-Austin 1999, pet. dism'd w.o.j.)* (internal citations omitted); *see also Watson v. North Tex. Higher Educ. Auth., Inc., No. 03–00–00139–CV, 2000 WL 1534905, at \*9–10, 2000 Tex.App. LEXIS 7017, at \*30–31 (Tex.App.-Austin Oct. 19, 2000, pet. dism'd by agr.)* (mem. op.) (affirming trial court's denial of plea to jurisdiction on sovereign-immunity grounds in suit challenging agency rule under section 2001.038 and further affirming trial court's order temporarily enjoining agency from enforcing rule). Allowing plaintiffs to challenge the validity of an agency rule but barring injunctive relief preventing application of the challenged rule would defeat the purpose of section 2001.038, which "is to obtain a final declaration of a rule's validity *before* the rule is applied." *Rutherford Oil Corp. v. General Land Office, 776 S.W.2d*

232, 235 (Tex.App.-Austin 1989, no writ). Therefore, we hold that if the Appellees raised valid rule challenges under the APA, the trial court had subject-matter jurisdiction to consider their claims for **\*904** both declaratory and injunctive relief. To hold otherwise would nullify the relief afforded by section 2001.038 of the APA. *See id.* at 236 (stating that to hold that state agency could not be enjoined from applying rule subject to validity challenge would "wholly nullify" predecessor to section 2001.038 of APA).

 **[7]**     The Department further contends that in order to seek injunctive relief against the State, the Appellees must bring a valid ultra vires claim against a state official, as opposed to the agency itself. *See Heinrich,* 284 S.W.3d at 373. We disagree. While the supreme court held in *Heinrich* that certain types of ultra vires suits must be brought against a state official, rather than the State or its subdivisions, the court noted that this rule did not apply to "claims challenging the validity of ordinances or statutes," because the UDJA "requires that the relevant government entities be made parties, and thereby waives immunity" for such validity claims. *Id.* at 373 n. 6 (citing Tex. Civ. Prac. & Rem.Code Ann. § 37.006(b)). Similarly, the APA requires that the relevant state agency be made a party to any action challenging the validity of an agency rule, and thereby waives the agency's immunity with respect to such rule challenges. Tex. Gov't Code Ann. § 2001.038(c) ("The state agency must be made a party to the action.").

### 2. Does the APA Apply?

 **[8]**     Having determined that subject-matter jurisdiction is established by the APA for agency rule challenges, we must now determine whether the Appellees actually raised valid rule challenges under the APA in this case. As a preliminary matter, section 2001.038 requires that the challenged action be "a rule." *See* Tex. Gov't Code Ann. § 2001.038(a). While there is no doubt that Rules 15.24 and 15.171 are agency rules, a closer examination is required to determine whether the Department's September 2008 internal memorandum qualifies as a "rule" that may be challenged under the APA.

Section 2001.003 of the APA defines a rule as a state agency statement of general applicability that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency." Tex. Gov't Code Ann. § 2001.003(6) (West 2008). The definition of a rule "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *Id.* The Department's September 2008 memorandum describes internal procedures

to be taken by Department staff in order to comply with Rule 15.171 and outlines the methods by which non-citizens are to be issued driver's licenses indicating "status dates" as required by that rule. *See* Rule 15.171. The complained-of portion of the memorandum is a statement that non-citizen driver's licenses will be produced "in a vertical card format with a red box around the photograph, a statement at the top of the card ('Temporary Visitor'), and a secondary statement near the photograph which will include the [ ] status expiration date." Because the inclusion of a status date is required by Rule 15.171, the memorandum does not reflect rulemaking in connection with that issue, but merely reiterates what is already contained in Rule 15.171. The question then becomes whether the "Temporary Visitor" designation and the vertical format of the licenses described in the memorandum constitute improper agency rulemaking.

 **[9]**     **[10]**     **[11]**     Not every administrative pronouncement is a rule within the meaning of the APA. *See Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994). In order to be considered statements of "general applicability" as described in **\*905** section 2001.003(6), agency pronouncements must "affect the interest of the public at large such that they cannot be given the effect of law without public input." *Railroad Comm'n v. WBD Oil & Gas Co.,* 104 S.W.3d 69, 79 (Tex.2003). Agency statements that "have no legal effect on private persons" are not considered rules. *Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764, 770 (Tex.App.-Austin 1999, no pet.).

The Appellees have not identified any public interest in ensuring that all qualified applicants receive a horizontally oriented driver's license or a driver's license free from any "Temporary Visitor" designation. [5] The Appellees have also failed to identify any legal effect on private persons as a result of the Department's policy. It is undisputed that the vertically oriented driver's licenses, including the "Temporary Visitor" designation, remain valid Texas driver's licenses, despite their non-standard appearance. The Department's internal policy regarding the appearance of driver's licenses as outlined in the memorandum does not affect the interest of the public such that it cannot be altered without public input, nor does it have any legal effect on private persons. On that basis, we hold that the Department's September 2008 memorandum does not qualify as a rule under the APA. *See WBD Oil & Gas Co.,* 104 S.W.3d at 79; *Brinkley,* 986 S.W.2d at 770; *see also* Tex. Gov't Code Ann. § 2001.003(6).

Because the Department's internal memorandum does not qualify as a rule under the APA, section 2001.038 does not confer subject-matter jurisdiction on the trial court to consider the Appellees' request for declaratory and injunctive relief with respect to the memorandum. *See generally Entertainment Publ'ns,* 292 S.W.3d at 723 (first resolving issue of whether agency action constituted rule under APA in the affirmative before concluding that trial court had jurisdiction to consider validity challenge).

### 3. Subject–Matter Jurisdiction Under the UDJA: The September 2008 Memorandum

 **[12]**   **[13]**   **[14]**   While the Appellees also seek relief under the UDJA, the UDJA is not a general waiver of sovereign immunity and does not enlarge a trial court's jurisdiction. *See Heinrich,* 284 S.W.3d at 370; *State of Texas v. BP Am. Prod. Co.,* 290 S.W.3d 345, 360 (Tex.App.-Austin 2009, pet. filed). Therefore, if the memorandum represents an act within the legal authority and discretion of the Director, any challenge to the memorandum represents an attempt to control state action and is barred by sovereign immunity. *See Heinrich,* 284 S.W.3d at 372. On the other hand, if a party alleges, and can ultimately prove, that a state official has acted outside his legal authority, that party's ultra vires claims are considered attempts to reassert the control of the State and are not barred by sovereign immunity. [6] *See id.*

 ***906*** **[15]**   **[16]**   However, because the Appellees lack standing under the UDJA, we need not reach the issue of whether they have raised a valid ultra vires claim alleging acts beyond the Director's authority. While private parties may seek declaratory relief in connection with an alleged ultra vires act, "[a] declaratory judgment requires a justiciable controversy as to the rights and status of parties actually before the court for adjudication, and the declaration sought must actually resolve the controversy." *Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 163–64 (Tex.2004). To establish standing under the UDJA, the Appellees must show "a particularized, legally protected interest that is actually or imminently affected by the alleged harm." *Save Our Springs Alliance, Inc. v. City of Dripping Springs,* 304 S.W.3d 871, 882 (Tex.App.-Austin 2010, no pet. h.). As discussed above, the Appellees have not alleged any cognizable legal effect on private persons as a result of the Department's September 2008 memorandum, as it merely alters the appearance of certain driver's licenses. The Appellees have not shown that receipt of a Texas driver's license that is standard in appearance, as opposed to vertically oriented and stamped

with a "Temporary Visitor" designation, is a recognizable legally protected interest. On that basis, we hold that the Appellees have not established standing to challenge the Department's September 2008 memorandum under the UDJA, and therefore that the trial court lacked subject-matter jurisdiction to resolve the issue.

### 4. Standing Under the APA: Rules 15.24 and 15.171

 **[17]**   We now turn to the question of whether the Appellees have standing to challenge Rules 15.24 and 15.171 under the APA. [7] In order to have standing under section 2001.038, the Appellees must have alleged that the challenged rules or their threatened application "interfere[ ] with or impair [ ], or threaten[ ] to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code Ann. § 2001.038.

 **[18]**   While a driver's license is not a legal right, it is considered a privilege. *See Texas Dep't of Pub. Safety v. Schaejbe,* 687 S.W.2d 727, 728 (Tex.1985). Appellees Salazar, Soria, and Trejo have all alleged that due to their immigration status, they are not eligible to obtain Texas driver's licenses under Rules 15.24 and 15.171. Under these rules, a non-citizen's immigration documentation from the federal government must have been originally issued for a period of at least one year. Salazar, Soria, and Trejo work in the United States through the federal H–2B program on visas issued for a period of approximately ten months. While they generally receive extensions from the federal government, the fact that their visas are originally issued for a period of less than a year prevents them from obtaining a Texas driver's license under the new rules. As a result, Salazar, Soria, and Trejo have demonstrated that the new rules interfere with their privilege to obtain a Texas driver's license, giving them standing to challenge ***907*** the rules under section 2001.038 of the APA.

 **[19]**   Green Meadows alleges that it relies on H–2B workers in conducting its landscaping business, and that due to the seasonal nature of its business, the H–2B visas it requests for its workers are valid for a period of ten months. Because the visas held by the H–2B workers employed by Green Meadows are valid for less than one year, these workers are precluded from obtaining a Texas driver's license under the new rules. According to Green Meadows, it cannot employ workers without driver's licenses as foremen, because the foremen must be able to drive work crews from one job site to another. Green Meadows further contends that the

resulting shortage of foremen has prevented it from fulfilling obligations to its landscaping customers.

The ability of an employer to participate in federal guest-worker programs, such as the H–2B program, is a privilege created by federal law. *See* 8 U.S.C.A. § 1101(a)(15)(H)(ii)(a) (West Supp. 2009). Green Meadows has alleged that the Department's new rules threaten to impair this privilege by preventing its H–2B employees from obtaining Texas driver's licenses, thus limiting Green Meadows's ability to utilize these employees in its business. Therefore, we hold that Green Meadows has sufficiently established standing to challenge the new rules under the APA.

 [20]     Appellee Gomez, who holds a Texas Class B commercial driver's license, alleges that he was denied a Class A driver's permit in March 2009 as a result of the Department's new rules, despite having taken and passed the required written examination. The record reflects that Gomez's immigration documentation is valid from March 10, 2009, to September 9, 2010. Gomez testified at the temporary-injunction hearing that he applied for the Class A permit sometime in March 2009. When asked whether he applied for a Class A permit before or after March 10, 2009, Gomez responded, "I think before." However, the trial court later asked Gomez whether he provided the immigration document entered into evidence—the document reflecting that his valid immigration status extends from March 10, 2009, to September 9, 2010—when applying for the license, and Gomez answered, "Correct." It is unclear why Gomez was denied the Class A permit, as his immigration document was valid for more than one year at the time it was issued and remained valid for more than six months at the time he applied for the license. If the problem stemmed from his applying for the license prior to the March 10, 2009 effective date of his immigration document, it would have been remedied on that date, and in fact, Gomez's immigration document remains sufficient to obtain a license under the new rules until March 2010, at which time it will no longer have six months of validity remaining. Because Gomez has not established that Rules 15.24 and 15.171 have interfered with or impaired his ability to obtain a Class A license, we hold that he lacks standing to challenge Rule 15.24 and 15.171 under the APA. [8]

 [21]     Similarly, appellee Galvan has not established that the Department's new rules have impaired or interfered with a legal right or privilege. The Department concedes that Galvan, as a legal permanent resident of the United States,

was entitled to a standard license reflecting an expiration **\*908** date six years from the date it was issued, but that he was issued a vertically oriented license stamped "Temporary Visitor" by mistake. While this turn of events is unfortunate, it is not an indication Rule 15.24 or Rule 15.171 impairs or interferes with or threatens to impair or interfere with Galvan's legal privilege to obtain a Texas driver's license. Therefore, Galvan has not established standing to challenge these rules. [9]

In light of the foregoing, we hold that the trial court properly exercised subject-matter jurisdiction over the challenges to Rules 15.24 and 15.171 brought by Green Meadows, Salazar, Soria, and Trejo under section 2001.038 of the APA. The Appellees' challenge to the Department's September 2008 memorandum, Gomez and Galvan's rule challenges, and all claims raised pursuant to the UDJA, are dismissed for want of jurisdiction.

***Temporary Injunction***
 [22]     We now turn to the Department's second issue on appeal, in which it argues that the trial court abused its discretion in determining that the Appellees established the elements necessary to entitle them to a temporary injunction. [10] *See Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993) (stating that trial court's decision to grant or deny temporary injunction is reviewed for abuse of discretion). "To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002).

In support of the argument that they would suffer a probable, imminent, and irreparable injury in the absence of a temporary injunction, Salazar, Soria, and Trejo contend that the Department's new rules prevent them from obtaining Texas driver's licenses, which in turn prevents them from receiving promotions at work and forces them to rely on others for transportation to work or to obtain medical care if needed. Green Meadows argues that application of the Department's rules would disrupt its business by restricting the number of employees that can act as foremen and drive work crews to various job sites.

The Department asserts, however, that even viewing the evidence in the light most favorable to the trial court's order, as we must to do in reviewing a temporary injunction, *see*

*CRC–Evans Pipeline Int'l, Inc. v. Myers,* 927 S.W.2d 259, 262 (Tex.App.-Houston [1st Dist.] 1996, no writ), the Appellees have failed to establish a probable, imminent, and irreparable injury that they would suffer in the absence of a temporary injunction.

 **[23]** **[24]** **[25]** **[26]** Establishing probable, imminent, and irreparable injury requires proof of an actual threatened injury, as opposed to a speculative or purely conjectural one. *Dallas General Drivers, Warehousemen & Helpers v. Wamix, Inc.,* 156 Tex. 408, 295 S.W.2d 873, 879 (1956). Fear or apprehension of possible injury is insufficient to support a finding of imminent injury. *Frey v. DeCordova Bend Estates Owners Ass'n,* 647 S.W.2d 246, 248 (Tex.1983). The question of whether a probable, imminent, **\*909** and irreparable injury exists to warrant injunctive relief is a legal question for the court. *Operation Rescue–National v. Planned Parenthood,* 975 S.W.2d 546, 554 (Tex.1998). Furthermore, a temporary injunction will not be granted "where there is a plain and adequate remedy at law." *McGlothlin v. Kliebert,* 672 S.W.2d 231, 232 (Tex.1984).

 **[27]** **[28]** To the extent Salazar, Soria, and Trejo cite their inability to drive in Texas for purposes of driving to work, obtaining food and other necessities, or seeking medical care if necessary, there are alternatives to a standard Texas driver's license that create an adequate remedy to this potential harm. Section 521.030 of the transportation code provides that a non-resident from an approved country of residence who holds a license in his or her country of residence may rely on that reciprocal license to legally drive in Texas without obtaining a Texas driver's license. Tex. Transp. Code Ann. § 521.030 (West 2007). Mexico, the country of residence for Salazar, Soria, and Trejo, is on the list of approved countries for the use of reciprocal licenses. *See* 37 Tex. Admin. Code § 15.91(b)(6) (2009) (Tex. Dep't of Pub. Safety, Int'l Reciprocity). Rule 15.91 also provides that "[r]eciprocal privileges are limited to private vehicles. Carriage of ... goods other than personal baggage of the occupants of the vehicles is not authorized." *Id.* § 15.91(d)(2). This would appear to exclude any transporting of landscaping work crews and their equipment. However, for everyday driving purposes, the statute and regulation authorizing reciprocal licenses foreclose Salazar, Soria, and Trejo from arguing that in the absence of a temporary injunction, they would suffer imminent, irreparable injury for which there is no adequate remedy. [11]

 **[29]** Salazar, Soria, and Trejo further argue that because they are unable to obtain Texas driver's licenses, they are unable to seek promotions at work, as the position of foreman requires a driver's license. Salazar, Soria, and Trejo have presented no evidence that they are otherwise qualified or eligible for a promotion to the position of foreman. As a result, their inability to seek a possible promotion without a Texas driver's license does not represent an imminent injury, but a speculative or merely conjectural one. *See Butnaru,* 84 S.W.3d at 204 (stating that applicant for temporary injunction has burden of pleading and proving probable, imminent, and irreparable injury). Therefore, we hold that Salazar, Soria, and Trejo do not meet the required elements of temporary injunctive relief.

 **[30]** Similarly, Green Meadows's assertion that it will eventually run out of employees eligible to work as foremen is merely conjectural, and does not represent the type of imminent, irreparable injury required to qualify for temporary injunctive relief. Furthermore, while Green Meadows argues that it is harmed by its inability to promote from within the company, there is no indication that Green Meadows is in any way precluded from hiring additional employees who possess valid Texas driver's licenses to serve as foremen. As a result, Green Meadows has **\*910** not shown that its inability to promote from within creates a probable, imminent, and irreparable injury for which there is no other adequate remedy.

Based on our conclusion that the Appellees have failed to establish the existence of a probable, imminent, irreparable injury for which there is no adequate remedy, we hold that the trial court abused its discretion in temporarily enjoining the Department from enforcing Rules 15.171 and 15.24.

## CONCLUSION

We hold that the challenges to Rules 15.24 and 15.171 brought by Green Meadows, Salazar, Soria, and Trejo are not barred by sovereign immunity. However, because the necessary elements for temporary injunctive relief were not met, we reverse the trial court's order issuing injunctive relief with respect to those claims. All of Appellees' remaining claims are dismissed for lack of subject-matter jurisdiction on the basis of sovereign immunity.

Footnotes

1 We substitute Lt. Col. Lamar Beckworth, in his official capacity, as successor to Stanley E. Clark, former director of the Texas Department of Public Safety. *See* Tex.R.App. P. 7.2.

2 Since 2006, subsection (1)(F) of Rule 15.24 has provided that a federally issued Form I–94 could only be used to establish identity if it was originally issued for at least one year and has at least six months of validity remaining at the time of the license application. Subsection (1)(F) is not at issue in this appeal.

3 The federal H–2B program allows employers in non-agricultural businesses to petition the federal government for permission to hire temporary labor and service workers from other countries if those positions cannot be filled by persons in the United States. *See* 8 U.S.C.A. § 1101(a)(15)(H)(ii)(a) (West Supp.2009).

4 Temporary protected status (TPS) is granted to eligible nationals of designated countries who are temporarily unable to safely return to their home country because of ongoing armed conflict, an environmental disaster, or other extraordinary and temporary condition. *See id.* § 1254a (West 2005).

5 Licenses issued to individuals under the age of 21 are vertically oriented as required by statute. *See* Tex. Transp. Code Ann. § 521.123 (West 2007) (requiring Department to "orient the information on the license to clearly distinguish the [under 21] license from a license that is issued to a person who is 21 years of age or older").

6 As the supreme court explained in *Heinrich,* ultra vires suits may only be brought against the relevant government actors in their official capacity, rather than the state agency itself. *See* 284 S.W.3d at 373. Therefore, even if we determine that the Appellees have raised a valid ultra vires claim with respect to the September 2008 memorandum, that claim remains barred by sovereign immunity to the extent it is brought against any party other than the Director of the Department.

7 To the extent the Appellees also seek relief under the UDJA in connection with these rule challenges, we dismiss those claims for want of jurisdiction on the ground that a party may not seek relief under the UDJA when such relief would be redundant to relief under the APA. *See Texas State Bd. of Plumbing Exam'rs v. Associated Plumbing–Heating–Cooling Contractors of Tex., Inc.,* 31 S.W.3d 750, 753 (Tex.App.-Austin 2000, pet. dism'd by agr.) ("When a plaintiff files a proceeding that only challenges the validity of an administrative rule, the parties are bound by the APA and may not seek relief under the UDJA because such relief would be redundant.").

8 For the same reason, even if we considered Gomez's rule challenge to be a valid ultra vires claim under the UDJA, he has failed to establish a justiciable controversy and therefore lacks standing under the UDJA as well.

9 Like Gomez, Galvan has also failed to establish a justiciable controversy that would give him standing under the UDJA in the event of a valid ultra vires claim regarding the Department's rules.

10 In light of our holding on the jurisdictional question, we need only determine whether Green Meadows, Salazar, Soria, and Trejo established the elements necessary to entitle them to a temporary injunction, as the remaining appellees have been dismissed.

11 Based on the testimony provided at the temporary-injunction hearing, it appears that Salazar holds a license from Mexico, but that Soria and Trejo do not. However, the question at issue here is whether an adequate remedy is available, not whether the parties have actually availed themselves of that remedy. Furthermore, "[t]he lack of an adequate remedy is not shown by the mere fact that the remedy provided would involve more expense or delay." *Kendall Appraisal Dist. v. Cordillera Ranch, Ltd.,* No. 04–03–00150–CV, 2003 WL 21696901, at *3, 2003 Tex.App. LEXIS 6293, at *10 (Tex.App.-San Antonio July 23, 2003, no pet.) (citing *Canadian Helicopters Ltd. v. Wittig,* 876 S.W.2d 304, 306 (Tex.1994)).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

355 S.W.3d 618
Supreme Court of Texas.

TEXAS DEPARTMENT OF
TRANSPORTATION, Petitioner,
v.
Roger SEFZIK, Respondent.

No. 08–0943.  |  Oct. 21, 2011.

## Synopsis

**Background:** Applicant for permit to erect outdoor-advertising sign brought suit against Texas Department of Transportation (TxDot), seeking declaration that Administrative Procedure Act's (APA's) provisions governing "contested cases" applied to TxDot's denial of his application and alleging that denial of contested-case proceeding violated due process. The 53rd District Court, Travis County, Suzanne Covington, J., granted TxDot's plea to jurisdiction based on sovereign immunity. Applicant appealed. The Corpus Christi - Edinburg Court of Appeals, 267 S.W.3d 127, affirmed in part and reversed and remanded in part. Review was granted.

**[Holding:]** The Supreme Court held that the sovereign immunity of the Texas Department of Transportation was not waived.

Court of Appeals reversed in part; remanded to trial court.

## Attorneys and Law Firms

**\*619** Beth Ellen Klusmann, Assistant Solicitor General, Betsy Jane Johnson, Office of the Attorney General, Austin, James C. Ho, Gibson Dunn & Crutcher LLP, Dallas, David S. Morales, Office of the Attorney General of Texas, Deputy First Assistant Attorney General, Kent C. Sullivan, 14th Court of Appeals, Greg W. Abbott, Attorney General and Clarence Andrew Weber, Kelly Hart & Hallman LLP, Austin, for Texas Department of Transportation.

J. Allen Smith, Scott J. Conrad, Bradley E. McLain, Settle Pou, Dallas and Clyde Russell Woody, Hartzog Conger Cason & Neville, Oklahoma City, OK, for Roger Sefzik.

## Opinion

PER CURIAM.

 **[1]**   At issue in this case is whether sovereign immunity bars Roger Sefzik's lawsuit seeking declaratory relief under the Uniform Declaratory Judgments Act (UDJA) against the Texas Department of Transportation (TxDOT). In *City of El Paso v. Heinrich,* we dismissed claims **\*620** seeking declaratory and injunctive relief against governmental entities as barred by sovereign immunity. 284 S.W.3d 366, 380 (Tex.2009). The court of appeals relied on our pre-*Heinrich ultra vires* precedent to conclude that declaratory judgment actions do not implicate sovereign immunity. We reverse and hold that state agencies, like TxDOT here, are immune from suits under the UDJA unless the Legislature has waived immunity for the particular claims at issue. However, because Sefzik's claim was filed pre-*Heinrich,* we remand the case to the trial court so that Sefzik has a reasonable opportunity to assert an *ultra vires* claim against state officials.

In March 2005, Sefzik filed a permit application with TxDOT to erect an outdoor advertising sign along Interstate 30. A few weeks later, another company filed a similar application, seeking to create a sign in the same area. After reviewing the conflicting applications, TxDOT found that Sefzik's permit was invalid. Under former section 21.142 of the Texas Administrative Code, applicants for sign permits were required to verify that a sign would be near adjacent commercial or industrial activities that had been open for at least ninety days. *See* 43 TEX. ADMIN. CODE § 21.142(2)(K), (30) (2008) (Tex. Dep't of Transp., Definitions) *repealed* 36 Tex. Reg. 2418 (2011) (proposed Dec. 2, 2010). When TxDOT received Sefzik's application, one of the businesses he listed was only open for seventy-eight days. TxDOT denied Sefzik's application and approved the competing bid.

Sefzik appealed to TxDOT's Executive Director, Michael Behrens, and requested an oral hearing. Behrens denied Sefzik's appeal without holding a hearing, and explained that TxDOT had discretion to deny Sefzik's invalid permit application. Sefzik filed a motion for rehearing, arguing, *inter alia,* that he was entitled to a hearing under the Administrative Procedure Act's (APA) "contested case" procedures. *See* TEX. GOV'T CODE § 2001.051. TxDOT did not respond, and the motion was eventually overruled by operation of law.

Sefzik then filed suit against TxDOT but did not join Behrens or any other TxDOT official. Sefzik sought relief under the

UDJA, requesting that the district court declare the APA's "contested case" procedures entitled him to a hearing. [1] TxDOT filed a plea to the jurisdiction, arguing that sovereign immunity barred Sefzik's suit. The district court granted the plea to the jurisdiction and denied Sefzik's motion for a new trial. Sefzik appealed.

A divided court of appeals reversed, holding that declaratory judgment claims do not implicate sovereign immunity and thus TxDOT was a proper party to the UDJA action. 267 S.W.3d 127, 132–34 ("[W]hen a private plaintiff merely seeks a declaration of his or her rights under a statute, such an action is not subject to a sovereign immunity defense, and a waiver or consent to suit is unnecessary."). Having concluded that the UDJA does not implicate sovereign immunity, the court of appeals did not decide whether the UDJA or the APA waives immunity.

 **[2]**    **[3]**    **[4]**    Reviewing the immunity question de novo, *see Harris County Hosp. Dist. v. Tomball Reg'l Hosp.,* 283 S.W.3d 838, 842 (Tex.2009), we conclude that, under *Heinrich,* sovereign immunity bars UDJA actions against the state and its political subdivisions absent a legislative waiver. *Heinrich* clarified an area of the law that had been unclear, namely, the intersection between the doctrine of sovereign immunity and the *ultra vires* exception to it. While the doctrine of sovereign immunity originated to protect the public fisc from unforeseen expenditures that could hamper governmental functions, *see Tex. Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 854 (Tex.2002), it has been used to shield the state from lawsuits seeking other forms of relief, *see, e.g., W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 839 (1958) ("[T]he rule of state immunity from suit without its consent applies to suits under the Uniform Declaratory Judgments Act...."). Concomitant to this rule, however, is the *ultra vires* exception, under which claims may be brought against a state official for nondiscretionary acts unauthorized by law. *See, e.g., Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 404 (Tex.1997). Such lawsuits are not against the state and thus are not barred by sovereign immunity. *Id.*

 **[5]**    In *Heinrich,* we addressed which governmental entities —the state, its subdivisions, or the relevant government actors in their official capacities—are proper parties to a suit seeking declaratory relief for an *ultra vires* action. 284 S.W.3d at 371–73. Heinrich sued the City of El Paso and various government officials, claiming the defendants violated her statutory rights when they altered her pension benefits. *Id.* at 369–70. She

asked the courts to declare that the defendants acted without authority in taking such action. *Id.* Our precedent made clear that "suits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity." *Id.* at 372. While we recognized that these suits are against the state for all practical purposes, we held that they "cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity." *Id.* at 373. Thus, we allowed Heinrich to pursue claims for prospective relief against the state officials, but we dismissed the claims against the city and the other governmental entities. *Id.* at 379–80.

 **[6]**    **[7]**    **[8]**    Two points from *Heinrich* are relevant here. First, *Heinrich* held that the proper defendant in an *ultra vires* action is the state official whose acts or omissions allegedly trampled on the plaintiff's rights, not the state agency itself. *Id.* at 372–373. Sefzik did not sue any state official. [2] Instead, he argues that the court of appeals correctly exempted UDJA actions seeking a declaration of rights from the application of the sovereign immunity doctrine. The second point from *Heinrich* dictates otherwise. As noted, we dismissed Heinrich's claims seeking declaratory and injunctive relief against governmental entities, brought under the UDJA, because the entities were immune. In so doing, we necessarily concluded that the UDJA does not waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute or other law. Very likely, the same claim could be brought against the appropriate state official under the *ultra vires* exception, but the state agency remains immune. *See id.* at 372–73. As we have consistently stated, the UDJA does not enlarge the trial court's jurisdiction **\*622** but is "merely a procedural device for deciding cases already within a court's jurisdiction." *Tex. Parks & Wildlife Dep't v. Sawyer Trust,* 354 S.W.3d 384, 388 (2011) (quoting *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993)). Accordingly, the underlying action, if against the state or its political subdivisions, must be one for which immunity has expressly been waived.

 **[9]**    **[10]**    **[11]**    Although the UDJA waives sovereign immunity in particular cases, Sefzik's claim does not fall within the scope of those express waivers. For example, the state may be a proper party to a declaratory judgment action that challenges the validity of a statute. *Heinrich,* 284 S.W.3d at 373 n. 6 (citing TEX. CIV. PRAC. & REM.CODE § 37.006(b)); *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 697–98 (Tex.2003); *Tex. Educ. Agency v. Leeper,* 893 S.W.2d 432, 446 (Tex.1994). [3] But Sefzik is not challenging

the validity of a statute; instead, he is challenging TxDOT's actions under it, and he does not direct us to any provision of the UDJA that expressly waives immunity for his claim.[4]

 **[12]**     Sefzik also suggests that the APA provides a guide for analyzing the application of sovereign immunity to his case. The APA's declaratory judgment provision allows a plaintiff to challenge the validity or applicability of a rule. *See* TEX. GOV'T CODE § 2001.038(a), (c) ("The validity or applicability of a rule ... may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs ... a legal right or privilege of the plaintiff.... The state agency must be made a party to the action."). While the APA may waive sovereign immunity, an issue we do not decide here, Sefzik does not challenge the validity or applicability of any agency *rule.* Instead, he challenges the application of the APA's contested case procedures, which are established by *statute.* As noted in his brief, Sefzik's claim is broader than the APA's scope. Moreover, the APA's mechanism for seeking a declaration of rights does not trump *Heinrich*'s conclusion that the state is generally immune from declaratory actions brought under the UDJA. Accordingly, section 2001.038 does not carry Sefzik's claim over the hurdle of sovereign immunity.

In the event that we reverse the court of appeals' judgment, Sefzik urges this Court to remand the case so that he can replead an *ultra vires* claim within the trial court's jurisdiction. If given that opportunity, Sefzik asserts he would plead a claim against TxDOT officials for improperly denying his permit. As mentioned previously, under the former Administrative Code provisions governing this case, applicants for sign permits were required to verify that a sign would be near adjacent commercial or industrial activities which had **\*623** been open for at least ninety days. *See* 43 TEX. ADMIN. CODE § 21.142(2)(K), (30) (2008) (Tex. Dep't of Transp., Definitions) *repealed* 36 Tex. Reg. 2418 (2011) (proposed Dec. 2, 2010). The Administrative Code

went on to provide that "[p]ermits will be considered on a first-come, first-serve basis." *Id.* § 21.150 (2008) (Tex. Dep't of Transp., Permits) *repealed* 36 Tex. Reg. 2418 (proposed Dec. 2, 2010). If the first application was denied, the Administrative Code specified that other applications would be considered "between the time a denied application is returned to the applicant and the time it is resubmitted." *Id.* Sefzik contends that his application was the only one on file on the 90th day; thus, in denying his permit, TxDOT officials failed to perform a purely ministerial duty.

 **[13]**     When this Court upholds a plea to the jurisdiction on sovereign immunity grounds, we allow the plaintiff the opportunity to replead if the defect can be cured. *See, e.g., Sawyer Trust,* 354 S.W.3d. at 392 (citing *Tex. A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 840 (Tex.2007)). As mentioned, Sefzik did not sue any state officials; however, Sefzik brought his claim pre-*Heinrich.* As we have observed, our decisions prior to *Heinrich* were "less than clear" as to who the proper party was in a suit for declaratory remedy, as well as the parameters of the *ultra vires* exception to the doctrine of sovereign immunity. *See Heinrich,* 284 S.W.3d at 373. In light of our clarifications to this area of the law in *Heinrich,* Sefzik should have an opportunity to replead in an attempt to cure the jurisdictional defects in his petition. We thus remand the case to allow Sefzik this opportunity without expressing any opinion on the merits of such a claim. *See Sawyer Trust,* 354 S.W.3d at 393.

Accordingly, without hearing oral argument, TEX. R. APP. P. 59. 1, we reverse in part the court of appeals' judgment, and remand the case to the trial court in accordance with this opinion.

Justice JOHNSON did not participate in the decision.

**Parallel Citations**

55 Tex. Sup. Ct. J. 42

---

Footnotes

1     Sefzik also alleged that TxDOT's actions violated his due process and equal protection rights under the United States and Texas Constitutions. The court of appeals ultimately affirmed the district court's dismissal on those issues, 267 S.W.3d at 135–38, and Sefzik did not petition this Court to review that decision.

2     Although Sefzik refused to apply the *ultra vires* label to his suit below, that is the underlying nature of his claim. The relief he seeks —a declaration that he is entitled to a hearing—is directly related to whether Behrens acted outside the scope of his authority in denying a hearing. That is, Sefzik ultimately wishes to compel a government official (Behrens) to perform some act that he considers to be nondiscretionary (holding a hearing). That relief falls within the *ultra vires* rationale.

3       We have recognized this waiver because the UDJA expressly requires joinder of the governmental unit. *See* TEX. CIV. PRAC. & REM.CODE § 37.006(b) ("In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party ... and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also be served with a copy of the proceeding and is entitled to be heard."); *Leeper,* 893 S.W.2d at 446 ("The DJA expressly provides that ... governmental entities must be joined or notified."). This reasoning is consistent with the requirement that the Legislature expressly waive immunity with "clear and unambiguous" language. TEX. GOV'T CODE § 311.034; *Taylor,* 106 S.W.3d at 696.

4       On "rare occasions," we may recognize a waiver absent explicit language. *Taylor,* 106 S.W.3d at 697. Sefzik has not argued that we should infer a waiver of immunity under the UDJA, so we do not consider that possibility.

**End of Document**                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

848 S.W.2d 298
Court of Appeals of Texas,
Austin.

UNIVERSITY INTERSCHOLASTIC

LEAGUE and Bailey Marshall, Appellants,

v.

Bruce LaFeyette BUCHANAN, et al., Appellees.
UNIVERSITY INTERSCHOLASTIC LEAGUE
and Dr. Bailey Marshall, Appellants,

v.

Phillip Earl BOMAR, Jr., et al., Appellees.

Nos. 3–92–108–CV, 3–92–161–CV.   |   Feb. 3,
1993.   |   Rehearing Overruled March 31, 1993.

Learning disabled high school athletes sought to permanently enjoin organization regulating high school athletics from enforcing rule precluding participation by athletes over 19 years old. The 331st and 53rd Judicial District Courts, Travis County, B.B. Schraub, J., granted the injunction, and organization appealed. The Court of Appeals, Kidd, J., held that: (1) athletes were "disabled" under Rehabilitation Act; (2) organization failed to reasonably accommodate athletes by not allowing exceptions to rule; (3) students' failure to exhaust remedies under Individuals with Disabilities Education Act did not deprive trial court of jurisdiction; and (4) "public interest exception" to mootness doctrine permitted review.

Affirmed.

**Attorneys and Law Firms**

**\*299** William C. Bednar, Jr., Eskew, Muir & Bednar, Austin, for University Interscholastic League.

James R. Raup, McGinnis, Lochridge & Kilgore, Austin, for Austin Independent School Dist. and Dr. Jim Hensley.

Diane M. Henson, Graves, Dougherty, Hearon & Moody, Austin, for Bruce LaFeyette Buchanan and Phillip Earl Bomar, Jr.

Leonard J. Schwartz, Schwartz & Eichelbaum, P.C., Austin, for Dallas Independent School Dist. and Dr. Marvin E. Edwards.

Before CARROLL, C.J., and JONES and KIDD, JJ.

**Opinion**

KIDD, Justice.

The University Interscholastic League and its Executive Director, Bailey Marshall, **\*300** (collectively hereinafter the "UIL") appeal the judgment of the trial court granting a permanent injunction against the enforcement of the UIL's over–19 rule. [1] We will affirm the judgment of the district court.

**FACTUAL BACKGROUND**

Composed of representatives of Texas school districts, the UIL is a voluntary organization that regulates, among other things, the competitive athletics of the junior and senior high school student athletes in Texas. This case involves a challenge to section 400(a) of the UIL Constitution and Contest Rules (the "over–19 rule") which states: "Subject to the other sections of this subchapter, an individual is eligible to participate in a League varsity contest as a representative of a participant school if that individual ... is less than 19 years old on September 1 preceding the contest...."

The UIL states that the underlying purpose of the over–19 rule is to ensure the safety of the participating student athletes and the equality of competitors. It argues that one policy justification for the over–19 rule is the avoidance of potential injury which might result if younger, less developed high school students are required to compete against older students. Furthermore, the UIL argues that the over–19 rule discourages the practice of "redshirting," i.e., having students repeat grades so that they will be more mature and better athletes during their high school years. The UIL permits no exception to or waiver of the over–19 rule based on special circumstances of individual students.

Appellees, Bruce Buchanan and Phillip Bomar (the "Students"), obtained permanent injunctions allowing them to participate in the 1991 football season. The final judgments rendered in these causes stated that the over–19 rule violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West Supp.1992) ("Section 504"), as applied to the Students. Section 504 provides in pertinent part:

> No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of

this title, shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

[29 U.S.C.A. § 794](#).

The factual bases for the permanent injunctions involving the Students are as follows.

**Bruce Buchanan**

Buchanan turned nineteen years old before he entered the twelfth grade at Travis High School of the Austin Independent School District ("Austin ISD"). Because he had learning disabilities, he had repeated the first and seventh grades. During ninth grade, Buchanan began participating in his school's football program. Although he was nineteen at the start of his senior year, Buchanan was below the average weight and height of his team members, and he never was a starter on the team.

Both Buchanan's mother and his Admission, Review and Dismissal (ARD) Committee [2] requested a waiver from the over–19 rule. The UIL responded that there were "no rules which allow for a waiver of the 19–year–old rule." Buchanan instituted this lawsuit against the UIL and its director, and later joined Austin ISD and Dr. **\*301** Jim Hensley, the Superintendent of Austin ISD, as defendants in the suit to enjoin the enforcement of the rule.

**Phillip Bomar**

Bomar was also nineteen years of age at the start of his senior year. He had repeated his fourth and seventh grades, and was classified by his school district, Dallas Independent School District ("Dallas ISD"), as learning disabled. Like Buchanan, Bomar began playing football for his high school, Justin F. Kimball High School. Bomar was average in size compared to the other members of his football team and was a starting linebacker during his junior year of high school.

Bomar's mother and high school principal applied for a waiver of the over–19 rule for Bomar, which the UIL refused. In response, Bomar filed this action against the UIL, its director, Dallas ISD, and Dr. Marvin Edwards, the Superintendent of Dallas ISD.

**CROSS–CLAIMS OF THE SCHOOL DISTRICTS**

Both school districts filed cross-claims against the UIL, stating that the UIL's mandatory forfeiture rule caused them to violate the rights of the Students. Section 700(a)(2)(C)(ii) of the UIL Constitution and Contest Rules (the UIL's "mandatory forfeiture rule") provides that if a school allows a student who is finally determined ineligible to participate in a UIL contest under a court order, the school must forfeit all contests in which the student participated. In the past, the UIL has enforced the mandatory forfeiture rule to require that a school forfeit all of its contests in which the litigating student participated even though the student's participation was pursuant to a lawful court-ordered injunction. [3]

In October 1991, the trial court issued temporary orders enjoining the enforcement of the over–19 rule against the Students and the mandatory forfeiture rule against Austin ISD and Dallas ISD. These two causes were then consolidated for purposes of trial and appeal. After a trial on the merits, the district court rendered a final judgment in favor of the Students and the school districts, enjoining the enforcement of the two rules.

From this judgment, the UIL appeals bringing forth four points of error.

**IMPACT OF THE REHABILITATION ACT ON THE OVER–19 RULE**

**[1]** **[2]** In order to obtain injunctive relief, an applicant must establish the existence of a wrongful act, imminent harm, and irreparable injury, and the absence of an adequate remedy at law. *Hues v. Warren Petroleum Co.,* 814 S.W.2d 526, 529 (Tex.App.—Houston [14th Dist.] 1991, writ denied); *Priest v. Texas Animal Health Comm'n,* 780 S.W.2d 874, 875 (Tex.App.—Dallas 1989, no writ). The decision to grant or deny a permanent injunction lies within the trial court's sound discretion, and appellate review is restricted to whether the action involved a clear abuse of discretion. *Hues,* 814 S.W.2d at 529; *Priest,* 780 S.W.2d at 875.

**[3]** **[4]** The UIL argues in its first two points of error that the trial court erred in granting the permanent injunctions against the over–19 rule and in awarding attorneys' fees. [4] In

its first point of error, the UIL alleges that the rule does not discriminate solely on the basis of the Students' handicaps; the UIL maintains that the Students are ineligible due to their ages which are determined by their birth dates. The rule and its purposes, it contends, apply equally to both handicapped and non-handicapped students.

**\*302** We agree that the UIL's enforcement of its over–19 rule as to these Students was not on the basis of a current handicap or because of a history of being handicapped. However, the record clearly demonstrates that both Students repeated grades in school because of learning disabilities. Had they not experienced difficulties in the classroom and progressed through school at a pace slower than most students, they would have turned nineteen after September 1 of their senior year and thus would have been age-eligible to participate in interscholastic athletics.

The United States District Court, in *Doe v. Marshall,* 459 F.Supp. 1190 (S.D.Tex.1978), *vacated and remanded on other grounds,* 622 F.2d 118 (5th Cir.1980), *cert. denied,* 451 U.S. 993, 101 S.Ct. 2336, 68 L.Ed.2d 855 (1981),[5] invoked a balancing test of the harms inflicted upon the various parties in its determination of whether to grant a preliminary injunction of a UIL rule. *Id.* at 1192. In the present cases, evidence demonstrated that the Students would benefit emotionally by participating in competitive athletics. The evidence did not show that these Students had been involved in redshirting or that they presented a danger to other student athletes; the concerns that made the rule necessary are not present in these causes and the UIL is not harmed. Thus, the equities before the trial court weighed in favor of enjoining the enforcement of the rule.

The United States Supreme Court has stated that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers.... [T]o assure meaningful access, *reasonable accommodations* in the grantee's program or benefit may have to be made." *Alexander v. Choate,* 469 U.S. 287, 301, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985) (discussing *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)) (emphasis added). Furthermore, the United States Court of Appeals in *Brennan v. Stewart,* 834 F.2d 1248, 1262 (5th Cir.1988), concluded that "our precedent requires that the 'reasonable accommodation' question be decided as an issue of fact...."

Although the UIL provides a waiver procedure for some eligibility rules, e.g., the four-year eligibility rule, it fails to furnish such a process for the over–19 rule. Since the UIL already utilizes a waiver procedure for some rules, the evidence indicates that instituting such a procedure for the over–19 rule might be a reasonable accommodation in the UIL program to ensure that handicapped persons achieve meaningful access to the competitions regulated by the UIL. We find the U.S. District Court's reasoning on this issue in *Booth v. University Interscholastic League,* No. A–90–CA–764 (W.D.Tex. Oct. 4, 1990) (case dismissed as moot Jan. 14, 1991), particularly persuasive:

> [T]o uphold the [UIL's] blanket policy against consideration of the Plaintiff's circumstances in this case would be to undermine the objectives of the Rehabilitation Act without advancing the policies behind the 19 year-old eligibility rule. There is no evidence before the Court to suggest that the [UIL] bases its decision to bar the Plaintiff from playing high school football on any particular harm that might result if he is allowed to play, or on anything other than a policy of strictly enforcing its rules. But the Rehabilitation Act *requires* that federally assisted programs do more for those who fall within its ambit. For these reasons, requiring the [UIL] to give special consideration to the Plaintiff based on his history of being handicapped is a reasonable accommodation.

*Booth,* at 11–12. The Students in these causes are entitled to special consideration by the UIL to guarantee that the objectives of Section 504 are effectuated. A waiver mechanism for the over–19 rule would permit the UIL to consider the facts of particular situations in order to make individualized determinations as to the enforcement of the rule. Such determinations are *reasonable accommodations* which would advance both the purposes of Section 504 and the policies behind the over–19 rule. Under **\*303** these factual circumstances, the "no-exception" policy to the over–19 rule must yield to Section 504's reasonable accommodation requirement established by the United States Supreme Court in *Alexander.*

Accordingly, we hold that the trial court did not abuse its discretion in enjoining the enforcement of the over–19 rule. Points of error one and two are overruled.

### EXHAUSTION OF REMEDIES

 **[5]**    In its third point of error, the UIL alleges that, because the Students did not exhaust the administrative remedies under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C.A. §§ 1400–1484 (West Supp.1992), [6] the district court lacked jurisdiction over the causes. Specifically, it complains that the Students did not comply with section 1415(f) of the IDEA which states, "before the filing of a civil action under [the Rehabilitation Act and] such laws seeking relief that is also available under this subchapter, the procedures under subsections (b)(2) and (c) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter." 20 U.S.C.A. § 1415(f). The applicable remedy under this statute consists of a due process hearing and subsequent review for any complaint raised by a handicapped child or its parents regarding the child's education. 20 U.S.C.A. § 1415(b)(2), (c). The UIL maintains that the Students did not comply with this prerequisite for civil suits because they did not request a due process hearing to contest the exclusion of interscholastic athletics from their IEPs. [7]

The Students respond that the IDEA and Section 504 are different statutes with different purposes. They urge that while the IDEA strives to assure that handicapped children receive appropriate free public education, Section 504 prohibits discrimination against handicapped persons. *See Smith v. Robinson,* 468 U.S. 992, 1016, 104 S.Ct. 3457, 3470, 82 L.Ed.2d 746 (1984). The Students argue that their complaint is against the UIL for discrimination on the basis of their handicaps, not against the school districts for denial of a free appropriate public education; hence, relief was only available under Section 504. They argue that, because the UIL is not vested with the duty to provide a free appropriate public education under the IDEA, the Students could not assert their action against the UIL under the IDEA. The record reflects that the school districts applied to the UIL for waivers to the rule which the UIL denied. Therefore, the Students and their school districts acted in accordance with the UIL rules, and the cause of action was governed by Section 504 and not the IDEA. We agree with the Students regarding this exhaustion of remedies point, and thus we overrule the UIL's third point of error.

### MANDATORY FORFEITURE RULE

In its fourth and final point of error, the UIL contends that the trial court erred in enjoining the mandatory forfeiture rule and in awarding attorneys' fees. It insists that "the rule is reasonably related to a legitimate state purpose and is not arbitrary, capricious, or fundamentally unfair."

#### Issue of Mootness

The Students reurge this Court to dismiss the appeal as moot. [8] They argue that since the 1991 football season has ended and they have graduated, an active controversy **\*304** no longer exists. The school districts respond by urging that such action on our part would vacate the trial court's judgment and would permit the UIL to invoke the sanctions contained in the mandatory forfeiture rule.

 **[6]**    **[7]**    **[8]**    The mootness doctrine is well established. Appellate courts only determine cases in which an actual controversy exists. *Camarena v. Texas Employment Comm'n,* 754 S.W.2d 149, 151 (Tex.1988); *Texas Educ. Agency,* 797 S.W.2d at 369. The issue of whether an injunction is valid becomes moot when the injunction does not continue to have effect. *See Parr v. Stockwell,* 322 S.W.2d 615, 616 (Tex.1959); *Texas Educ. Agency,* 797 S.W.2d at 369; *Spring Branch I.S.D. v. Reynolds,* 764 S.W.2d 16, 18 (Tex.App.— Houston [1st Dist.] 1988, no writ). An appellate court must set aside the judgment and dismiss the cause when an appeal is moot. *Texas Educ. Agency,* 797 S.W.2d at 369; *Texas Parks & Wildlife Dep't v. Texas Ass'n of Bass Clubs,* 622 S.W.2d 594, 596 (Tex.App.—Austin 1981, writ ref'd n.r.e.).

 **[9]**    Two exceptions to the mootness doctrine currently exist: (1) the "capable of repetition exception" and (2) the "collateral consequences exception." *General Land Office v. OXY U.S.A., Inc.,* 789 S.W.2d 569, 571 (Tex.1990). However, neither exception applies to these causes. *See Spring Branch I.S.D.,* 764 S.W.2d at 18–19.

The UIL urges this Court to avoid dismissal by adopting a new exception to the mootness doctrine, the "public interest exception." According to the UIL, thirty-six states have recognized the "public interest exception," which allows appellate review of a question of considerable public importance if that question is capable of repetition between either the same parties or other members of the public but for

some reason evades appellate review. The UIL points out that other states have applied this doctrine in high school athletic controversies such as this one.

In *Texas Education Agency,* 797 S.W.2d at 369, under similar facts as these, we determined that the appeal was moot because the football eligibility of the litigating students had expired. *See also Spring Branch I.S.D.,* 764 S.W.2d at 18. However, these cases are distinguishable from the instant cause. In neither of those cases was the question of attorneys' fees involved. [9] Furthermore, in the instant cause, the school districts, which are parties to this appeal, have a direct interest in the continued viability of the district court judgment to prevent the UIL from enforcing the mandatory forfeiture rule. *See Mahavongsanan v. Hall,* 529 F.2d 448 (5th Cir.1976) (Student brought action to compel university to grant a degree. After injunctive relief was granted, university awarded degree and appealed the judgment. The Fifth Circuit Court of Appeals held that the case was not moot because the legal interests of the parties continued to be adverse.). Therefore, because of these distinguishing facts, we have decided to review the case pursuant to a "public interest

exception" to the mootness doctrine, and adhere to our earlier ruling overruling the Students' motion to dismiss the appeal as moot.

Because we elect to review these causes under the "public interest exception" to the mootness doctrine, and because we affirm the lower court's final judgment that the over–19 rule violates Section 504 of the Rehabilitation Act, we affirm the district court's ruling that the Students were eligible to play football during the 1991 season. Therefore, since there is no basis for the UIL to invoke the mandatory forfeiture rule, we have no need to address its fourth point of error.

### CONCLUSION

Finding no error, the judgment of the district court is affirmed.

**Parallel Citations**

81 Ed. Law Rep. 1145, 1 A.D.D. 742, 3 NDLR P 263

Footnotes

1    As a preliminary matter, we address the Students' motion to dismiss this appeal as moot. For reasons discussed later in this opinion, we decline to dismiss the appeal as moot.

2    The ARD Committee is composed of, at a minimum, a school administrator, a special education teacher, a regular education teacher, and the child's parent. Other persons may be included in the ARD Committee if determined to be necessary. One of the functions of the ARD Committee is to develop an individualized educational plan (IEP) for the student. Buchanan's IEP did not include interscholastic football as part of his program. Buchanan never petitioned for an administrative appeal of the decision of the ARD Committee to the Texas Education Agency. Buchanan's mother testified that because the ARD Committee recommended a waiver from the over–19 rule, she agreed with its decision, and thus did not feel it was necessary to appeal the decision.

3    *See Texas Educ. Agency v. Dallas Indep. Sch. Dist.,* 797 S.W.2d 367, 369 (Tex.App.—Austin 1990, no writ). (This Court held that the appeal in that case was moot, and therefore the underlying order was vacated. Accordingly, the UIL's determination of ineligibility became final and triggered the enforcement of the mandatory forfeiture rule).

4    As a preliminary matter, the UIL contends in its second point of error that the Students do not meet the definition of "qualified handicapped persons" under section 504 of the Rehabilitation Act. After reviewing the Act and its attendant regulations, we reject this argument and conclude that both students meet the definition of "qualified handicapped persons."

5    Although not controlling, this Court looks to federal precedent for its persuasive value.

6    Among the stated purposes of IDEA are
        to assure that all children with disabilities have available to them, within the time periods specified in section 1412(2)(B) of this title, a free appropriate public education which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of children with disabilities and their parents or guardians are protected....
        20 U.S.C.A. § 1400(c).

7    The UIL admitted in oral argument that had the school districts declared the Students eligible under the IDEA, the UIL would not have abided by such determination. We also note that the school districts requested waivers from the UIL of the over–19 rule, and therefore the Students had no need to invoke an administrative procedure designed to request affirmative action from the school authorities.

8    We overruled the Students' original motion to dismiss as moot.

9    If we moot this appeal and the judgment of the district court is vacated, the judgment for attorneys' fees is vacated as well.

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

210 S.W.3d 770
Court of Appeals of Texas,
Corpus Christi–Edinburg.

VALLEY BAPTIST MEDICAL CENTER, Appellant,

v.

Margaret STRADLEY, Appellee.

No. 13–06–191–CV.  |  Nov. 30, 2006.

**Synopsis**
**Background:** Patient whose doctor recommended exercise routine and referred her to medical center's fitness center brought premises liability and negligence claims against medical center after she fell from treadmill at fitness center and sustained injuries. The 107th District Court, Cameron County, Benjamin Euresti, Jr., J., denied medical center's motion to dismiss. Medical center appealed.

**[Holding:]** The Court of Appeals, Valdez, C.J., held that patient's claims were not health care liability claims that required her to submit an expert report in support of her claims.

Affirmed.

**Attorneys and Law Firms**

**\*771** Scott T. Clark, Adams & Graham, Harlingen, for appellant.

Don Stecker, Putman & Putman, Inc., San Antonio, for appellee.

Before Chief Justice VALDEZ and Justices RODRIGUEZ and GARZA.

**OPINION**

Opinion by Chief Justice VALDEZ.

Valley Baptist Medical Center (“VBMC”), appellant, brings an interlocutory appeal from the trial court's denial of its motion to dismiss the underlying cause of action. Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(9) (Vernon Supp.2006). Margaret Stradley, appellee, has filed a motion asking this

Court to dismiss the appeal for lack of jurisdiction. By four issues, VBMC asks us to determine whether: (1) Stradley's allegation that VBMC was negligent in its safety practices alleges a departure from “accepted standards of safety” such that she is making a health care liability claim and is required to provide an expert report; (2) in light of the current definition of “health care liability claim” and the Texas Supreme Court's *Diversicare* opinion, claims based on the safety practices of health care providers must **\*772** involve conduct that is “directly related to health care” or “an inseparable part of the rendition of health care services” in order to be subject to the medical liability chapter of the Texas Civil Practice and Remedies Code; (3) dismissal for lack of an expert report is an affirmative defense; and (4) VBMC waived its right to seek dismissal for lack of an expert report. We affirm the trial court's denial of VBMC's motion to dismiss.

**I. BACKGROUND**

**A. Factual Background**
The underlying cause of action stems from a fall Stradley had on a treadmill at VBMC's Wellness Center, a fitness center located on the campus of Valley Baptist Medical Center. At the time of the incident, Stradley was a 78 year-old retiree who was having weight, hypertension, and mobility issues. Her primary care physician “prescribed” exercise and referred Stradley to the Wellness Center. During one of her visits to the center, Stradley attempted to use a treadmill. It is alleged that the treadmill unexpectedly accelerated and when Stradley pulled the emergency stop cord, the treadmill did not stop. Stradley was allegedly thrown to the floor by the treadmill and injured her arm and shoulder.

**B. Procedural Background**
Stradley brought a premises liability claim and negligence causes of action against VBMC.[1] VBMC answered with a general denial of the allegations. It later filed a motion to dismiss. VBMC's motion to dismiss claimed Stradley's cause of action was really a health care liability claim, which is governed by the Texas Civil Practice and Remedies Code requirement that an expert medical report be filed within 120 days of when the claim was filed. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a)(Vernon Supp.2006). The trial court denied VBMC's motion to dismiss, stating in its order that “the underlying nature of this case is not a ‘health care liability claim’ [sic] as defined in Section 74.001 et. seq. Texas Civil Practice and Remedies Code and therefore,

Defendant's Motion to Dismiss should be denied." VBMC brings this appeal under the interlocutory appeal statute. Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(9)(Vernon Supp.2006) (providing that a person may appeal from an interlocutory order of a district court, county court at law, or county court that denies all or part of the relief sought by a motion under Section 74.351(b)). [2]

## II. DISCUSSION

### A. Stradley's Motion to Dismiss the Appeal

 [1]  The characterization of a claim as a health care liability claim is a threshold question in section 51.014 appeals. *See, e.g., Valley Baptist Med. Ctr. v. Azua,* No. 13–05–00488–CV, 2006 WL 2076756, at *2, 2006 Tex.App. LEXIS 6659, *5, 198 S.W.3d 810, 814 (Tex.App.-Corpus Christi July 27, 2004, no pet.) (not designated for publication) ("Although section 51.014(a)(9) **\*773** specifically authorizes an interlocutory appeal of the denial of relief sought under section 74.351(b), section 74.351 applies only to 'health care liability claims.' Therefore, we must first determine if appellant's claim constitutes a health care liability claim."); *see also Oak Park, Inc. v. Harrison,* No. 11–05–00298–CV, 2006 Tex.App. LEXIS 8096, *7 (Tex.App.-Eastland July 27, 2004, no pet.) (not designated for publication). Therefore, Stradley's motion to dismiss for lack of jurisdiction is denied.

### B. Standard of Review

 [2]  Generally, we review a trial court's order on a motion to dismiss under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). However, whether a claim is a health care liability claim pursuant to section 74.351 is a question of law and is reviewed *de novo. Buck v. Blum,* 130 S.W.3d 285, 290 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Ponce v. El Paso Healthcare Sys., Ltd.,* 55 S.W.3d 34, 36 (Tex.App.-El Paso 2001, pet. denied); *Gomez v. Matey,* 55 S.W.3d 732, 735 & n. 2 (Tex.App.-Corpus Christi 2001, no pet.). The dismissal order states that "the underlying nature of this case is not a 'health care liability claim' [sic] as defined in Section 74.001 et. seq. Texas Civil Practice and Remedies Code and therefore, Defendant's Motion to Dismiss should be denied." We shall review the statutory interpretation question presented by VBMC's motion to dismiss *de novo.*

### C. The Categorization of Safety Claims

The first two issues are so interrelated and dispositive to this appeal that they will be dealt with together. Through its second issue, VBMC contends that the trial court erred in denying its motion to dismiss because all claims based on safety practices ("safety claims") against a health care provider should be categorized as health care liability claims under chapter 74's definition of a health care liability claim. VBMC contends every safety claim against a health care provider or physician would be a health care liability claim if the safety claim asserts departures from "accepted standards of safety." In essence, VBMC urges us to read the definition of a health care liability claims as "*a cause of action against a health care provider* or physician *for* treatment, lack of treatment, or other claimed *departure from accepted standards of* medical care, or health care, or *safety* or professional or administrative services directly related to health care...." Tex. Civ. Prac. & Rem.Code Ann. § 74.001(13)(Vernon 2005) (emphasis added). It primarily relies upon the holding in *Diversicare* to support its reading of chapter 74. *See Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 855 (Tex.2005).

### 1. Safety Claims Under the MLIIA: The Diversicare Case

The Texas Supreme Court recently dealt with how safety violation allegations could be categorized as health care liability claims under the Medical Liability and Insurance Improvement Act ("MLIIA"), chapter 74's precursor. *Id.* at 842. In *Diversicare,* Maria Rubio, through her daughter as next friend, sued her nursing home for injuries that occurred from two alleged falls and for alleged sexual assault against her by another nursing home patient. *Id.* at 845. The sexual assaults allegedly took place nearly five and a half years before suit was filed. *Id.* Diversicare moved for summary judgment on all of Rubio's claims arising from the alleged sexual assaults, arguing that the MLIIA's two-year statute of limitations barred recovery on the claims. *Id.* Rubio argued that because her claims were not health **\*774** care liability claims under the MLIIA, they were governed by the general statute of limitations for personal injury claims, which tolls the statute of limitations for mental incapacity. Tex. Civ. Prac. & Rem.Code Ann. §§ 16.001(b), 16.003 (Vernon).

A majority of the Supreme Court held that Rubio's causes of action were health care liability claims because the legislature meant to include all safety claims against health care providers or physicians within the scope of the MLIIA.

*Diversicare Gen. Partner, Inc.,* 185 S.W.3d at 853. The relevant statute at the time read:

> *a cause of action against a health care provider* or physician *for* treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or *safety* which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract.

*Former* Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4) (emphasis added). [3] The Supreme Court noted that, "[t]he Legislature's inclusion within the scope of the [MLIIA] of claims based on breaches of accepted standards of 'safety' expands the scope of the statute beyond what it would be if it only covered medical and health care." *Diversicare Gen. Partner, Inc.,* 185 S.W.3d at 855. The majority reasoned that a nursing home's provision of professional supervision, monitoring, and protection of the patient population necessarily implicated the standards of safety under the MLIIA. *Id.* at 850–51. However, the majority's opinion conceded that, "[t]here may be circumstances that give rise to premise liability claims in a healthcare setting that may not be properly classified as health care liability claims...." *Id.* at 854.

### 2. Safety Claims Under Chapter 74

The instant case is governed by chapter 74 of the Civil Practice and Remedies Code, which contains different language than that used in the *Diversicare* case. A health care liability claim under the current statute is defined as:

> *[A] cause of action against a health care provider* or physician *for* treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or *safety* or professional or administrative services *directly related to health care,* which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

Tex. Civ. Prac. & Rem.Code Ann. § 74.001(13) (Vernon 2005) (emphasis added). According to the Code Construction Act, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." Tex. Gov't Code Ann. § 311.011(a) (Vernon 2005).

The instant case is legally distinguishable from *Diversicare* because the statute in question has been revised. The MLIIA broadly defined health care liability claims because it not only included claims for treatment or lack of treatment, but it also included claims for "other claimed departure from accepted standards of medical care or health care or safety ...." *former* Tex.Rev.Civ. Stat. art. 4590i, § 1.03(a)(4). For, "the Legislature's inclusion within the scope of the MLIIA of claims based on breaches of accepted standards of 'safety' expands the scope of the statute beyond what it would be if it only covered medical and health care." *Diversicare Gen. Partner,* **\*775** *Inc.,* 185 S.W.3d at 854. We note that there was no comma separating the phrases medical care, health care, or safety and that a cause of action under the MLIIA must be one "which proximately results in injury to or death of the patient." *Id.*

The current statute covers three types of claims: treatment, care, and peripheral claims. Tex. Civ. Prac. & Rem.Code Ann. § 74.001(13). Claims involving treatment, lack of treatment, medical care, or health care against a health care provider or physician that proximately cause injury or death to a claimant are automatically categorized as health care liability claims. *Id.* Claims involving "safety or professional or administrative services" constitute the final type of possible health care liability claims contemplated by the statute. *Id.* These peripheral claims are not separated by commas, they are only separated by the disjunctive term "or," and therefore fall into the same class of claims. The phrase appearing right after the peripheral claims is "directly related to health care." Both the peripheral claims and the latter phrase are confined with each other by commas. Because we are mindful of the rules of grammar when reading a statute, we find the peripheral claims are tempered by the phrase "directly related to health care" because it appears immediately after that class of claims.

[3] Based upon a grammatically correct reading of the statute, we hold that a safety claim can be categorized as a health care liability claim only when it is against a health care provider or physician for a claimed departure from accepted standards of safety directly related to health care. *But see Diversicare Gen. Partner, Inc.,* 185 S.W.3d at 861 n. 4 (Jefferson, C.J., concurring in part, dissenting in part, and concurring in judgment) (in dicta the Chief Justice noted that, "[i]t is clear under the revised statute that claims for 'professional or administrative services' must be 'directly related to health care'; however, there is no indication that claims involving 'safety' must also relate to health care."). Holding otherwise and finding all safety claims against health care providers or physicians to be health care liability claims regardless of whether they directly relate to health care, would

be an arbitrary and legislatively unauthorized expansion of the health care liability statute.

### 3. Stradley's Claims

 [4]    [5]    [6]    Our final step in resolving VBMC's first two issues is to determine whether the underlying nature of Stradley's claims are safety claims that directly relate to health care. Artful pleading cannot avoid the requirements of section 74.351 when the essence of the suit is a health care liability claim. *Diversicare Gen. Partner, Inc.,* 185 S.W.3d at 849 ("It is well settled that a health care liability claim cannot be recast as another cause of action to avoid the requirements of the MLIIA"); *Garland Cmty. Hosp. v. Rose,* 156 S.W.3d 541, 543 (Tex.2004); *MacGregor Med. Ass'n v. Campbell,* 985 S.W.2d 38, 40 (Tex.1998). To determine whether a cause of action falls under chapter 74's definition of a health care liability claim, we examine the claim's underlying nature. *Id.* (citing *Sorokolit v. Rhodes,* 889 S.W.2d 239, 242 (Tex.1994)). One consideration in that determination may be whether proving the claim would require the specialized knowledge of a medical expert. *Garland Cmty. Hosp.,* 156 S.W.3d at 544 (citing *Rogers v. Crossroads Nursing Serv., Inc.,* 13 S.W.3d 417, 419 (Tex.App.-Corpus Christi 1999, no pet.)).

Stradley's premises liability claim and negligence causes of action stem from an accident she had while using a treadmill. They are personal injury claims of the most pedestrian nature. A jury could understand **\*776** the evidentiary issues and negligence standards posed by Stradley's claims without the aid of a medical expert's report. *See Rogers,* 13 S.W.3d at 419. Much has been made about Stradley's physician recommending an exercise routine and how such a recommendation might recast Stradley's claims into health care liability claims. The analogy is absurd. While exercise has a salutary effect on one's health, in most situations a doctor's recommendation of regular exercise is no more related to the rendition of health care than the automobile ride one makes for a doctor's appointment. *See, e.g., Shults v. Baptist St. Anthony's Hosp. Corp.,* 166 S.W.3d 502, 505 (Tex.App.-Amarillo 2005, pet. denied) (holding that the presence of a sharp paint chip in the shower of the plaintiff's hospital room could not be considered in any way an inseparable part of the medical services rendered to the plaintiff.).

Based upon the underlying nature of Stradley's claims, we hold that they do not constitute health care liability claims under the statute. We overrule VBMC's first and second issues.

### III. CONCLUSION

We affirm the trial court's order denying VBMC's motion to dismiss and remand the cause to the trial court for further proceedings. Because of our disposition of the VBMC's first and second issues, we need not address VBMC's third or fourth issues. *See* Tex.R.App. P. 47.1.

---

Footnotes

1    Stradley alleged that VBMC failed to (1) to adequately hire, train, and instruct its employees in the safe operation of exercise machines, (2) adequately inspect, repair, or maintain the machines, (3) supervise her use of the treadmill, and (4) warn her of the risks posed by the treadmill.

2    Section 74.351(b) of the Texas Civil Practice & Remedies Code reads, "If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall subject to Subsection (c), enter an order that...."

3    The legislature repealed the MLIIA, amended parts of the previous article 4590i, and recodified it in 2003 as chapter 74 of the Texas Civil Practice and Remedies Code. Act of June 2, 2003, 78th Leg., R.S., ch. 204, 2003 Tex. Gen. Laws 847.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle G. Attorneys
        Title 2, Subtitle G--Appendix
          a-1. Rules of Disciplinary Procedure (Refs & Annos)
            Part II. The District Grievance Committees

V.T.C.A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.10

2.10. Classification of Inquiries and Complaints

Currentness

The Chief Disciplinary Counsel shall within thirty days examine each Grievance received to determine whether it constitutes an Inquiry or a Complaint. If the Grievance is determined to constitute an Inquiry, the Chief Disciplinary Counsel shall notify the Complaint and Respondent of the dismissal. The Complainant may, within thirty days from notification of the dismissal, appeal the determination to the Board of Disciplinary Appeals. If the Board of Disciplinary Appeals affirms the classification as an Inquiry, the Complainant will be so notified and may within twenty days amend the Grievance one time only by providing new or additional evidence. The Complainant may appeal a decision by the Chief Disciplinary Counsel to dismiss the amended Complaint as an Inquiry to the Board of Disciplinary Appeals. No further amendments or appeals will be accepted. In all instances where a Grievance is dismissed as an Inquiry other than where the attorney is deceased or is not licensed to practice law in the State of Texas, the Chief Disciplinary Counsel shall refer the Inquiry to a voluntary mediation and dispute resolution procedure. If the Grievance is determined to constitute a Complaint, the Respondent shall be provided a copy of the Complaint with notice to respond, in writing, to the allegations of the Complaint. The notice shall advise the Respondent that the Chief Disciplinary Counsel may provide appropriate information, including the Respondent's response, to law enforcement agencies as permitted by Rule 6.08. The Respondent shall deliver the response to both the Office of the Chief Disciplinary Counsel and the Complainant within thirty days after receipt of the notice.

**Credits**

Adopted by orders of Feb. 26, 1991, and Oct. 9, 1991, eff. May 1, 1992. Amended by order of June 15, 1994, eff. Oct. 1, 1994. Renumbered from Rule 2.09 and amended by order of Dec. 29, 2003, eff. Jan. 1, 2004.

<An order of the Supreme Court dated Feb. 26, 1991, as amended by an order of the Supreme Court dated Oct. 9, 1991, adopted the Texas Rules of Disciplinary Procedure, eff. May 1, 1992.>

Notes of Decisions (6)

V. T. C. A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.10, TX ST RULES DISC P 2.10
Current with amendments received through August 15, 2014

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle G. Attorneys
        Title 2, Subtitle G--Appendix
          a-1. Rules of Disciplinary Procedure (Refs & Annos)
            Part II. The District Grievance Committees

V.T.C.A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.16

2.16. Confidentiality

Currentness

A. All members and staff of the Office of Chief Disciplinary Counsel, Board of Disciplinary Appeals. Committees, and Commission shall maintain as confidential all Disciplinary Proceedings and associated records, except that:

1. the pendency, subject matter, status of an investigation, and final disposition, if any, may be disclosed by the Office of Chief Disciplinary Counsel or Board of Disciplinary Appeals if the Respondent has waived confidentiality, the Disciplinary Proceeding is based on conviction of a serious crime, or disclosure is ordered by a court of competent jurisdiction;

2. if the Evidentiary Panel finds that professional misconduct occurred and imposes any sanction other than a private reprimand.

a. the Evidentiary Panel's final judgment is a public record from the date the judgment is signed; and

b. once all appeals, if any, have been exhausted and the judgment is final, the Office of Chief Disciplinary Counsel shall, upon request, disclose all documents, statements, and other information relating to the Disciplinary Proceeding that came to the attention of the Evidentiary Panel during the Disciplinary Proceeding;

3. the record in any appeal to the Board of Disciplinary Appeals from an Evidentiary Panel's final judgment, other than an appeal from a judgment of private reprimand, is a public record; and

4. facts and evidence that are discoverable elsewhere are not made confidential merely because they are discussed or introduced in the course of a Disciplinary Proceeding.

B. The deliberations and voting of an Evidentiary Panel are strictly confidential and not subject to discovery. No person is competent to testify as to such deliberations and voting.

C. Rule 6.08 governs the provision of confidential information to authorized agencies investigating qualifications for admission to practice, attorney discipline enforcement agencies, law enforcement agencies, the State Bar's Client Security Fund, the State

Bar's Lawyer Assistance Program, the Supreme Court's Unauthorized Practice of Law Committee and its subcommittees, and the Commission on Judicial Conduct.

**Credits**

Adopted by orders of Feb. 26, 1991, and Oct. 9, 1991, eff. May 1, 1992. Renumbered from Rule 2.15 and amended by orders of Dec. 29, 2003, eff. Jan. 1, 2004. Amended by order of Dec. 7, 2009, eff. Jan. 1, 2010.

<An order of the Supreme Court dated Feb. 26, 1991, as amended by an order of the Supreme Court dated Oct. 9, 1991, adopted the Texas Rules of Disciplinary Procedure, eff. May 1, 1992.>

Notes of Decisions (1)

V. T. C. A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 2.16, TX ST RULES DISC P 2.16
Current with amendments received through August 15, 2014

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle G. Attorneys
        Title 2, Subtitle G--Appendix
          a-1. Rules of Disciplinary Procedure (Refs & Annos)
            Part XV. Miscellaneous Provisions

V.T.C.A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 15.09

15.09. Immunity

[Currentness]

No lawsuit may be instituted against any Complainant or witness predicated upon the filing of a Grievance or participation in the attorney disciplinary and disability system. All members of the Commission, the Chief Disciplinary Counsel (including Special Assistant Disciplinary Counsel appointed by the Commission and attorneys employed on a contract basis by the Chief Disciplinary Counsel), all members of Committees, all members of the Board of Disciplinary Appeals, all members of the District Disability Committees, all officers and Directors of the State Bar, and the staff members of the aforementioned entities are immune from suit for any conduct in the course of their official duties. The immunity is absolute and unqualified and extends to all actions at law or in equity.

**Credits**

Adopted by orders of Feb. 26, 1991, and Oct. 9, 1991, eff. May 1, 1992. Amended by order of June 15, 1994, as corrected by order of Sept. 12, 1994, eff. Oct. 1, 1994. Renumbered from Rule 15.11 and amended by order of Dec. 29, 2003, eff. Jan. 1, 2004.

<An order of the Supreme Court dated Feb. 26, 1991, as amended by an order of the Supreme Court dated Oct. 9, 1991, adopted the Texas Rules of Disciplinary Procedure, eff. May 1, 1992.>

V. T. C. A., Govt. Code T. 2, Subt. G App. A-1, Disc. Proc., 15.09, TX ST RULES DISC P 15.09
Current with amendments received through August 15, 2014

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle G. Attorneys
        Title 2, Subtitle G--Appendix
          A. State Bar Rules
            Article X. Discipline and Suspension of Members
              Section 9. Texas Disciplinary Rules of Professional Conduct (Refs & Annos)
                Preamble: A Lawyer's Responsibilities

V.T.C.A., Govt. Code T. 2, Subt. G App. A, Art. 10, § 9, Preamble

Preamble: A Lawyer's Responsibilities

Currentness

1. A lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice. Lawyers, as guardians of the law, play a vital role in the preservation of society. The fulfillment of this role requires an understanding by lawyers of their relationship with and function in our legal system. A consequent obligation of lawyers is to maintain the highest standards of ethical conduct.

2. As a representative of clients, a lawyer performs various functions. As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system. As negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements of honest dealing with others. As intermediary between clients, a lawyer seeks to reconcile their divergent interests as an advisor and, to a limited extent, as a spokesperson for each client. A lawyer acts as evaluator by examining a client's affairs and reporting about them to the client or to others.

3. In all professional functions, a lawyer should zealously pursue clients' interests within the bounds of the law. In doing so, a lawyer should be competent, prompt and diligent. A lawyer should maintain communication with a client concerning the representation. A lawyer should keep in confidence information relating to representation of a client except so far as disclosure is required or permitted by the Texas Disciplinary Rules of Professional Conduct or other law.

4. A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.

5. As a public citizen, a lawyer should seek improvement of the law, the administration of justice and the quality of service rendered by the legal profession. As a member of a learned profession, a lawyer should cultivate knowledge of the law beyond its use for clients, employ that knowledge in reform of the law and work to strengthen legal education. A lawyer should be mindful of deficiencies in the administration of justice and of the fact that the poor, and sometimes persons who are not poor, cannot afford adequate legal assistance, and should therefore devote professional time and civic influence in their behalf. A lawyer should aid the legal profession in pursuing these objectives and should help the bar regulate itself in the public interest.

6. A lawyer should render public interest legal service. The basic responsibility for providing legal services for those unable to pay ultimately rests upon the individual lawyer, and personal involvement in the problems of the disadvantaged can be one

of the most rewarding experiences in the life of a lawyer. Every lawyer, regardless of professional prominence or professional workload, should find time to participate in or otherwise support the provision of legal services to the disadvantaged. The provision of free legal services to those unable to pay reasonable fees is a moral obligation of each lawyer as well as the profession generally. A lawyer may discharge this basic responsibility by providing public interest legal services without fee, or at a substantially reduced fee, in one or more of the following areas: poverty law, civil rights law, public rights law, charitable organization representation, the administration of justice, and by financial support for organizations that provide legal services to persons of limited means.

7. In the nature of law practice, conflicting responsibilities are encountered. Virtually all difficult ethical problems arise from apparent conflict between a lawyer's responsibilities to clients, to the legal system and to the lawyer's own interests. The Texas Disciplinary Rules of Professional Conduct prescribe terms for resolving such tensions. They do so by stating minimum standards of conduct below which no lawyer can fall without being subject to disciplinary action. Within the framework of these Rules many difficult issues of professional discretion can arise. The Rules and their Comments constitute a body of principles upon which the lawyer can rely for guidance in resolving such issues through the exercise of sensitive professional and moral judgment. In applying these rules, lawyers may find interpretive guidance in the principles developed in the Comments.

8. The legal profession has a responsibility to assure that its regulation is undertaken in the public interest rather than in furtherance of parochial or self-interested concerns of the bar, and to insist that every lawyer both comply with its minimum disciplinary standards and aid in securing their observance by other lawyers. Neglect of these responsibilities compromises the independence of the profession and the public interest which it serves.

9. Each lawyer's own conscience is the touchstone against which to test the extent to which his actions may rise above the disciplinary standards prescribed by these rules. The desire for the respect and confidence of the members of the profession and of the society which it serves provides the lawyer the incentive to attain the highest possible degree of ethical conduct. The possible loss of that respect and confidence is the ultimate sanction. So long as its practitioners are guided by these principles, the law will continue to be a noble profession. This is its greatness and its strength, which permit of no compromise.

**Credits**

Adopted by order of Oct. 17, 1989, eff. Jan. 1, 1990.

<The original Rules Governing the State Bar of Texas, consisting of former
articles 1 to 13, were approved by the Supreme Court February 22, 1940.>

<Articles 1 through 9 of the State Bar Rules were adopted and former articles 1 through 11 of the Rules
Governing the State Bar of Texas were repealed by Order of the Texas Supreme Court dated March 14, 1983.>

<Article 10 of the State Bar Rules was adopted and article 12, §§ 1 to 7 and 9 to 36, as well as
article 13, of the Rules Governing the State Bar were repealed by Order of the Texas Supreme
Court dated February 29, 1984, effective March 1, 1984. That same order also restated and
continued article 12, § 8, of the Rules Governing the State Bar (the Texas Code of Professional
Responsibility) and promulgated such art. 12, § 8 as article 10, § 9, of the State Bar Rules.>

<Article 11 of the State Bar Rules was adopted by order of the Texas Supreme Court dated May 9, 1984.>

<Article 12 of the State Bar Rules, effective June 1, 1986, was adopted
by order of the Texas Supreme Court dated December 19, 1985.>

<Article 13 of the State Bar Rules, effective May 15, 1988, was
adopted by order of the Texas Supreme Court dated March 14, 1988.>

V. T. C. A., Govt. Code T. 2, Subt. G App. A, Art. 10, § 9 Preamble, TX ST RPC Preamble
Current with amendments received through August 15, 2014

**End of Document**                                           © 2015 Thomson Reuters. No claim to original U.S. Government Works.